1               **UNITED STATES DISTRICT COURT**
                **DISTRICT OF NORTH DAKOTA**

2                 **SOUTHEASTERN DIVISION**

- - - - - - - - - - - - - - - - - -

3                                   )
  United States of America,     )

4                               )
         Plaintiff,     )

5                             )
       vs.           )**FILE NO. 3:09-cr-155-01**

6                         )         **3:09-cr-155-02**
  Ferris Lavelle Lee, a/k/a Vito,)     **3:09-cr-155-04**

7  Marcus Jermaine Royston,     )     **3:09-cr-155-08**
  a/k/a BD, Maurice M. Forest,  )

8  Jessica M. Dietz,         )
                                  )

9          Defendants.     )

- - - - - - - - - - - - - - - - - -

10

11

12

13               **T R A N S C R I P T**

14                   **O F**

15             **P R O C E E D I N G S**

16      **JURY TRIAL - VOLUME IX - MAY 24, 2010**

17          **Pages 1716-1828**

18

19

20

21

22  TAKEN AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
           655 FIRST AVENUE NORTH

23           FARGO, NORTH DAKOTA  58102

24  BEFORE:  THE HONORABLE RALPH R. ERICKSON

25  COURT REPORTER:  KELLY A. KROKE

```
 1                    A P P E A R A N C E S

 2   MR. CHRISTOPHER C. MYERS          COUNSEL FOR PLAINTIFF;
     MS. JULIE LAWYER
 3   Office of US Attorney
     655 1st Avenue North, Ste. 250
 4   Fargo, ND 58102

 5   MR. JOHN T. GOFF            COUNSEL FOR DEFENDANT LEE;
     Attorney at Law
 6   4650 38th Avenue South, Ste. 110
     Fargo, ND  58106
 7
     MR. STEVEN D. MOTTINGER    COUNSEL FOR DEFENDANT ROYSTON;
 8   Attorney at Law
     15 9th Street South
 9   Fargo, ND  58102

10   MR. JASON T. LOOS          COUNSEL FOR DEFENDANT FOREST;
     Attorney at Law
11   505 North Broadway, Ste. 208
     Fargo, ND  58102
12
     MS. CAREY A. GOETZ         COUNSEL FOR DEFENDANT DIETZ;
13   Attorney at Law
     316 North 5th Street
14   Bismarck, ND  58503

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                    W I T N E S S E S

 3   PLAINTIFF'S:                                  PAGE NO.

 4      BRAD STUVLAND

 5      Cross-Examination by Mr. Goff                1722
        Cross-Examination by Mr. Mottinger           1747
 6      Cross-Examination by Mr. Loos                1765
        Further Cross-Examination by Mr. Goff        1771
 7

 8   DEFENDANT'S:

 9      JAKE NORTHERN

10      Direct Examination by Mr. Goff              1795
        Cross-Examination by Mr. Mottinger          1815
11      Cross-Examination by Mr. Loos               1820

12      BEN LEINGANG

13      Direct Examination by Mr. Loos              1824

14

15

16                    E X H I B I T S

17   EXHIBIT NO.    DESCRIPTION           OFR'D   REC'D

18   Exhibit 28     CD/Audio Recording of  1733    1733
                    Debrief of Buy 5/28/09
19
     Exhibit 32     CD/Audio Recording of  1737    1737
20                  Debrief of Buy 5/28/09

21   Exhibit 122    CD/Audio Recording     1732    1732

22   Exhibit M      Transcript of 1st Debrief 1734 1735
                    5/28/09 (Exhibit 28)
23
     Exhibit N      Transcript of 2nd Debrief 1737 1737
24

25
```

**P R O C E E D I N G S**

(May 24, 2010:  The following proceedings commenced at 9:00 a.m.: In open court, all counsel and the Defendants present, outside the presence and hearing of the jury:)

THE COURT:  We're on the record in a case entitled United States of America versus Ferris Lee, Marcus Royston -- I don't remember Mr. Forest's first name.

DEFENDANT FOREST:  Take me off the case. Don't worry about it.

MR. MYERS:  Maurice.

THE COURT:  Maurice Forest, I'm sorry, and Jessica Dietz.  You'd think I'd remember that.  But anyhow present are the defendant, Mr. Lee, with his counsel, Mr. Goff; Mr. Royston with his counsel, Mr. Mottinger; Mr. Forest with his counsel, Mr. Loos; and Ms. Dietz with her counsel, Ms. Goetz.  Ms. Lawyer and Mr. Myers appear on behalf of the United States. We're outside the presence of the jury about to start the third week of this jury trial.

Is there anything that anyone wants to take up outside the presence of the jury before we get started?  Mr. Myers?

MR. MYERS:  No, Your Honor.

```
 1              THE COURT:  Mr. Goff?

 2              MR. GOFF:  No, Your Honor.

 3              THE COURT:  Mr. Mottinger?

 4              MR. MOTTINGER:  No, Your Honor.

 5              THE COURT:  Mr. Loos?

 6              MR. LOOS:  No, Your Honor.

 7              THE COURT:  Ms. Goetz?

 8              MS. GOETZ:  No, Your Honor.

 9              THE COURT:  All right.  Let's go ahead and

10   bring them in.

11              (In open court, all counsel and the

12   Defendants present, in the presence and hearing of the

13   jury:)

14              THE COURT:  We'll go on the record in a case

15   entitled United States of America versus Ferris Lee,

16   Marcus Royston, Maurice Forest and Jessica Dietz.  The

17   record should reflect that Mr. Lee appears personally

18   along with his counsel, Mr. Goff.  Mr. Forest appears

19   personally along with his counsel, Mr. Loos.

20   Mr. Royston appears personally along with his counsel,

21   Mr. Mottinger.  And Ms. Dietz appears personally along

22   with her counsel, Ms. Goetz.  Mr. Myers and Ms. Lawyer

23   appear on behalf of the United States.

24              The jury's in the box.  Has anything

25   happened to you since we were last here on Thursday that
```

1    would affect your ability to be fair and impartial?

2                  (Jury indicating no.)

3                  THE COURT:  Has anyone spoken to you or

4    attempted to speak to you about this case or anyone

5    involved in it?

6                  (Jury indicating no.)

7                  THE COURT:  Does the United States waive the

8    polling of the jury?

9                  MR. MYERS:  Yes, Your Honor.

10                 THE COURT:  And do you wish the Court to

11   make any further inquiry?

12                 MR. MYERS:  No, Your Honor.

13                 THE COURT:  Mr. Goff, same questions.

14                 MR. GOFF:  We'd waive, Your Honor.  No

15   further inquiry necessary.

16                 THE COURT:  Mr. Mottinger?

17                 MR. MOTTINGER:  Waive.

18                 THE COURT:  Do you wish the Court to make

19   any further inquiry?

20                 MR. MOTTINGER:  No.

21                 THE COURT:  Mr. Loos?

22                 MR. LOOS:  Yes, and no, Your Honor.

23                 THE COURT:  And Ms. Goetz?

24                 MS. GOETZ:  I waive, and no, Your Honor.

25                 THE COURT:  Thank you.  When we broke

1     Mr. Goff was about to commence with a cross-examination

2     of Agent Stuvland.  You remain under oath.

3               Mr. Goff, you may proceed.

4               MR. MOTTINGER:  Your Honor, could I have a

5     second with Mr. Goff?

6               THE COURT:  You may.

7                      **CROSS-EXAMINATION**

8     **BY MR. GOFF:**

9        Q.  Good morning, Agent Stuvland.

10       A.  Good morning.

11       Q.  How are you this morning?

12       A.  Good.  How about yourself?

13       Q.  Pretty good.  Agent Stuvland, it's been several

14    days, but on your direct examination you were talking

15    about -- quite a bit at least about surveillance in

16    several controlled buys?

17       A.  Yes.

18       Q.  And I think to a large extent we talked about --

19    or you talked about the controlled buy in July of 2009?

20       A.  Yes.

21       Q.  With Herb Brown as a CI?

22       A.  Yes.

23       Q.  And as I recall that was a buy when Herb Brown

24    was wearing some sort of a surveillance camera on his

25    clothing?

1    A.   That's correct.

2    Q.   And what we saw then on the video from that

3 camera was the activity between the Loaf 'N Jug and I

4 think South University MeritCare Hospital?

5    A.   Yes.

6    Q.   Now your testimony about that was that that

7 occurred on July 24th?

8    A.   Yes.

9    Q.   Is it possible that was a different day or was it

10 absolutely July 24th?

11    A.   I believe it was July 24th.

12    Q.   You keep that in your log and your notes and your

13 reports and things?

14    A.   Yes.

15    Q.   On the earlier controlled buys on May 28th, you

16 talked about two of those at CashWise and Sunmart,

17 correct?

18    A.   Yes.

19    Q.   And I think that what we saw from that or one --

20 one -- one or both of those, excuse me, one or both of

21 those buys on May 28th were photographs of text messages

22 and phone numbers and things, correct?

23    A.   That's correct.

24    Q.   And those were between Herb Brown and a number

25 that you said was for Ferris Lee?

1    A.   Yes.

2    Q.   But I'm not sure, did you actually identify the

3    phone number that Herb Brown called as belonging to

4    Ferris Lee?

5    A.   No.

6    Q.   But you identified Ferris how?

7    A.   His voice on the conversations.

8    Q.   Okay.  So you heard his voice.  It was recorded

9    and you were able to hear his voice?

10   A.   Yes.

11   Q.   And tell us again how you know the voice of

12   Ferris Lee?

13   A.   Through prior investigations and the current

14   investigations.  I've spent a lot of time listening to

15   jail phone calls from when he's been incarcerated in

16   different jail facilities.  Prior investigation, one of

17   my main -- a big part of my job for that investigation

18   was to listen to jail phone calls of him and his other

19   associates that were part of the investigation.

20   Q.   So you've heard him on a number of phone calls?

21   A.   A lot, yes.

22   Q.   Okay.  And then you were able to verify that, at

23   least the text messages from Herb's phone, by taking

24   photographs of those, correct?

25   A.   That's correct.

1    Q.   On this July 24th buy, the buy you say was on

2  July 24th, how was that set up?

3    A.   We had attempted to do the purchase the previous

4  day, on July 23rd, and were unsuccessful in doing so at

5  that time.   And I then gave Herb Brown instructions to

6  try and set it up for the next day for $400 of crack.

7    Q.   Herb Brown set it up how?

8    A.   He set it up himself through a conversation with

9  Mr. Lee.

10    Q.   Were you present?

11    A.   No, I was not.

12    Q.   Why was that one set up differently than the

13  others?

14    A.   It -- it was set up differently because on the

15  23rd when we attempted to purchase the crack cocaine

16  Mr. Lee was unavailable and told us to hit up somebody

17  else, BD.   So it was and it really wasn't.   It wasn't

18  the same as the others in the sense that he wasn't

19  available when we originally tried on the 23rd.   So the

20  24th really was more of a continuation of what we

21  started on the 23rd.

22    Q.   Were there additional communications reported to

23  you by Herb Brown between him and Ferris Lee that you

24  weren't present for?

25    A.   Yes.

1    Q.   Did he tell you what kind of communications?

2    A.   He -- not specifically.  He just said that he had

3    it set up so that we'd be able to purchase $400 of crack

4    cocaine.

5    Q.   Did he tell you whether that was through a

6    telephone call or text message or anything?

7    A.   I believe he said it was through phone calls.

8    Q.   Were you able to verify that by looking at his

9    call history?

10   A.   I didn't make any attempt to do so.

11   Q.   Why not?

12   A.   Because we had already started the process on the

13   23rd, and I had taken photographs of those text

14   messages, and I felt that was sufficient at that time.

15   Q.   And it didn't occur on the 23rd you say because

16   Ferris Lee just said go somewhere else?  Go to BD?

17   A.   Information I was told by Herb Brown was that he

18   was out of town in South Dakota, and obviously there was

19   a text message where he told us to hit BD.

20   Q.   On the May 28th controlled buys, the Sunmart and

21   CashWise, you were -- well, you're the case agent in the

22   whole case, right?

23   A.   For the -- I would say myself and Officer

24   Leingang were kind of co-case agents for the parts that

25   were occurring in the Fargo region.  I would say I was

1    primarily the case agent.

2        Q.   So you would have been the case agent on the

3    May 28th, 2009 controlled buys?

4        A.   Yes.

5        Q.   And you -- you testified about those I think

6    already, but you were a part of those transactions,

7    surveillance and so forth, correct?

8        A.   Yes.

9        Q.   And was there -- I think we've already heard some

10   testimony, too, but was there audio and video recording

11   of those transactions?

12       A.   There was audio and video recording of the

13   Sunmart buy.  There was an audio recording of the

14   CashWise buy.

15       Q.   But not video?

16       A.   That's correct.

17       Q.   Why not?

18       A.   Well, for one it was at night and it's difficult

19   to video at night because everything is dark.  I think

20   that was probably the primary factor.

21       Q.   Okay.  But that was -- it was Herb Brown as well

22   in those?

23       A.   Yes.

24       Q.   Was there any consideration given to having Herb

25   Brown wear this clothing camera?

1    A.   Again you would have the same issues of it's

2  nighttime so it's difficult to video at night.

3    Q.   But in a vehicle there may be lights that come on

4  and off, things like that?

5    A.   There could be, yes.

6    Q.   But that was the reason that didn't happen?

7    A.   It was twofold.  One, it was dark out.  No. 2, I

8  hadn't introduced Herb Brown to the body camera at that

9  point.  We're very cautious in letting informants and

10  other individuals know the types of different equipment

11  that we have available for investigations and typically

12  won't use that equipment unless it's -- we feel it's

13  absolutely necessary for the investigation.  At that

14  point, based upon it was nighttime and other factors, I

15  didn't want to expose Herb Brown to that body camera at

16  that time.

17    Q.   By that time how long had Herb Brown been working

18  with you?

19    A.   Well, I had initially interviewed him on I

20  believe it was April 15th, 2009.  By the time we did the

21  controlled purchases on May 28th, he had been doing

22  things actively as a CI for a couple of weeks.

23    Q.   You interviewed him first when?  I'm sorry.  I

24  missed that.

25    A.   I believe it was April 15th, 2009.

1    Q.   And as part of that interview, initial interview

2  with Herb Brown, there was negotiations with him and you

3  and other representatives of law enforcement, including

4  the U.S. Attorney's Office, about what consideration he

5  would get for his cooperation?

6    A.   No.   His initial interview there was no

7  participation by the U.S. Attorney's Office.   All of the

8  conversation back and forth was between Herb Brown and

9  myself and another member of law enforcement that was

10  present for the interview.

11    Q.   And if, on that audio recording of one of Herb

12  Brown's initial interviews with you, he spent about

13  eight minutes trying to make sure that he negotiated a

14  good deal for him, for himself, would that sound correct

15  to you?

16    A.   He definitely wanted assurances that he was going

17  to get consideration for his cooperation.

18    Q.   And he did?

19    A.   Yes, he did.

20    Q.   So back to these controlled buys on May 28th,

21  2009.   The first one was at Sunmart, right?

22    A.   Yes, West Fargo Sunmart.

23    Q.   And that was the one in the daytime?

24    A.   Correct.

25    Q.   With video and audio recording?

1    A.   Yes.

2    Q.   And I think that that's the one we heard that

3  agent -- or Officer Wes Libner was involved in the

4  surveillance?

5    A.   That's correct.

6    Q.   And he had observed this green vehicle which you

7  ultimately observed at Sunmart, Grand Prix I believe?

8    A.   I believe it's a Pontiac Grand Prix, yes.

9    Q.   Pontiac Grand Prix.  And you associated that

10  vehicle with Ferris Lee?

11    A.   Yes.

12    Q.   Why?

13    A.   It's registered to him in the state of Illinois.

14    Q.   In Illinois?

15    A.   Yes.

16    Q.   It had Illinois plates?

17    A.   Yes.

18    Q.   Were you familiar in this investigation with

19  other people or anyone else using that green Grand Prix?

20    A.   There may have been some information.  I don't

21  recall specifically.  Possibly that Shaina Sjostrand had

22  driven it.  Other than that, I'm not aware of anybody

23  else.

24    Q.   Okay.  Did you get a chance to actually observe

25  Ferris Lee in the vehicle on May 28th at Sunmart?

1    A.   No, I didn't.  I was primarily inside of Sunmart

2  for that transaction.

3    Q.   And the same question with the CashWise

4  transaction later that day, later that night, evening,

5  did you get a chance to observe Ferris Lee in the

6  vehicle?

7    A.   No, I didn't.  I was parked on the side of

8  CashWise for most of the transaction.

9    Q.   So is my understanding correct that your

10  knowledge, to the extent you have knowledge, of Ferris

11  Lee's presence was because Herb Brown told you that and

12  his voice you heard?

13    A.   That's correct.

14        MR. GOFF:  Your Honor, may I have an exhibit

15  marked?

16        THE COURT:  You may.

17    Q.   (Mr. Goff continuing)  Agent Stuvland, I want to

18  show you what's been marked for identification as

19  Defendant's Exhibit 122 (indicating), which purports to

20  be a CD or DVD.  Do you recognize that?  It has a note

21  on it as well.

22    A.   I believe this is the video that was shot by

23  Jesse Jahner there at Sunmart on September 28th.

24    Q.   And that was presented to us by the government

25  and represents -- they've represented it to be that as

1    well?

2        A.   Yes.

3                MR. GOFF:  Your Honor, my understanding is

4    that we have a stipulation with the government as to any

5    further foundation, and I would like to offer

6    Defendant's Exhibit 122 at this time.

7                THE COURT:  Any objection?

8                MR. MYERS:  No objection, Your Honor.

9                THE COURT:  Mr. Mottinger?

10               MR. MOTTINGER:  No, Your Honor.

11               THE COURT:  Mr. Loos?

12               MR. LOOS:  No objection.

13               THE COURT:  Ms. Goetz?

14               MS. GOETZ:  No objection.

15               THE COURT:  122 is received.

16               MR. GOFF:  Your Honor, could I publish that

17   for the jury?

18               THE COURT:  You may.

19               (Defendant's Exhibit 122 played in open

20   court.)

21       Q.   (Mr. Goff continuing)  Is that the extent of the

22   audio -- or excuse me, the video recording?

23       A.   I believe so.

24               MR. GOFF:  Your Honor, may I approach?

25               THE COURT:  You may.

1    Q.   (Mr. Goff continuing)   Agent Stuvland, I'm now

2  showing you what is already marked Government's Exhibit

3  28 in this case (indicating).   It's another CD or DVD.

4  Do you recognize that?

5    A.   Yes, I do.

6    Q.   What is it?

7    A.   I believe this would be a copy of an audio

8  recording that I provided to the prosecution from a

9  recorded debrief or interview that I did with Herb Brown

10  after the -- that first controlled purchase there on

11  May 28th at that West Fargo Sunmart.

12              MR. GOFF:   Your Honor, I'd offer

13  Government's 28.

14              THE COURT:   Any objection, Mr. Myers?

15              MR. MYERS:   No, Your Honor.

16              THE COURT:   Mr. Mottinger?

17              MR. MOTTINGER:   No.

18              THE COURT:   Mr. Loos?

19              MR. LOOS:   No, Your Honor.

20              THE COURT:   Ms. Goetz?

21              MS. GOETZ:   No, Your Honor.

22              THE COURT:   Twenty-eight is received.

23              MR. GOFF:   May I publish that for the jury,

24  Your Honor?

25              THE COURT:   You may.

1         MR. MYERS:  Judge, if we could before it's

2    published, there is a corresponding transcript, and I

3    think the audio Miss Wilson's going to play, it's

4    synchronized with the transcript, so perhaps we could --

5         THE COURT:  Is there a stipulation to

6    allowing the transcript, or do you want to go through

7    and lay the foundation for it?

8         MR. GOFF:  I think there's a stipulation as

9    to foundation, Your Honor, but identified as Court

10   Exhibit 28.

11        THE COURT:  Any objection, Mr. Mottinger?

12        MR. MOTTINGER:  No.

13        THE COURT:  Mr. Loos?

14        MR. LOOS:  No, Your Honor.

15        THE COURT:  Ms. Goetz?

16        MS. GOETZ:  No, Your Honor.

17        THE COURT:  And Mr. Myers?

18        MR. MYERS:  No objection, Your Honor.  I

19   would note, I think there's going to be a different

20   court exhibit though.  I think that was prepared prior

21   to the trial, and I think there's a different order.  Am

22   I correct?

23        THE CLERK:  It goes with which exhibit?

24        MR. GOFF:  Apparently, Your Honor, it would

25   be identified as Court Exhibit M.

1          THE COURT:  Court Exhibit M is received for

2    purposes of preservation of the record, and 28 is

3    received pursuant to the stipulation.

4          MR. GOFF:  If we may publish both of those,

5    Your Honor?

6          THE COURT:  You may.  I remind you that the

7    transcript is not the evidence, that the evidence is

8    what you actually hear.

9          (Government's Exhibit 28 played in open

10   court.)

11   Q.  (Mr. Goff continuing)  Agent Stuvland, in that

12   debrief Herb Brown clearly says that whatever money you

13   had given him he handed to BD; is that correct?

14   A.  That's correct.

15   Q.  He didn't say he gave it to Vito?

16   A.  He did not say that.

17   Q.  And he did say that he couldn't see anything

18   exactly -- identify anything that he said Vito handed to

19   BD?

20   A.  All he said was that he handed something to him

21   and he knew what it was.

22   Q.  But when you asked him again he said it just was

23   hand to hand to hand?

24   A.  Correct.

25   Q.  Now was this a $400 deal or -- excuse me, that's

1    the wrong one.  This is May.  I was talking about July.

2    How much was this deal?

3        A.   $100.

4        Q.   $100.  And how much substance was obtained from

5    that approximately?

6        A.   Two rocks of crack cocaine.  I think the weight

7    from the lab was .36 grams.

8        Q.   Okay.  And was that the end of the transaction at

9    Sunmart?

10       A.   Yes.

11       Q.   And then the arrangements were made for another

12   transaction later that day at CashWise?

13       A.   That's correct.

14              MR. GOFF:  May I have -- make sure these

15   exhibits are marked correctly, Your Honor?

16              THE COURT:  You may.

17              MR. GOFF:  May I approach, Your Honor?

18              THE COURT:  You may.

19       Q.   (Mr. Goff continuing)  Agent Stuvland, I'm

20   showing you what's been marked Government's Exhibit 32

21   and the corresponding transcript which is marked Court

22   Exhibit N (indicating).  Do you recognize those?

23       A.   Yes, I do.

24       Q.   What are they?

25       A.   Thirty-two is a copy of an audio recording I

1    provided to the prosecution.  It's a recorded debrief or

2    interview that I conducted with Herb Brown after that

3    second controlled purchase on May 28th there at the

4    CashWise.

5         Court Exhibit N would be the corresponding

6    transcript that goes with the audio that I assisted in

7    preparing.

8       Q.  And those are the audio because there is no

9    video, correct?  Well, not because, but there is no

10   video, correct?

11      A.  That's correct.

12           MR. GOFF:  With the same stipulations, Your

13   Honor, I would offer Exhibit 32 and Court Exhibit N.

14           THE COURT:  Any objection, Mr. Myers?

15           MR. MYERS:  No, Your Honor.

16           THE COURT:  Mr. Mottinger?

17           MR. MOTTINGER:  No, Your Honor.

18           THE COURT:  Mr. Loos?

19           MR. LOOS:  No, Your Honor.

20           THE COURT:  Ms. Goetz?

21           MS. GOETZ:  No objection.

22           THE COURT:  Court Exhibit N is received and

23   Exhibit 32 is received.

24           MR. GOFF:  May we publish for the jury, Your

25   Honor?

1           THE COURT:  You may.

2           (Government's Exhibit 32 played in open

3    court.)

4      Q.  (Mr. Goff continuing)  Agent Stuvland, again on

5    that transaction, during the debrief that we just saw,

6    or heard, Herb Brown clearly said that he gave any money

7    to BD?

8      A.  Yes.

9      Q.  Not Ferris?

10     A.  That's correct.

11     Q.  And again on both of those your identification of

12   Ferris being present is because Herb said so and what

13   you say was your voice identification?

14     A.  And his vehicle.

15     Q.  And his vehicle?

16     A.  Yes.

17     Q.  Now you also testified last week about a big

18   graph or chart about wire transfers?

19     A.  Yes.

20     Q.  Do you recall that?

21     A.  Yes.

22     Q.  Do you remember the wire transfers in this case

23   on that graph or chart?

24     A.  In general.  I can't tell you in detail every

25   single one, the date, the amount, to that extent, no.

1            MR. GOFF:  May I approach, Your Honor?

2            THE COURT:  You may.

3       Q.  (Mr. Goff continuing)  Agent Stuvland, I'm

4   showing you Court Exhibit J (indicating), which is the

5   chart of the wire transfers that you testified about; is

6   that correct?

7       A.  Yes.

8       Q.  Did you put that together?

9       A.  I assisted in the preparation of it, yes.

10      Q.  Okay.  From the investigative materials in this

11  case?

12      A.  Yes.

13      Q.  How many wire transfers do you show originating

14  from Ferris Lee?

15      A.  One.

16      Q.  Okay.  And who was that to?

17      A.  Jake Northern.

18      Q.  And where was that purported to be at the time?

19      A.  The money was received in Chicago, Illinois.

20      Q.  And from my copy of that exhibit I can't tell the

21  date.  Can you tell me the date?

22      A.  It's unclear on this other than 2009.  It's kind

23  of crunched together with information from the money

24  transfer that's next to it.

25      Q.  So it doesn't show up on there, does it?

1    A.   Not in full, no.

2    Q.   Okay.  How many wire transfers do you see being

3    received by Ferris Lee on this exhibit?

4    A.   Five.  In addition to that I also did observe one

5    more that he had sent out as well.

6    Q.   So he actually sent out two, right?

7    A.   That's correct.

8    Q.   He sent another one to Shaina Sjostrand?

9    A.   Yes.

10   Q.   For a hundred dollars?

11   A.   Yes.

12   Q.   On February 1st of '09?

13   A.   Yes.

14   Q.   Okay.  So that takes care of the ones he sent

15   out.  Let's look at the ones that he has coming in.

16   Starting on the lower -- or on the left side there's one

17   from Marcus Royston; is that right?

18   A.   Yes.

19   Q.   And that's for a hundred dollars?

20   A.   Yes, it is.

21   Q.   And then way over on the right side there's one

22   from Rashad Jackson?

23   A.   Yes.

24   Q.   And that's for a hundred dollars?

25   A.   Yes.

1      Q.   Now in the middle, so to speak, of that section

2  there are three others that come in to Ferris?

3      A.   Yes.

4      Q.   Two of them from Herb Brown?

5      A.   Yes.

6      Q.   And the total on those is $2,900?

7      A.   Yes.

8      Q.   And then there's one from Shaina Sjostrand; is

9  that correct?

10     A.   Yes.

11     Q.   What's the date on that?

12     A.   November 26th, 2008.

13     Q.   How much is that?

14     A.   $1,150.

15     Q.   From your knowledge of this investigation, have

16  you gathered any information or been told any

17  information about what Shaina wired money for to Ferris

18  November 26th?

19             MR. MYERS:   I'm going to object, Your Honor.

20  Hearsay.

21             MR. GOFF:   Your Honor, it's just law

22  enforcement information being shared back and forth.

23             MR. MYERS:   Still hearsay, Your Honor.

24             MR. GOFF:   I can ask different questions,

25  Your Honor.

1    THE COURT:  You may.

2    Q.  (Mr. Goff continuing)  Are you aware of Ferris

3    Lee and a couple of other people being arrested in

4    Bismarck around the end of November, late November?

5    A.  Yes.

6    Q.  Are you aware that they bailed out of jail

7    shortly thereafter?

8    A.  Yes.

9    Q.  And does that correspond with the date that

10   Shaina Sjostrand wired $1,150?

11   A.  I don't recall the exact date that they bailed

12   out.  I believe it was that same month though.

13   Q.  Same month?

14   A.  I believe so.

15   MR. GOFF:  May I have one second, Your

16   Honor?

17   THE COURT:  You may.

18   MR. GOFF:  May I approach, Your Honor?

19   THE COURT:  You may.

20   Q.  (Mr. Goff continuing)  Agent Stuvland, I'm

21   showing you what is Exhibit No. 1 (indicating), which

22   purports to be a bail receipt.  It's already admitted

23   into evidence.  Have you ever seen that before?

24   A.  I'm not sure if I have or haven't.  It doesn't

25   look --

1    Q.   Excuse me?

2    A.   -- overly familiar.

3    Q.   Well, it purports to be a bail or bond receipt?

4    A.   Yes.

5    Q.   And you've seen many of those before, correct?

6    A.   Not from the Burleigh County Jail but, yes, I

7    have in the past from other facilities.

8    Q.   Fargo-Moorhead?

9    A.   Yes.

10   Q.   Cass County?  Clay County?

11   A.   Yes.

12   Q.   What's the date on that bond receipt?

13   A.   11/28/2008.

14   Q.   And who's it for?

15   A.   Jonathan McClarin.

16   Q.   And to your knowledge was Jonathan McClarin

17   arrested with Ferris Lee in late November in Bismarck?

18   A.   I believe he was arrested with him at Tara

19   Bauer's trailer.

20   Q.   So having that bond receipt in mind and looking

21   at this wire list, does it look to correspond pretty

22   closely with the wire that was transferred from Shaina

23   to Ferris?

24   A.   My information, based upon these two exhibits,

25   would be that the money would have been wired two days

1    prior to Jonathan McClarin being bailed out of jail.

2        Q.   Okay.  And other than that the only two wires

3    involving Ferris for more than a hundred dollars are the

4    two with Herb Brown for more than a hundred dollars?

5        A.   That's incorrect.  There would be the one he

6    wired to Jake Northern for $280, the two from Herb Brown

7    in excess of a hundred dollars, one for $2,000, one for

8    $900, and then the one coming in from Shaina Sjostrand

9    for $1,150.

10       Q.   Perhaps you misunderstood my question.  I was

11   talking about the wires coming in to Ferris.

12       A.   Okay.  Then I misunderstood your question.  Yes,

13   there would be the three, the two from Herb Brown and

14   the one from Shaina.

15       Q.   Right.  Were those the only ones more than a

16   hundred dollars, correct?

17       A.   That's correct.

18       Q.   Now you -- you've already said and referred to

19   it, but you know that Ferris Lee has been in jail

20   before, correct?

21       A.   Yes.

22       Q.   Do you know if Ferris Lee was in jail in 2006?

23       A.   I don't know that for sure.  I believe he was,

24   but I can't tell you positively.

25       Q.   But your recollection is you think he was?

1      A.   I think he was probably incarcerated at that

2   time, yes.

3      Q.   Oh, yes, and you testified last week about a

4   Cadillac that was purchased by Marcus Royston and

5   Jessica Dietz?

6      A.   Yes.

7      Q.   Who actually purchased that Cadillac?

8      A.   It's in the name of Marcus Royston and Jessica

9   Dietz.

10     Q.   Is there any identifying or registration

11  information of that Cadillac connected to Ferris Lee?

12     A.   Not on the purchase paperwork, no.

13     Q.   Now just a couple more questions I think about

14  that July 24th controlled buy.  If I remember correctly,

15  last week when -- when we all -- I believe the jury saw

16  the video and heard the audio of that transaction, there

17  was some discussion about Herb Brown getting a sack of

18  weed I think it was?

19     A.   There was some discussion about somebody getting

20  a sack of weed, yes.

21     Q.   Did Herb Brown get a sack of weed?

22     A.   Not to my knowledge.

23     Q.   You didn't find anything during the post-buy

24  search?

25     A.   No.

1    Q.   And as far as you know he never got any?

2    A.   That's correct.  And the conversation appeared to

3  be something that had happened prior to the controlled

4  purchase.

5    Q.   Now was that transaction originally set up for

6  $400?

7    A.   Yes, it was.

8    Q.   And it turned out to be $200?

9    A.   Yes.  We changed it prior to the purchase to 200

10  instead of 400.

11    Q.   Who's "we"?

12    A.   Law enforcement, myself.  And at that time the

13  money was being provided by the BCI, Jesse Jahner.

14    Q.   Why did you downsize the transaction?

15    A.   I don't recall the exact reason why.  I think

16  they just -- BCI just decided they didn't want to spend

17  that much money at that time.

18    Q.   But that's the transaction that Herb Brown came

19  to you and said:  I can get $400 worth of crack?

20    A.   No.  I had told him the previous day on the 23rd

21  when we tried to do the -- first started setting up this

22  controlled purchase.  After it was apparent it wasn't

23  going to happen that day, I gave Herb Brown instructions

24  to try and set up the controlled purchase for $400.

25    Q.   And Herb Brown came back to you and said that he

1    could do that?

2        A.   Yes.

3        Q.   But you weren't involved in any of those plan

4    discussions, correct?

5        A.   Not between himself and any others, no.

6        Q.   And you said you thought there were phone calls

7    between Herb Brown and you said you thought Ferris Lee?

8        A.   I believe that he'd indicated something to the

9    effect that there had been phone conversations between

10   the two of them.

11       Q.   So you don't really have any knowledge as to what

12   the content of those conversations were, do you?

13       A.   Other than what he -- information he provided to

14   me, no.

15       Q.   That's what I'm asking.  You don't personally

16   have any knowledge of the content of those

17   conversations, do you?

18       A.   No.

19               MR. GOFF:  One second, Your Honor?

20               THE COURT:  You may.

21               MR. GOFF:  That's all I have, Your Honor.

22               THE COURT:  Mr. Mottinger?

23                       **CROSS-EXAMINATION**

24   **BY MR. MOTTINGER:**

25       Q.   You first interviewed Herb Brown on the 15th of

1  April, correct?

2      A.   I believe so, yes.

3      Q.   And already at that point he was trying to

4  structure some kind of a deal with the government?

5      A.   Yes.

6      Q.   That has continued until shortly before trial,

7  correct?

8      A.   Yes.

9      Q.   You were aware when you first met with Herb Brown

10  that he was already convicted or in the process of being

11  convicted for delivery of an imitation controlled

12  substance?

13      A.   No.

14      Q.   Subsequent to that time he was convicted of

15  delivery of an imitation controlled substance, currently

16  is serving a sentence?

17      A.   Subsequent to that I know that he's plead guilty

18  to a controlled substance charge in the state of North

19  Dakota.

20      Q.   And that would have occurred some -- the

21  underlying offense would have occurred sometime in

22  January of 2009 in Bismarck?

23      A.   It would have been within that time frame, yes.

24  I don't know the exact date.   I wasn't part of his court

25  proceedings in Bismarck.

1     Q.   And that's part of the underlying alleged

2  conspiracy that brings us all together here, correct?

3     A.   Part of this investigation, yes.

4     Q.   The videotape that was played a little earlier in

5  regard to the 5/28 transaction at the Sunmart, there's

6  more to that video, is there not?  It starts a little

7  earlier?

8     A.   Not that I know of.  I didn't shoot the video,

9  but I turned over what footage I did have.

10    Q.   In that audio Herb Brown identifies BD, Marcus,

11 correct?

12    A.   Are you talking about the --

13    Q.   The Sunmart video, yes.

14    A.   Yes, he does.

15    Q.   And he pretty much indicated he didn't have much

16 to do with him.  He just kind of knew who he was?

17    A.   He said that -- basically indicated he didn't

18 know him well enough that he would have his phone

19 number, but he knew who he was.

20    Q.   At that point he didn't know him well enough that

21 he would have a phone number, correct?

22    A.   That's what he said, yes.

23    Q.   Herb Brown -- you're aware that Herb Brown

24 testified earlier in this trial that he handed the money

25 directly to Ferris Lee on both the Sunmart and CashWise

1    transactions?

2        A.  No, I'm not.

3        Q.  Would it surprise you if he testified that he

4    handed the money directly to Ferris Lee at the CashWise

5    and Sunmart transaction?

6        A.  Not really.  It's been quite a while.

7        Q.  Is that something that somebody would forget, who

8    they transferred the money to?

9        A.  I guess I can't speak for Herb Brown.  I can only

10   speak for myself.

11       Q.  He told you something substantially different in

12   the debrief, correct?

13       A.  He told me that he handed the money to BD in the

14   debrief, yes.

15       Q.  The CashWise transaction, is that the transaction

16   where he ran into the female inside the store?

17       A.  Outside the store, yes.

18       Q.  Was he under constant surveillance once he ran

19   into that female?

20       A.  Yes.

21       Q.  Were you able to observe him at all times?

22       A.  I personally, no.  I handed off surveillance,

23   after he exited the vehicle, to the other surveillance

24   units that were there with me at CashWise.

25       Q.  Could it be argued that contact with the female

1     at that point would have somehow tainted the entire

2     controlled buy?

3         A.   No.   That happens.   And I think you can hear a

4     good recording of portions of the conversation.

5         Q.   Have you ever had a situation before where during

6     a controlled buy the informant picks up another

7     individual and the individual ends up as part of the

8     controlled buy in the same vehicle?

9         A.   Probably not those exact same circumstances, but

10    it has happened before where we do it at a public

11    location like a gas station or a grocery store and

12    unexpectedly the informant will run into someone that

13    they know and have a conversation with them, yes.

14        Q.   And again in the debrief of the CashWise

15    transaction, Mr. Brown told you that he handed the money

16    directly to BD, is that correct, Marcus Royston?

17        A.   In the debrief, yes, that's what he told me.

18        Q.   And you weren't aware that -- and again you

19    weren't aware that he testified differently during his

20    testimony in court here?

21        A.   I have no idea what he's testified to.

22        Q.   Moving along to July 23rd, the MeritCare

23    transaction, apparently there was a controlled buy that

24    was attempted on the 23rd of July, correct?

25        A.   Yes.

 1    Q.   Is that the incident where there was a text

 2   message, "Hit bd"?

 3    A.   Yes.

 4    Q.   Did you attempt to follow through on that?

 5    A.   As far as attempting to contact BD?

 6    Q.   Yes.

 7    A.   No.

 8    Q.   Why not?

 9    A.   I don't recall why.  It was a decision that I

10   made at that time.

11    Q.   Is it possible Mr. Brown told you he didn't even

12   have BD's number?

13    A.   Again I don't recall.  It was a decision that I

14   made at that time.

15    Q.   In any event that transaction was followed up the

16   next day?

17    A.   Yes.

18    Q.   Just backing up a little bit, on the 23rd, if I

19   understand your testimony correctly, there was no

20   attempt to contact BD?

21    A.   That's correct.

22    Q.   No controlled substance was obtained from BD at

23   that point?

24    A.   That's correct.

25    Q.   The video that we saw, you had an opportunity to

1  view that on the big screen?

2     A.  Yes, I did.

3     Q.  And you've reviewed that video before?

4     A.  Yes, I have.

5     Q.  Pretty clear that you can't -- that no one would

6  be able to identify anybody inside the car, correct?

7     A.  That's incorrect.  I took a photograph of the

8  computer screen showing Ferris Lee.

9     Q.  You couldn't take a photograph of -- you can't

10 identify Marcus Royston as being in the car, correct?

11    A.  That's correct.

12    Q.  Isn't it true that you can't even determine

13 whether or not there's a passenger in the vehicle absent

14 Herb Brown's testimony?

15    A.  Well, you don't see the backseat of the vehicle,

16 but I think in the front seat you can tell that there

17 was nobody else sitting there when Herb Brown was

18 sitting there.

19    Q.  You have never conducted any individual

20 surveillance on Marcus Royston; is that correct?

21    A.  That's correct.

22    Q.  You've not reviewed any telephone tapes that

23 would have a voice you could recognize as Marcus

24 Royston's; isn't that correct?

25    A.  That's correct.

1    Q.  Have you reviewed any videos that have positively

2  identified Marcus Royston as being with anybody else

3  referenced in this conspiracy trial?

4    A.  No.

5            MR. MOTTINGER:  May we approach, Your Honor?

6            THE COURT:  You may.

7            (The following sidebar discussion was had

8  outside the hearing of the jury:)

9            THE COURT:  You may.

10            MR. MOTTINGER:  In regard to the video that

11  we saw, I had Mr. Myers burn me a disc and we cued that

12  up.  Mr. Royston is requesting that we have an

13  opportunity to view that entire video.  There's some

14  footage that starts before then.  Is it possible to cue

15  that up?

16            MR. MYERS:  Yeah, I think we can just play

17  it.

18            MR. MOTTINGER:  Just start from the

19  beginning.

20            MR. MYERS:  I don't recall where it starts

21  or where she started it.  I don't know.

22            MR. MOTTINGER:  Well --

23            THE COURT:  One at a time.

24            MR. MOTTINGER:  Let's just start at the

25  beginning and play it.

1        THE COURT:  Then you'll stop when we get to

2   the point where we started -- where we've already seen,

3   or are you just going to run it all through?

4        MR. MOTTINGER:  He's claiming that it was

5   cut, but there's just some portions that could be

6   played.

7        (Sidebar concluded.)

8        MR. MOTTINGER:  Your Honor, could we take a

9   break?  We have issues in that regard.

10        THE COURT:  All right.  What we'll do is

11   we'll go ahead and take our morning recess.  Ladies and

12   gentlemen of the jury, I'll remind you that you're not

13   to discuss the case, form any opinions or draw any

14   conclusions until the case is ultimately submitted to

15   you for your deliberations.  We'll stand in recess until

16   10:20.

17        (Recess taken; 10:00 a.m. to 10:20 a.m.)

18        (In open court, all counsel and the

19   Defendants present, outside the presence and hearing of

20   the jury:)

21        THE COURT:  We're back on the record in a

22   case entitled United States of America versus Ferris

23   Lee, Marcus Royston, Maurice Forest and Jessica Dietz.

24   Each of the defendants is present along with their

25   counsel of record.  Mr. Myers and Ms. Lawyer are present

1    for the United States.

2              The Court is informed that there apparently

3    are some technical difficulties.  Mr. Mottinger?

4              MR. MOTTINGER:  Your Honor, the CD that was

5    played was marked in the discovery as disc 1, CD 15,

6    5/28/09.  Mr. Royston initially believed the copy that

7    was played was not what he remembered seeing in the

8    discovery.  I had an opportunity to review my tape with

9    the government's tape.  That exhibit appears to be fine.

10             There are some additional audiotapes and

11   radio traffic of that particular buy.  Mr. Royston has

12   an issue in regard to whether or not some of the dates

13   on that audio correspond.  We started to go through it.

14   We've got about probably 40 or 50 minutes of audio to go

15   through.  Visiting with Mr. Goff, Mr. Loos and

16   Ms. Goetz, we will finish today.  And under the

17   circumstances, in light of the position our clients are

18   taking, and I recognize they've got a lot riding on

19   this, we would ask leave of the Court to break until we

20   have an opportunity to review those materials.

21             THE COURT:  How long -- it's at least 40

22   minutes.  You've got to figure this out.

23             MR. MOTTINGER:  We've got 40 minutes of one

24   tape, and if it's not on there we're going to have to

25   take a look at some other ones.

```
 1                  THE COURT:  All right.  So if we were to
 2   take a break until -- just send the jury home -- or send
 3   the jury out and come back at 1:00?
 4                  MR. MOTTINGER:  We should be able to do
 5   that, Judge.
 6                  THE COURT:  Anybody have any objection to
 7   that?
 8                  MR. MYERS:  That's fine, Judge.
 9                  THE COURT:  Let's bring them in.
10                  MR. GOFF:  Your Honor, there's one other
11   matter.
12                  THE COURT:  Oh, okay.
13                  MR. GOFF:  I've indicated to the Court that
14   I had one subpoena issued and I do, and that witness is
15   here and it's Shaina Sjostrand.  After discussing that
16   at length over yesterday and today with my client, he's
17   instructed me that he does not want Shaina Sjostrand to
18   be called in our case; therefore, I'm informing the
19   Court that I'm not calling her and I'd ask that she be
20   released from her subpoena.
21                  THE COURT:  Any objection from the United
22   States?
23                  MR. MYERS:  That's fine, Judge.
24                  THE COURT:  Any objection from Mr. Royston?
25                  MR. MOTTINGER:  I don't believe we did have
```

1    any intention of calling her, Judge.

2              THE COURT:  Mr. Forest?  Mr. Loos?

3              MR. LOOS:  No, Your Honor, that's fine.

4              THE COURT:  Ms. Goetz?

5              MS. GOETZ:  No, Your Honor.

6              THE COURT:  All right.  Ms. Sjostrand may be

7    released from her subpoena.

8              MR. GOFF:  That's all I have.  Thank you.

9              (In open court, all counsel and the

10   Defendants present, in the presence and hearing of the

11   jury:)

12             THE COURT:  Good morning, ladies and

13   gentlemen.  We're back on the record in a case entitled

14   United States of America versus Lee, Royston, Forest and

15   Dietz.  Each of the defendants is present along with

16   their counsel of record.  Ms. Lawyer and Mr. Myers are

17   present on behalf of the United States.  The jury's in

18   the box.

19             Ladies and gentlemen of the jury, we've run

20   into some technical difficulties and it's going to take

21   a while for them to be resolved.  And rather than have

22   you sit in the jury room for what can only be described

23   as an indeterminant amount of time, I'm going to send

24   you out and say why don't you come back at 1 o'clock

25   this afternoon.  So we'll stand in recess until 1

1   o'clock this afternoon.

2           I think that for your sort of planning

3   purposes, I suspect that the case will be in by the

4   close of business today or certainly early tomorrow, and

5   then once the evidence is all in there will be closing

6   arguments.  But my anticipation is that you would in

7   fact probably get the case to deliberate sometime

8   tomorrow, and so that's kind of where we're at.

9           We'll stand in recess until 1 o'clock this

10  afternoon.  I remind you you're not to discuss the case,

11  form any opinions or draw any conclusions until the case

12  is ultimately submitted to you for your deliberations.

13           (Jury excused.)

14           (In open court, all counsel and the

15  Defendants present, outside the presence and hearing of

16  the jury:)

17           THE COURT:  Is there anything anybody wants

18  to take up at this point?  If not, we'll stand in recess

19  until 1 o'clock this afternoon.

20           (Recess taken; 10:25 a.m. to 1:00 p.m.)

21           (In open court, all counsel and the

22  Defendants present, outside the presence and hearing of

23  the jury:)

24           THE COURT:  We're back on the record in a

25  case entitled United States of America versus Ferris

```
 1    Lee, Marcus Royston, Maurice Forest and Jessica Dietz.

 2    Each of the defendants appears personally along with

 3    their counsel of record.  Ms. Lawyer and Mr. Myers

 4    appear on behalf of the United States.

 5             When we broke we were apparently looking

 6    into some technical difficulties.  Have they been

 7    resolved, Mr. Mottinger?

 8             MR. MOTTINGER:  Pardon?

 9             THE COURT:  Have we resolved whatever

10    technical difficulties you were dealing with?

11             MR. MOTTINGER:  We found what we were

12    looking for.  We think it may have been played once

13    already, but we'll go through it again.

14             THE COURT:  Okay.  Before we bring -- well,

15    that's fine.  Is there anything else we need to take up

16    before we bring the jury in?

17             (No response.)

18             THE COURT:  Let's go ahead and bring them

19    in.

20             (In open court, all counsel and the

21    Defendants present, in the presence and hearing of the

22    jury:)

23             THE COURT:  We'll go on the record in a case

24    entitled United States of America versus Ferris Lee,

25    Marcus Royston, Maurice Forest and Jessica Dietz.  The
```

1    record should reflect that Mr. Lee appears personally

2    along with his counsel, Mr. Goff.  Mr. Royston is

3    present along with his lawyer, Mr. Mottinger.

4    Mr. Forest is present with his counsel, Mr. Loos.  And

5    Ms. Dietz is present with her counsel, Ms. Goetz.  Mr.

6    Myers and Ms. Lawyer appear on behalf of the United

7    States.  The jury's back in the box.

8            Will the United States waive the polling.

9            MR. MYERS:  Yes, Your Honor.

10          THE COURT:  Mr. Goff?

11          MR. GOFF:  Yes, Your Honor.

12          THE COURT:  Mr. Mottinger?

13          MR. MOTTINGER:  Yes, Your Honor.

14          THE COURT:  Mr. Loos?

15          MR. LOOS:  Yes, Your Honor.

16          THE COURT:  Ms. Goetz?

17          MS. GOETZ:  Yes, Your Honor.

18          THE COURT:  When we broke Mr. Mottinger was

19    about to conduct a cross-examination of Agent Stuvland

20    and, Special Agent Stuvland, you remain under oath, and

21    you may proceed.

22          MR. MOTTINGER:  Thank you.

23    Q.  (Mr. Mottinger continuing)  A couple things we

24    went over this morning.  To the best of your knowledge,

25    law enforcement never had a cell phone number for Marcus

1  Royston, did they?

2      A.  No.

3      Q.  And so if anybody said that they were either

4  phoning him or texting him, you would have to take that

5  individual at their word?

6      A.  The only person that ever identified a cell phone

7  to me was Jessica Dietz.  Other than that, I don't have

8  any other identified phone numbers for him.

9      Q.  And Jessica Dietz certainly was not involved in

10  any of the deliveries that allegedly took place on the

11  28th of May, was she?

12     A.  That's correct.

13     Q.  Earlier in your testimony on direct you

14  referenced a telephone call that set up the second buy.

15  Do you remember that?

16     A.  Yes.

17          MR. MOTTINGER:  Judge, I believe we've got

18  that cued up.  I would like to play it without benefit

19  of the Court exhibit, the transcript.  I want the jury

20  just to listen to that tape.  I think we're ready to

21  play it at this point.

22          THE COURT:  And just for the record, what

23  exhibit is it?

24          MR. MOTTINGER:  I believe that it would

25  be -- looks like it's marked as Plaintiff's 32.

1           THE COURT:  That would be the -- 32 is the

2   debrief?  Thirty is --

3           MR. MOTTINGER:  Twenty-nine maybe.

4           THE COURT:  Twenty-nine is the audio of a

5   phone call.  That sounds right.

6           MR. MOTTINGER:  Yes.

7           THE COURT:  All right.  You may play 29 if

8   you wish.

9           MS. WILSON:  I didn't know he didn't want

10  the transcript.

11          MR. MOTTINGER:  You can put the transcript

12  up.  That's fine.

13          MS. WILSON:  Okay.

14          (Plaintiff's Exhibit 29 played in open

15  court.)

16    Q.  (Mr. Mottinger continuing)  Detective Stuvland,

17  do you know who was on that tape?  Were you on the tape?

18    A.  Yes, I was.

19    Q.  Was the date mentioned at the beginning of that

20  tape May 20th as opposed to May 28th?

21    A.  No.  I was talking very fast, but I said

22  5/28/2009.

23    Q.  So if it sounds like 5/20, that would be just a

24  listening error on our part?

25    A.  That's correct.

1    Q.   And you don't know what the seating arrangements

2    were in the Pontiac on that particular occasion, do you,

3    on the second occasion?

4    A.   At CashWise?

5    Q.   Yes.

6    A.   It was described on the debrief with Herb Brown.

7    Yes, I do.

8    Q.   But there's no tape of that, correct?

9    A.   Videotape?

10   Q.   Right.

11   A.   There is no videotape.

12   Q.   On the first videotape, the Sunmart buy?

13   A.   Yes.

14   Q.   You've reviewed that tape?

15   A.   Yes.

16   Q.   Are you able to see anybody in the passenger seat

17   of the Pontiac when it pulls into the lot?

18   A.   I don't believe you can when it pulls into the

19   lot.   It pans by very quickly.

20   Q.   That vehicle was under surveillance at all times?

21   A.   From the time it left the West Fargo address over

22   to Sunmart, yes.

23   Q.   So other than Mr. Brown, it would be impossible

24   for anybody else to have gotten into that vehicle from

25   the time it entered the Sunmart lot until the time the

1    alleged transaction was completed?

2        A.   Well, I think it would have been very difficult

3    to have occurred, yes.

4        Q.   In any event nobody saw anybody other than

5    Mr. Brown enter that vehicle?

6        A.   Not to my knowledge, no.

7        Q.   Or exit the vehicle?

8        A.   That's correct.

9               MR. MOTTINGER:  I don't have anything else.

10              THE COURT:  Thank you.  Mr. Loos?

11              MR. LOOS:  Thank you, Your Honor.

12                     **CROSS EXAMINATION**

13   **BY MR. LOOS:**

14       Q.   Good afternoon, Officer Stuvland.

15       A.   Good afternoon.

16       Q.   If I understand this right, did you mostly run

17   this operation out of Fargo?  Didn't have a whole lot to

18   do with the Bismarck side of things?

19       A.   I think that's probably a fair way to

20   characterize it.

21       Q.   Are you familiar with Maurice Forest from Fargo

22   at all?

23       A.   Not really, no.

24       Q.   Do you have any videotape or audiotape of

25   Mr. Forest?

1       A.   No, I do not.

2       Q.   Do you have any photographs of Mr. Forest while

3   he's in Fargo?

4       A.   No, I don't.

5       Q.   Do you recall Court Exhibit J, all the money

6   wires?

7       A.   Yes.

8       Q.   Was Mr. Forest listed on there at all?

9       A.   He was not listed on Exhibit J.

10      Q.   So to the best of your knowledge did Mr. Forest

11  ever wire any money to anyone?

12      A.   Yes, he did.

13      Q.   Who did he wire money to?

14      A.   I don't recall the name.

15      Q.   Did he ever wire any money to Jake Northern or

16  Vito or any of those people?

17      A.   No.

18      Q.   Now we've heard the testimony that Mr. Forest was

19  brought out here to collect money.  If he was brought

20  out to collect money, wouldn't it make sense that he

21  should be wiring money back to Vito or JB or some of

22  these other players?

23      A.   That would be -- depend upon the timing of when

24  he collected it as opposed to when they would have

25  needed it versus been able to come and collect it

1    themselves in person rather than being wired to them, I

2    suppose.

3        Q.   When you do these drug buys with confidential

4    informants, do you typically do them in crowded public

5    places like Sunmart or CashWise?

6        A.   I wouldn't say typically, but they happen just as

7    frequently as going to a person's residence or a hotel

8    room.   Public parking lots happen very commonly.

9        Q.   Does that pose any kind of a safety risk to

10   anyone?

11       A.   Quite the contrary.   By doing it in a public

12   place, we feel it's less likely that somebody would try

13   and cause violence or harm to somebody else.   So that's

14   why it's not uncommon for a public place to be chosen.

15       Q.   Now we saw some video that one of the informants

16   was wearing a camera.   Is that something that you

17   typically use?

18       A.   No.   Not very often, no.

19       Q.   Why not?

20       A.   Well, because it's larger in size than the audio

21   recording equipment so you're adding to the risk of the

22   informant being discovered.   In addition to that we

23   don't like to let the informants know of all of our

24   capabilities.   More frequently you would see that being

25   used by a law enforcement person acting as an undercover

1    person in a drug operation versus actually putting it on

2    the informant themselves.

3        Q.   How long have you been doing narcotics work?

4        A.   Well, I've been assigned to the Detective Bureau

5    in Moorhead working drug investigations since 2003.

6    Prior to that I spent eight years working a drug

7    detection dog as a K9 handler.

8        Q.   During your time investigating narcotics

9    offenses, do you come across suspects who use aliases?

10       A.   Yes.

11       Q.   Is that something that people in the narcotics

12   business typically do?

13       A.   Use aliases?

14       Q.   Yes.

15       A.   Yeah, it's happened for undercover

16   investigations.

17       Q.   Have you come across narcotics dealers who have

18   more than one identification?

19       A.   Yes.

20       Q.   And do they often use each other's

21   identification, try and claim they're someone who

22   they're -- someone who they, for example, know isn't in

23   the drug business so if they give the police that

24   person's name they won't think it will attract attention

25   to them?

1    A.   I guess I've never asked any of them how they

2   chose whichever identity that they've maybe been caught

3   with when they've been caught with more than one

4   identification.   So I guess the best I can say is that

5   we've caught people with more than one identification in

6   the past.

7    Q.   In your investigation into -- well, first of all,

8   let me ask you this:   Did you investigate Jake Northern

9   before he became an informant?

10    A.   Yes, I did.

11    Q.   Was Mr. Northern doing anything to hide his

12   drug-dealing activities?

13    A.   I guess I didn't ask him specifically what

14   methods he was undertaking at the time that we were

15   doing -- or after we did our investigation.   During the

16   investigation I guess I don't know of any specific

17   things that he was doing to hide his drug-selling

18   activities.

19    Q.   Does he have aliases?

20    A.   He has a nickname that he goes by so at least one

21   other name that he uses.

22    Q.   Are you familiar with Lionel Fraction?

23    A.   Yes.

24    Q.   And did you investigate him in relation to this

25   case?

1    A.   To a degree, yes.

2    Q.   Did you have any credible information that he was

3 a part of this case?

4    A.   I did not develop any credible -- well, yes,

5 there was bits and pieces of information that he had

6 some involvement in the case to a low level.

7    Q.   Anything that was credible or found to be true?

8    A.   Well, I would say it came from a credible source

9 and wasn't disproven.

10    Q.   What source was that?

11    A.   Jake Northern.

12         MR. LOOS:  Could I have just one minute,

13 Your Honor?

14         THE COURT:  You may.

15         MR. LOOS:  I have no other questions, Your

16 Honor.

17         THE COURT:  Thank you.  Ms. Goetz?

18         MS. GOETZ:  I pass on this witness, Your

19 Honor.  Thank you.

20         THE COURT:  Mr. Myers?

21         MR. MYERS:  I don't have any redirect,

22 Judge.

23         MR. GOFF:  Your Honor, may I ask an

24 additional question?

25         THE COURT:  You may.

 1              MR. GOFF:  Thank you.  I'll do it from here.

 2              **FURTHER CROSS EXAMINATION**

 3   **BY MR. GOFF:**

 4      Q.  Agent Stuvland, did you actually check the

 5   registration on that green Pontiac Grand Prix?

 6      A.  Yes, I did.

 7      Q.  Through the State of Illinois?

 8      A.  Yes.

 9      Q.  And it's your testimony that it came back to

10   Ferris Lee?

11      A.  The vehicle was registered to Ferris Lee and

12   Wandra Spragues.

13              MR. GOFF:  That's all I have, Your Honor.

14   Thank you.

15              THE COURT:  Mr. Mottinger?

16              MR. MOTTINGER:  Nothing else.

17              THE COURT:  Mr. Loos?

18              MR. LOOS:  Nothing else, Your Honor.

19              THE COURT:  Ms. Goetz?

20              MS. GOETZ:  Nothing, Your Honor.

21              THE COURT:  Anything, Mr. Myers, now?

22              MR. MYERS:  No, Your Honor.

23              THE COURT:  You may step down, sir.

24              THE WITNESS:  Thank you.

25              THE COURT:  Mr. Myers?

1          MR. MYERS:  Thank you, Your Honor.  At this

2   time the United States would rest.

3          THE COURT:  Ladies and gentlemen of the

4   jury, there are a number of matters of law that the

5   Court needs to take up at this point.  I don't know

6   exactly how long this is going to take.  It shouldn't be

7   terribly long, but it could be 20 minutes.

8          I want to remind you that you're not to

9   discuss the case, form any opinions or draw any

10  conclusions until the case is ultimately submitted to

11  you for your deliberations.

12          (Jury excused.)

13          (In open court, all counsel and the

14  Defendants present, outside the presence and hearing of

15  the jury:)

16          THE COURT:  Have you had a chance to

17  double-check all the exhibits you want to put in?

18          MR. MYERS:  I haven't, but I believe we -- I

19  think we have them all in.  According to Miss Wilson we

20  do, Your Honor.  So I trust her.

21          THE COURT:  All right.  Well, here's the

22  story.  I've got to make my Bell findings, and I assume

23  you folks may have some motions to make.  Why don't you

24  give me five minutes, and during that five minutes you

25  just might want to make sure that the two of you are on

1    the same page as to what's offered and what's in.

2                MR. MYERS:  And I think, Judge, I think the

3    Court noted at the close of either last week or

4    Wednesday of last week that there were a couple court

5    exhibits that weren't in.  So if those haven't been

6    offered we'd ask that they just be made part of the

7    record.  Obviously they don't go the jury anyway but to

8    the extent that those aren't in --

9                THE COURT:  Yeah, the Court will receive all

10   the Court exhibits that have been referred to at this

11   point.  They're not going to the jury anyhow so just so

12   that they're part of the record.

13               Anything else we need to take up?

14               (No response.)

15               THE COURT:  All right.

16               (Recess taken; 1:20 p.m. to 1:45 p.m.)

17               (In open court, all counsel and the

18   Defendants present, outside the presence and hearing of

19   the jury:)

20               THE COURT:  We'll go on the record in a case

21   entitled United States of America versus Ferris Lavelle

22   Lee, also known as Vito; Marcus Jermaine Royston, also

23   known as BD; Maurice M. Forest; and Jessica Marie Dietz.

24   The record should reflect that Mr. Lee appears

25   personally along with his counsel, Mr. Goff.

1   Mr. Royston appears with his counsel, Mr. Mottinger.

2   Mr. Forest appears with his counsel, Mr. Loos.  And

3   Ms. Dietz appears with her counsel, Mr. -- or Ms. Goetz.

4   Mr. Myers and Ms. Lawyer appear on behalf of the United

5   States.

6            In considering United States v. Bell, which

7   is at 573 F.2d 1040, which is an Eighth Circuit case

8   from 1978, the Court has made a determination that there

9   is evidence from which a jury could reasonably find that

10  Ferris Lavelle Lee, Marcus Jermaine Royston, Maurice M.

11  Forest and Jessica Marie Dietz are participants in a

12  conspiracy and that co-conspirators' statements might be

13  admissible, therefore, against them.

14           The Court finds to a preponderance of the

15  evidence that the people who are involved in the

16  conspiracy involve persons known and unknown but have

17  been proven to include the following persons:  A person

18  known as JB, also known as Jake Northern; a person

19  identified only as Gov; Tara Bauer; Tambi Bishop;

20  Jonathan Jason McClarin, also known as Jay; a person

21  identified in the record only as Nikki; Jessica Dietz;

22  Herbert Brown; Lloyd Johnson; Marcus Royston; Rashad

23  Jackson, also known as Rob; Maurice Forest; Shaina

24  Sjostrand; Zach Jones, also known as Fats; Keith Murry,

25  also known as Moe; Shannon Harjo; Eugene Lindsay;

1    Adrienne "Promise" American Horse; Clarissa Takes Horse;

2    Lemont Rogers, also known as Wow-Wow; Galen Smith, also

3    known as Smitty; Cavelle Smallwood; Lloyd Johnson;

4    Lionel Fraction; Kenny DeBerry; Casey Peterson; and

5    Darrin Bernard Raysor.

6                The Court finds based on a preponderance of

7    the evidence that the following -- that those

8    individuals were members of the drug conspiracy, and any

9    statements that they may have made that have been

10   testified to appear to have been statements made in

11   furtherance of the conspiracy and are at this point

12   admitted.  Now I will acknowledge, of course, that there

13   are numerous members of the people identified on that

14   list that no hearsay statements have been received, but

15   as I see it that's what the evidence shows to a

16   preponderance.

17                Mr. Myers, any objection?  And I'll file a

18   written Bell finding in the next 24 hours consistent

19   with my ruling.

20                MR. MYERS:  I don't have any objection,

21   Judge.  Just to clarify I assume that there are a number

22   of unidentified co-conspirators for which the Court has

23   not identified an out-of-court statement attributed to a

24   witness; is that accurate?

25                THE COURT:  That's true.

1          MR. MYERS:  I don't have any objection.

2          THE COURT:  Mr. Goff?

3          MR. GOFF:  For purposes of the Court's

4   findings under United States v. Bell, I have no

5   objection.

6          THE COURT:  Mr. Mottinger?

7          MR. MOTTINGER:  Same.

8          THE COURT:  Mr. Loos?

9          MR. LOOS:  Same, Your Honor.

10          THE COURT:  Ms. Dietz?

11          MS. GOETZ:  No objection.

12          THE COURT:  All right.  And so we'll file

13   some kind of an order in the next 24 hours.

14          Mr. Myers, when you checked the exhibits did

15   they appear to all be present and accounted for?

16          MR. MYERS:  Yes, Your Honor.

17          THE COURT:  All received.  All right.

18   Mr. Loos, at one point you offered Exhibit 120, and we

19   received then 120A, and that's because 120 was an entire

20   discovery disc, some of which was certainly not relevant

21   to the proceedings and not admissible.  Do you wish at

22   this point to withdraw 120, or do you want to leave it

23   in the record?

24          MR. LOOS:  I'd like to withdraw it, Your

25   Honor.

1          THE COURT:  Any objection from the United

2    States?

3          MR. MYERS:  No, Your Honor.

4          THE COURT:  Just so the record is plain, I'm

5    going to grant the motion to withdraw 120.  The only

6    relevant portions of 120 were ultimately received as

7    120A and played in open court, and it strikes the Court

8    that leaving 120 in the record just clutters the record

9    and interjects the possibility that upon appeal someone

10   might find something to be part of the record that is

11   not actually part of it.  And so 120 may be withdrawn at

12   this point.  I'll have the clerk give it to you at our

13   next break.

14         MR. LOOS:  Thank you, Your Honor.

15         THE COURT:  All right.  Mr. Goff, any

16   motions or anything else that you wish to bring before

17   the Court at this time?

18         MR. GOFF:  Yes, Your Honor.  Your Honor,

19   pursuant to Rule 29 of the Rules of Criminal Procedure,

20   I would make a motion for judgment of acquittal as to

21   each of the 14 counts charged in the indictment as

22   relate to my client, Ferris Lee.  There is simply

23   insufficient evidence in the record to sustain a

24   conviction of any of the 14 counts, and I would draw the

25   Court's particular attention to Counts Two, Three, Four,

1  Six and Seven in which my client is only charged as

2  aiding and abetting and was not even allegedly present

3  during the transactions that occurred.  But I also make

4  the motion as to the remaining counts as well, Your

5  Honor.

6           THE COURT:  Thank you.  Mr. Mottinger?

7           MR. MOTTINGER:  Your Honor, I would make a

8  Rule 29 motion for judgment of acquittal in regard to

9  the conspiracy count and the one delivery count that

10 applies to Mr. Royston.

11           Particularly in regard to the conspiracy

12 count, there are probably only two individuals that

13 offered any real testimony in regard to the conspiracy

14 count, those being JB Northern and Herb Brown.  JB

15 Northern's testimony seemed by inference to indicate

16 that Mr. Royston had initially been involved in Sioux

17 Falls, traveled to Bismarck with Mr. Lee and

18 Mr. Northern.  Clearly we had an opportunity to hear

19 from all the Bismarck witnesses.  Nobody in Bismarck

20 puts Mr. Royston in town.  Absolutely nobody.

21           There's reference to several buys from

22 Mr. Royston.  None of that material ever showed up

23 anyplace.  Pounds of marijuana never showed up anyplace.

24 So we believe that JB Northern's testimony has been

25 impeached sufficiently that the jury should not be

1    allowed to draw any inference whatsoever from that

2    testimony.

3              In regard to the Herb Brown buys, it's

4    relatively clear, based on a review of Mr. Brown's

5    testimony, his testimony on the witness stand is

6    substantially different from the debriefs.  No

7    independent witness can put Mr. Royston in the car.

8    Videos are unclear.  Taking all those things into

9    consideration, we don't believe there's enough evidence

10   to convict Mr. Royston in regard to the charged delivery

11   count.

12             It's also important to note that most of the

13   Fargo witnesses do not put Mr. Royston and Mr. Lee at

14   the same location.  Law enforcement was candid enough to

15   indicate that they didn't have a telephone number for

16   Mr. Royston, couldn't get ahold of him.  That same type

17   of evidence was confirmed by various witnesses.

18             Taking all those things into consideration,

19   we would ask that the Court grant a Rule 29 motion in

20   regard to the two specific charges on Mr. Royston.

21             THE COURT:  Thank you.  Mr. Loos?

22             MR. LOOS:  Thank you, Your Honor.  We, too,

23   would ask for a Rule 29 motion of acquittal on the three

24   counts that Mr. Forest is charged in, the conspiracy,

25   Count Ten and Count Eleven.

1        Just to go a little bit further, in

2   Count Ten Mr. Forest was charged with distribution of

3   controlled substance.  The only testimony regarding that

4   count was from the witness Smitty.  He testified that he

5   thought my client may have been within the car.  That

6   wasn't verified by anyone else.  Clearly that's not

7   enough -- in my view that's not enough to have even a

8   preponderance that Mr. Forest was aiding or abetting or

9   in any other way a part of that controlled buy.

10       Number Eleven, again the only real evidence

11  against my client is the testimony of this Smitty who

12  refers to my client as D.  This witness was shown a

13  picture of my client the morning of trial -- or the

14  morning of his testimony.  I just -- I don't feel that

15  his testimony was credible in any way.  Plus the fact

16  that he was shown a picture of him the morning of trial

17  I think is at best a little underhanded.  I mean, this

18  is not referred to us in any way.  We had no notes or

19  anything.  This is something that was a complete

20  surprise to us.

21       And with regards to the conspiracy, there is

22  testimony that my client was in Bismarck, but the only

23  real testimony that he was -- that he knew anyone was

24  from Jake Northern.  Jake Northern said he brought him

25  up, and Jake Northern even testified that it was

1  possible that, you know, that he brought him up for

2  security.  He said it was possible Mr. Forest didn't

3  even know he was up here for security.  He said he

4  brought him up here to party and meet women, and

5  apparently that's what Mr. Forest did.  But I don't

6  think there's any other evidence really to show that he

7  was a part of any conspiracy.  Thank you.

8            THE COURT:  Ms. Goetz?

9            MS. GOETZ:  Thank you, Your Honor.  Your

10  Honor, with regard to Ms. Dietz, I move for judgment of

11  acquittal under Rule 29.  I do believe the evidence is

12  insufficient to sustain a conviction under Count One,

13  which is the conspiracy, which is the only charge

14  Ms. Dietz has been charged with.  There's no evidence to

15  show that she knew of the conspiracy or that she

16  intentionally joined the conspiracy as is required under

17  the elements.  The only evidence that we have is from

18  Jake Northern.  Jake Northern, as Mr. Mottinger had

19  stated, has been sufficiently impeached so as to

20  disregard his testimony.

21            The other evidence against her, there's very

22  little.  The other evidence against her was a car that

23  has not been mentioned as to be used for drug

24  transactions or anything.  I mean, these two, Marcus

25  Royston and Ms. Dietz, have a child together.  And

1   there's the bill of sale with Marcus' signature on it,

2   and then there's $800 in money transfers going between

3   the two of them.  I don't think either of those things

4   are sufficient to establish -- nor are they good

5   circumstantial evidence to establish a conspiracy,

6   what's going on here.

7           And back to the main -- the only other piece

8   is Jake Northern, and I do not believe that she should

9   be found guilty.  And I think the -- I think Your Honor

10  should enter a judgment of acquittal.  Thank you.

11          THE COURT:  All right.  Mr. Myers, do you

12  argue for the United States?  Let's take Mr. Goff's

13  client, Mr. Lee, first.

14          MR. MYERS:  Judge, I'm going to make the

15  same response for all defendants.  We oppose each of the

16  defendants' motions under Rule 29.  We believe there's

17  sufficient evidence for each count to go to the jury.

18  Thank you.

19          THE COURT:  I have some questions.  Do you

20  have a response to Count Ten as it relates to

21  Mr. Forest?  And the reason I ask is Smitty's testimony

22  seemed a bit ambivalent as I recall it.

23          MR. MYERS:  Judge, I can't specifically

24  recall the exact testimony, but I know he puts him at

25  both of those transactions, and I think that alone is

1    sufficient for a jury question.

2              The extent of the identification goes to the

3    weight, I think, and so Mr. Loos can certainly argue

4    that his identification of him being there wasn't very

5    strong and thus you should find him not guilty.  But I

6    think it's sufficient that he identified him, putting

7    him there.  That, coupled with the other evidence, is I

8    think sufficient in this case.

9              THE COURT:  Mr. Loos?

10             MR. LOOS:  That may be true for No. Eleven

11   but No. Ten he said several times that he wasn't sure if

12   he was even there.  He thought it might have been the

13   guy he knew as D.  I mean, I don't think that's enough

14   to go on.

15             THE COURT:  Here's what I'm going to do.

16   I'm going to take -- well, first of all, I think that if

17   we look at Mr. Lee that there is sufficient evidence.  I

18   would basically note for the record that the Court

19   ordinarily doesn't weigh the credibility of a witness

20   unless the witness has been so destroyed in the course

21   of the testimony that no reasonable juror could find the

22   testimony credible, and I just don't think that with

23   Mr. Northern.  Even though all of you obviously have

24   strong feelings that he's not very credible, I don't

25   think that it reaches that particular legal standard,

1    and I think that there is sufficient evidence to create

2    a jury question.

3            As far as the aiding and abetting on

4    Counts Two, Three, Four, Six and Seven for Mr. Lee, that

5    evidence is subject to I think attack on the grounds

6    that while the witness has stated that the ultimate

7    source was Mr. Lee, that really the evidence tying

8    Mr. Lee to any of those counts is tangential.  I do,

9    however, believe that there's still enough evidence to

10   create a jury question.

11           And I believe that my ruling is really

12   essentially the same for Mr. Royston, and once again

13   what it boils down to is whether or not the jury finds

14   that what Mr. Northern has to say is credible and if it

15   could be relied upon.

16           With Mr. Loos' client, Mr. Forest, I'm going

17   to take under advisement Count Ten because my

18   recollection is that the identification there was in

19   fact pretty ambivalent.  And if you look at whether a

20   juror could find beyond a reasonable doubt that that

21   crime was committed, I'm not sure.  And I want to go

22   back and read the -- read that particular part of

23   Smitty's testimony to try and put it all back together

24   because I just -- my recollection seems to be that it

25   was very ambivalent identification.  It may not be once

1    I actually read the transcript, and I think we'll have
2    some time here where I'll be able to do that.
3              We turn then I think to Miss Goetz's
4    argument on Ms. Dietz, and I think that, you know, this
5    is a case very different from the other three
6    defendants.  There are issues about her knowledge and
7    her joining of the conspiracy.  If you take at face
8    value what Mr. Northern has said, then it's pretty clear
9    that Ms. Goetz knowingly and in exchange for money
10   entered into the business of running a stash house
11   essentially.  I also would note for the record that
12   Mr. Northern was very forcefully and somewhat
13   effectively cross-examined.  Nonetheless, I think that
14   that's precisely why we have jurors.  I think that
15   ultimately that's the question for the jury to decide,
16   whether or not there's sufficient credible evidence to
17   find beyond a reasonable doubt.
18             I do think that there's a sufficient basis
19   for the case to go to the jury and I'm, therefore, going
20   to deny the Rule 29 motions as to all defendants on all
21   counts except for Mr. Forest's motion on Count Ten.  And
22   I'm going to review the record and make a ruling on that
23   at the appropriate time but certainly before the case
24   actually goes to the jury, and I'd like to have it done
25   before you make closing arguments obviously.

1            All right.  Anything else to come before the

2   Court from the United States?

3            MR. MYERS:  Just a housekeeping issue,

4   Judge, and I know the Court is probably in the process

5   of putting together the final jury instructions and the

6   verdict forms, and we'd ask that where it's plainly

7   obvious that the theory is aiding and abetting.  For

8   example, the controlled buys that Mr. Goff referred to,

9   that the jury just decide on that portion as opposed to

10  creating twice as long of a verdict form on each of

11  those counts.  But, I mean, that's obviously within the

12  Court's discretion, but that's what would be our

13  request.

14           THE COURT:  Well, there is -- you know,

15  certainly if you look at it there's the theory that

16  there was anything other than aiding and abetting going

17  on on a number of counts is -- it can't be sustained.

18  And so, I mean, it does strike me that unless the

19  defense has an objection that it just makes sense to

20  take the counts that are clearly simply aiding and

21  abetting and reduce them to an aiding and abetting

22  question on the jury verdict form.  But if the defense

23  prefers to have the jury deliberate on both theories,

24  that's fine.

25           MR. GOFF:  Can I have one second, Your

1    Honor?

2              THE COURT:  Yeah, you may.  I will tell you

3    this, is that even if the defense says they want to I'm

4    a little concerned about allowing a theory to go to the

5    jury that's unproven.  Don't usually do that.

6              MR. GOFF:  We have no objection.

7              THE COURT:  I intend then to prepare a jury

8    verdict form that would allow Counts Two, Three, Four,

9    Six and Seven to go to the jury simply on a theory of

10   aiding and abetting as opposed to direct criminal

11   activity.

12             Mr. Mottinger, anything further?

13             MR. MOTTINGER:  No.

14             THE COURT:  Mr. Loos?

15             MR. LOOS:  No, Your Honor.

16             THE COURT:  Ms. Goetz?

17             MS. GOETZ:  No, Your Honor.

18             THE COURT:  All right.  We'll go ahead

19   and -- oh, does Mr. Lee intend to present a defense?

20             MR. GOFF:  Pardon me, Your Honor?

21             THE COURT:  Do you intend to call any

22   witnesses?

23             MR. GOFF:  Your Honor, we intend to call

24   Jake Northern.

25             THE COURT:  All right.

1          MR. GOFF:  And at this point, Your Honor, if

2    this is the appropriate time to make a record on

3    anything else, I can.

4          THE COURT:  Yeah.  If you want to make any

5    record on anything you want now is your chance.

6          MR. GOFF:  At this point, Your Honor, and I

7    don't think it's going to change, it's our intention in

8    our case in chief only to present Mr. Northern, recall

9    Mr. Northern again.  In light of the Court's ruling on

10   the 404(b) evidence and all of the other information and

11   materials available and discussions that Mr. Lee and I

12   have had, we don't intend to present any further

13   evidence or testimony including -- that includes

14   Mr. Lee.

15         THE COURT:  All right.  Mr. Lee, you

16   understand that you do have a right to testify if you

17   wish, and that right's guaranteed to you by the

18   Constitution of the United States?

19         DEFENDANT LEE:  Yes.

20         THE COURT:  And you do understand that you

21   also have a right to be silent and to be free from

22   self-incrimination.  Do you understand that?

23         THE DEFENDANT:  Yes.

24         THE COURT:  And that means that basically

25   you get to be a witness if you choose to be a witness,

```
 1    and that's your decision and your decision alone to make

 2    in consultation with your lawyer?

 3                 DEFENDANT LEE:  Yes.

 4                 THE COURT:  At this point your lawyer's

 5    indicated you do not intend to testify; is that true?

 6                 DEFENDANT LEE:  Yes.

 7                 THE COURT:  And do you agree with that

 8    decision?

 9                 DEFENDANT LEE:  Yes.

10                 THE COURT:  All right.  Mr. Mottinger, is

11    there anything that you wish to bring before the Court

12    at this point?

13                 MR. MOTTINGER:  Your Honor, I would ask the

14    Court to make the same inquiry of Mr. Royston.

15                 THE COURT:  All right.  Do you intend to

16    present any witnesses?

17                 MR. MOTTINGER:  At this point we believe

18    just Mr. Northern.

19                 THE COURT:  All right.  Mr. Royston, do you

20    understand that you have the right to testify?

21                 DEFENDANT ROYSTON:  Yes.

22                 THE COURT:  It's guaranteed by the

23    Constitution to you?

24                 DEFENDANT ROYSTON:  Yes.

25                 THE COURT:  Do you understand that you also
```

```
1   have the right to remain silent and to be free from
2   self-incrimination?
3              DEFENDANT ROYSTON:  Yes.
4              THE COURT:  And that means basically you
5   have the ability to be a witness or not to be a witness
6   based on your own election, and that's your decision
7   alone to make in consultation with your lawyer?
8              DEFENDANT ROYSTON:  Yes.
9              THE COURT:  Your lawyer tells me that at
10  this point he believes you're going to waive your right
11  to testify; is that true?
12             DEFENDANT ROYSTON:  Yes.
13             THE COURT:  And are you in agreement with
14  your lawyer's decision?
15             DEFENDANT ROYSTON:  Yes.
16             THE COURT:  All right.  And Mr. Loos?
17             MR. LOOS:  Your Honor, my client does not
18  wish to testify is my understanding at this point.
19             THE COURT:  Do you intend to call any other
20  witnesses?
21             MR. LOOS:  We intend to call -- Agent
22  Leingang actually was our only witness.
23             THE COURT:  All right.  And Mr. Forest, your
24  lawyer explains to me that you at this point do not
25  intend to testify; is that true?
```

1   DEFENDANT FOREST:  Yes.

2   THE COURT:  Do you understand that the

3   Constitution of the United States guarantees to you the

4   right to testify if you wish to?

5   DEFENDANT FOREST:  Yes.

6   THE COURT:  Do you understand that you also

7   have the right to remain silent and to be free from

8   self-incrimination if you desire?

9   DEFENDANT FOREST:  Yes.

10   THE COURT:  And basically what that means is

11   you're a witness in this case only if you choose to be,

12   and so you could testify if you want to.  That's a

13   decision you get to make in consultation with your

14   lawyer, but it's your decision, not your lawyer's.  Do

15   you understand that?

16   DEFENDANT FOREST:  Yes.

17   THE COURT:  Are you in agreement with your

18   lawyer's decision that you will not testify?

19   DEFENDANT FOREST:  Yes.

20   THE COURT:  All right.

21   MR. LOOS:  I apologize.  We did subpoena one

22   other witness, I just want to put that on the record,

23   Mr. Kenneth DeBerry.

24   THE COURT:  Yeah.

25   MR. LOOS:  He indicated to me that he'd

1    rather take a bullet in his head than testify and,

2    therefore, I don't think he's going to be very useful,

3    and we do not plan on calling him.

4              THE COURT:  That's a decision you can make.

5    If you want to call him outside the presence of the jury

6    and have me explain to him what his legal obligation is,

7    I'd be happy to do that.

8              MR. LOOS:  I understand, Your Honor.  We've

9    decided that he's not going to be helpful.

10             THE COURT:  Fair enough.  Ms. Goetz, are you

11   going to make an opening statement?

12             MS. GOETZ:  No, Your Honor.

13             THE COURT:  All right.  And do you want to

14   waive your opening statement on the record in front of

15   the jury, or would you prefer to waive it now?

16             MS. GOETZ:  I would prefer to waive it now.

17             THE COURT:  All right.  And do you intend to

18   call any witnesses?

19             MS. GOETZ:  I do not, Your Honor.

20             THE COURT:  All right.  And does your client

21   intend to testify at this point?

22             MS. GOETZ:  No.

23             THE COURT:  All right.  Ms. Dietz, do you

24   understand that you have a constitutional right to

25   testify?

1    DEFENDANT DIETZ:  Yes.

2    THE COURT:  And do you understand that you

3  also have a constitutional right to remain silent and to

4  be free from self-incrimination?

5    DEFENDANT DIETZ:  Yes, sir.

6    THE COURT:  And do you understand that

7  basically that's your decision and your decision alone

8  to make, although you should make it after consulting

9  with your lawyer?

10    DEFENDANT DIETZ:  Yes, sir.

11    THE COURT:  Your lawyer tells me that you do

12  not intend to testify; is that true?

13    DEFENDANT DIETZ:  Yes, sir.

14    THE COURT:  And do you agree with your

15  lawyer's determination in this case?

16    DEFENDANT DIETZ:  Yes, I do.

17    THE COURT:  All right.  Gentlemen and lady

18  defendants, if any of you change your mind and you

19  decide that you want to testify, you can still do that.

20  You can testify right up until the time that the case is

21  entirely rested, and so that's something you might want

22  to bear in mind.  And my saying that doesn't mean that I

23  advise you to testify or not to testify.  I'm just

24  telling you that that's still your right, all right?

25    Anything else we need to take up before we

1   bring the jury in?

2                   MR. MYERS:  No, Your Honor.

3                   MR. GOFF:  No, Your Honor.

4                   THE COURT:  All right.  Thank you.

5                   (The following sidebar discussion was had

6   outside the hearing of the jury:)

7                   THE COURT:  I assume that Mr. Goff's going

8   to call Jake Northern and that some of the other

9   defendants would like an opportunity to reexamine

10  Mr. Northern as well.  And what I'm really trying to

11  figure out is customarily what I would do in a defense

12  case is the defense would get to call a witness.  Then

13  I'd allow the government to basically cross-examine or

14  in this case redirect and then go to the other

15  defendants.  But I'm wondering whether we'd prefer to

16  just have each of the defendants take up their

17  questioning of Mr. Northern first and then let the

18  government do their redirect in the hopes that we

19  only -- that we cut down one round of questioning in the

20  process.  Does -- doesn't really affect you, Mr. Goff.

21  Mr. Mottinger?

22                  MR. MOTTINGER:  That's fine with me.  I

23  think it's probably Mr. Myers' call, Judge.

24                  MR. MYERS:  What the Court suggests makes

25  the most sense and will be the most efficient I think.

1          THE COURT:  All right.  We'll do it that way

2     then.   Thank you.

3               (Sidebar concluded.)

4               (In open court, all counsel and the

5     Defendants present, in the presence and hearing of the

6     jury:)

7               THE COURT:  Mr. Goff, does Mr. Lee have a

8     witness to call?

9               MR. GOFF:  Yes, Your Honor, we do.  We call

10    Jake Northern, recall Jake Northern.

11              THE COURT:  Mr. Northern, if you please

12    would come forward and retake the stand.  The Court will

13    remind you that you remain under oath.  Once again I'm

14    also going to remind you that you should lean into the

15    microphone and talk as loudly and as plainly as

16    possible, okay?

17              MR. NORTHERN:  Yes.

18              THE COURT:  Thank you.  Mr. Mottinger -- or

19    Mr. Goff?  I'm sorry.

20              MR. GOFF:  That's all right.  Thanks, Judge.

21                        **JAKE NORTHERN,**

22       HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE
          WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO
23        SAID CAUSE, TESTIFIED AS FOLLOWS:

24                     **DIRECT EXAMINATION**

25    **BY MR. GOFF:**

1    Q.   Mr. Northern, you recall I'm John Goff.  I

2    represent Ferris Lee.

3    A.   (No response.)

4    Q.   Do you remember that?

5    A.   Okay, yes.

6    Q.   And you've already testified almost a couple

7    weeks ago, right?

8    A.   Yes.

9    Q.   And I have asked you to come back to ask you a

10   few additional questions, okay?

11   A.   Okay.

12   Q.   You said in your original testimony that you've

13   known Ferris Lee for quite a long time?

14   A.   Yes.

15   Q.   Like a number of years, right?

16   A.   Yes.

17   Q.   Do you know any members of his family?

18   A.   Yes.

19   Q.   Do you know his parents?

20   A.   Yes.

21   Q.   Do you know his mother is Wandra Spragues?

22   A.   Yes.

23   Q.   And do you know his father is Ferris Lee?

24   A.   Yes.

25   Q.   How long have you known them?

1    A.   For a lot of years, 16, 17 years or more.

2    Q.   And that's from going all the way back into

3    Chicago?

4    A.   Yes.

5    Q.   I have my notes from when you originally

6    testified, but my recollection is that you said you got

7    out of jail or prison sometime in like 2005 or '6.   I

8    don't want to put words in your mouth so I should just

9    ask a better question.

10        Do you remember when you got out of jail?

11   A.   No, sir.   I think it's -- well, I think it was

12   2006 or 2007.   It was one of those.

13   Q.   Okay.

14   A.   I'm not for sure.

15   Q.   And do you know if Ferris was in jail in 2006?

16   A.   I can't recall if he was.

17   Q.   And you remember when we talked before I asked

18   you about Lionel Fraction?

19   A.   Yes.

20   Q.   Does Lionel Fraction have anything to do with

21   this case?

22   A.   No, sir.

23   Q.   He didn't have anything to do with this case at

24   all?

25   A.   No, sir.

1    Q.   Did you talk -- during the investigative part of
2    this case or during the time that you started
3    cooperating with the government, did you talk with Agent
4    Stuvland?  Do you remember that name?
5    A.   Yes.
6    Q.   Did you talk with Agent Stuvland?
7    A.   Yes.
8    Q.   Do you recall talking with Agent Stuvland about
9    Lionel Fraction?
10   A.   No, sir.
11   Q.   Agent Stuvland testified that you had said Lionel
12   Fraction did have something to do with this case.  Do
13   you recall that?
14   A.   No, sir.
15   Q.   Is it possible that you just don't remember, or
16   are you saying that you never told him that?
17   A.   I don't remember, but I don't think I told him
18   that.
19   Q.   You don't think you even told him that?
20   A.   No.
21   Q.   You know Lionel Fraction though, right?
22   A.   Yes.
23   Q.   So if Agent Stuvland said you talked about him,
24   you think he's mistaken?
25   A.   I can't recall talking about him, but I'm quite

1    sure I didn't.

2        Q.   But your recollection -- aside from what Agent

3    Stuvland says or didn't say, your recollection and your

4    knowledge is that you say Lionel Fraction didn't have

5    anything to do with this case?

6        A.   Yes, he didn't.

7        Q.   Herb Brown did though, didn't he?

8        A.   Yes.

9        Q.   And you know Herb, right?

10       A.   Yes.

11       Q.   And you know that Herb was selling drugs, right?

12       A.   Yes.

13       Q.   Did you know that Herb was selling some fake

14   drugs?

15       A.   No, sir.

16       Q.   You don't know anything about that?

17       A.   No, sir.

18       Q.   Do you remember going to Chicago December 22nd or

19   23rd of 2008?  Do you remember that?

20       A.   Yes.

21       Q.   What was that for?

22       A.   Well, it was December 22nd or something.

23       Q.   2008?

24       A.   Yes.

25       Q.   And what was that trip to Chicago for?

1    A.   For my wife's birthday.

2    Q.   Elmarie?

3    A.   Yes.

4    Q.   And she's also known by the nickname of Red?

5    A.   Yes.

6    Q.   So when's her birthday?

7    A.   12/23.

8    Q.   It is right on the 23rd?

9    A.   Yes.

10   Q.   Okay.  And was there a party?

11   A.   Yes.

12   Q.   In Chicago?

13   A.   Yes.

14   Q.   Where?

15   A.   On 47 and Princeton in Chicago.

16   Q.   Forty-seven?

17   A.   Yes.

18   Q.   And whose home is that, or what is that?

19   A.   It was a big building.  We rented it out.

20   Q.   A building?

21   A.   Yes.

22   Q.   Rented it out for -- must have been a big party?

23   A.   Yes.

24   Q.   Who did you travel to Chicago with on that time,

25   that occasion?

1    A.   It was Herb, me, Vito, Shaina and Red.

2    Q.   That's it?

3    A.   Yeah.

4    Q.   Do you remember if when you traveled in the car

5    that trip that you talked about picking up cocaine?

6    A.   No.

7    Q.   Did you talk about picking up cocaine on that

8    trip in the car?

9    A.   No.

10   Q.   If Herb said that you talked about picking up

11   cocaine on that trip in the car, you talked about it in

12   the car, would that be true or not?

13   A.   No, that wouldn't be true.

14   Q.   Do you have any idea why Herb would say that?

15   A.   No, sir.

16   Q.   How much contact or involvement did you have with

17   Herb in North Dakota in connection with drugs?

18   A.   Could you explain that better to me?

19   Q.   Herb was selling some drugs, right?

20   A.   Okay.

21   Q.   Do you know that?

22   A.   Yes.

23   Q.   Did you do that with him ever?

24   A.   I believe so, yes.

25   Q.   Okay.  How many times do you remember that

1    happening?

2        A.   Probably once or twice.

3        Q.   Once or twice?

4        A.   Yes.

5        Q.   Do you remember who you sold drugs to that one or

6    two times or who Herb did?

7        A.   No, sir.

8        Q.   Do you remember what city it was in, what town?

9        A.   It was in Fargo.

10       Q.   Fargo?

11       A.   Yes.

12       Q.   Okay.  That's once or twice.  Were you with Herb

13   any other times when he was selling drugs to people?

14       A.   I could have been, yes, yes.

15       Q.   Okay.  Well, what's your -- what's your

16   recollection about that?

17       A.   Well, he sold drugs.  And, you know, I was with

18   him numbers of times, and he sold some drugs when I was

19   with him, yes.

20       Q.   I'm sorry?

21       A.   Yes, he sold drugs before while I was with him.

22       Q.   While you were around him, with him?

23       A.   Yes.

24       Q.   Do you remember any of the people that he sold to

25   while you were with him?

1    A.   No, sir.

2    Q.   Did it matter to you?

3    A.   No, sir.

4    Q.   Who's Duck?

5    A.   I'm not sure.  He's a guy from Chicago.

6    Q.   But you don't know what his real name is?

7    A.   No, sir.

8    Q.   Was Duck here?

9    A.   Yes, Duck was here.

10   Q.   When was Duck here?

11   A.   I would probably say May of last year.

12   Q.   May of 2009?

13   A.   Yes.

14   Q.   Like a year ago right now?

15   A.   Yes.

16   Q.   How well did you know that Duck?

17   A.   I didn't know him that well.

18   Q.   Did you get to know him?

19   A.   Not really.

20   Q.   Well, did you hang out with Duck while he was

21   here?

22   A.   Yes.

23   Q.   How much?

24   A.   Not that much.  Probably about three times when

25   he was here.

1    Q.   And tell me about those times, what you did or
2    where you went or who was there.
3    A.   Well, one time I recall we went to this girl
4    named Marcia's house.  Another time we was at the park
5    and another time at the mall.
6    Q.   Do you remember when those times were?
7    A.   No, sir.
8    Q.   Were they right away in May when he came, or was
9    it throughout the summer or what?
10   A.   It was pretty much like when he came.
11   Q.   Now Marcia, is that Marcia Carter?
12   A.   I don't know her last name, sir.
13   Q.   You don't even know her?
14   A.   I don't know her last name.
15   Q.   Can you describe her please?
16   A.   Yes.  She's probably 5' 1", black, probably 120
17   pounds.
18   Q.   Is she kind of young?
19   A.   Yes.
20   Q.   And you were at her home?
21   A.   Yes.
22   Q.   And Duck was with you?
23   A.   Yes.
24   Q.   Did Duck ever get involved in selling drugs?
25   A.   No, sir.

1    Q.   How many people named Duck do you know?

2    A.   About three.

3    Q.   How many of those three have been here to North

4    Dakota in the last couple years?

5    A.   One, but there's one more that stay up here.

6    Q.   One more that stayed up here?

7    A.   There's one more that's been here for a long

8    time.

9    Q.   So you know two people that go by the name Duck?

10   A.   Yes.

11   Q.   In North Dakota?

12   A.   Yes.

13   Q.   Or have been in North Dakota?

14   A.   Yes.

15   Q.   Okay.   The Duck that you were just talking about

16   that came here from Chicago in May of last year, that's

17   not the one that stays here then?

18   A.   No, sir.

19   Q.   That's a different Duck?

20   A.   Yes.

21   Q.   Do you know the -- the one that stays here, the

22   one you weren't talking about a minute ago, do you know

23   that person's real name?

24   A.   No, sir.

25   Q.   How do you know that person?

1   A.   I sold him drugs before.

2   Q.   You sold him drugs?

3   A.   Yes.

4   Q.   So it's a man?

5   A.   Yes.

6   Q.   Can you describe him?

7   A.   He's about 5' 11", probably about 170 pounds.

8   He's black.

9   Q.   And you sold him drugs how many times?

10   A.   Maybe twice.

11   Q.   Can I call him No. 1 Duck?

12   A.   Yes.

13   Q.   So then No. 2 Duck is the one that came from

14   Chicago?

15   A.   Yes.

16   Q.   And you hung out with him about three times?

17   A.   Yes.

18   Q.   And you don't know that -- I'm sorry.  Do you

19   remember if Duck No. 2 was involved in selling drugs?

20   A.   I don't know.  He never sold drugs around me.  I

21   never saw him involved with the drugs.

22   Q.   You never sold drugs with Duck, Duck No. 2?

23   A.   No, I never.  He probably was in the car with me

24   when I sold drugs before, yes.

25   Q.   I'm sorry?

1    A.   He probably was in the car when I sold drugs

2  before, yes.

3    Q.   He might have been there when you did?

4    A.   Yes.

5    Q.   But you didn't sell drugs with him or to anybody

6  he knows or anything like that?

7    A.   No, sir.

8    Q.   So if somebody had testified and said that

9  No. 2 Duck was selling drugs around here, you don't have

10  any knowledge of that?

11    A.   No, sir.

12    Q.   Well, how many times do you think No. 2 Duck was

13  with you when you sold drugs to somebody else?

14    A.   Maybe once or twice.

15    Q.   Once or twice.  Would that have been one or two

16  of the three times you hung out with him?

17    A.   Yes.

18    Q.   Do you remember who you sold to?

19    A.   Who I sold to?

20    Q.   Yeah.

21    A.   I can't recall.

22    Q.   Can't remember?

23    A.   No.  I think Herb.

24    Q.   Sold to Herb?

25    A.   Yes.

1    Q.   So you were selling drugs to Herb?

2    A.   Yes.

3    Q.   And Herb was selling drugs?

4    A.   Yes.

5    Q.   Did this Duck No. 2, did he ever use drugs?

6    A.   I don't know.

7    Q.   While he was with you, I guess?

8    A.   No, sir.

9    Q.   You wouldn't know about any other time though?

10   A.   Yes.  No, I wouldn't.

11   Q.   Now do you remember testifying earlier about a

12   trip to Chicago when you got Ecstasy pills?

13   A.   Yes.

14   Q.   And do you remember testifying earlier, about the

15   same time you were talking about getting Ecstasy pills,

16   that you never got crack in Chicago?  Do you remember

17   that?

18   A.   Yes.

19   Q.   Is that true?  You never got crack in Chicago?

20   A.   Yes, I got crack in Chicago before.

21   Q.   You did?

22   A.   Yes.

23   Q.   So you didn't testify last week or the week

24   before that you did not get crack in Chicago?

25   A.   Well, we were talking about at a certain time,

1    sir.  I have got crack in Chicago before.

2        Q.  I'm talking about the time you got Ecstasy pills,

3    that trip you got Ecstasy pills?

4        A.  I can't recall getting no crack.

5        Q.  But when you went with Herb you didn't get any

6    crack, did you?

7        A.  No, sir.

8        Q.  Okay.  Now are you still selling drugs?

9        A.  No, sir.

10       Q.  Not at all?

11       A.  No, sir.

12       Q.  When did you stop?

13       A.  When I got arrested for this case.

14       Q.  You haven't offered drugs to anybody in the last

15   three months?

16       A.  No, sir.

17       Q.  So if somebody testified here and said about

18   three months ago you offered to sell them some drugs,

19   they'd be lying?

20       A.  Yes, they will.

21       Q.  And you haven't offered to sell anybody any weed

22   here just recently in the last weeks?

23       A.  No, sir.

24       Q.  When you -- well, first of all, you're not in

25   jail, right?

1    A.   No, sir.

2    Q.   And you're pending sentencing in the case that

3  you have?

4    A.   Yes, sir.

5    Q.   And is that in state court?

6    A.   No.

7    Q.   That's in federal court here?

8    A.   Yes.

9    Q.   Okay.  And we already talked about that, your

10  cooperation, and you hope to get some help from the

11  government and so forth, right?

12    A.   Yes.

13    Q.   So in connection with the charges in this court

14  that you're facing, did you receive investigative

15  materials, police reports, compact discs, DVDs, things

16  like that?

17    A.   Yes.

18    Q.   You or your lawyer?

19    A.   Yes, my lawyer.

20    Q.   And did you have a chance to go through and

21  review some of that stuff with your lawyer?

22    A.   Yes.

23    Q.   Okay.  Did you copy any of that stuff?

24    A.   No, sir.

25    Q.   You didn't copy any of that stuff?

1    A.   No.  What you mean?

2    Q.   Take a record of any of it or photocopies or --

3    A.   Yes.

4    Q.   You did?

5    A.   Yes.

6    Q.   Did you take videos of some of it?

7    A.   Well, I recorded a little bit in my phone.

8    Q.   A little bit?

9    A.   Yes.

10   Q.   How much is a little bit?

11   A.   Well, of me getting the wire wore on me with me

12   selling drugs on it.

13   Q.   Okay.  Is it possible that you took 51 video

14   entries in your cell phone?

15   A.   No, that's not possible.

16   Q.   Well, how many do you think?

17   A.   Probably two.

18   Q.   Two?

19   A.   Yes.

20   Q.   Do you know Kelly Poss?

21   A.   Kelly Poss?

22   Q.   Do you know that name?

23   A.   No.

24   Q.   Do you know a girl named Kelly?

25   A.   I know a couple Kellys.

1    Q.   Somebody in Sioux Falls?

2    A.   Yes, I know Kelly in Sioux Falls.

3    Q.   Did you show her videos on your phone?

4    A.   Yes.

5    Q.   Okay.  If she said you had 51 video entries on

6    your cell phone, would that not be true?

7    A.   That wouldn't be true, sir.

8    Q.   You're saying you had two?

9    A.   Yes, sir.

10   Q.   What else did you copy?

11   A.   That was it.

12   Q.   Did you show any of these videos or any other

13   evidence that you got in this case to other witnesses?

14   A.   No, sir.

15   Q.   You're sure?

16   A.   Positive.

17   Q.   And you've since erased all that stuff on your

18   phone?

19   A.   Yes, sir.

20   Q.   Why?

21   A.   Because I didn't want to get in no trouble.

22   Q.   Why did you take it?

23   A.   Because everybody was going around saying I was a

24   snitch and people wanted to do stuff to me because of

25   that.  So I was basically saving myself by showing them

 1   who was doing the telling so I don't get hurt around

 2   here.  So that's why I did it.

 3       Q.  Are you worried about getting hurt?

 4       A.  Yes, sir.

 5       Q.  And what do you mean by "snitch"?

 6       A.  Well, telling on people.

 7       Q.  Doing what you're doing you mean?

 8       A.  Yes.

 9       Q.  And so you were trying to show people that all

10   this stuff is out there already?

11       A.  No.

12       Q.  What were you trying to show them?

13       A.  I was trying to show them that it wasn't me.  It

14   was rumors passed around that Vito was saying I was

15   telling on him and everything.  Everybody thought it was

16   me and I wore the wire on him and all that.  So I was

17   basically trying to take myself out to clear that.

18                   MR. GOFF:  May I have one second, Your

19   Honor?

20                   THE COURT:  You may.

21       Q.  (Mr. Goff continuing)  Did you show any of those

22   materials, the discovery materials, to Patrick Lee?

23       A.  No, sir.

24       Q.  Do you know Patrick Lee?

25       A.  Yes, sir.

1    Q.   He's in Sioux Falls also, right?

2    A.   Yes, sir.

3    Q.   You sure you didn't show him any?

4    A.   I'm positive.

5    Q.   You know Rocco?

6    A.   Yes.

7    Q.   How well do you know Rocco?

8    A.   I don't know him that well.

9    Q.   When's the last time you saw Rocco?

10   A.   It's been a long time.  I can't recall it but

11   since he left Bismarck.

12   Q.   That's the last time you saw him?

13   A.   Yes, sir.

14   Q.   Did you pick him up in Bismarck?

15   A.   What do you mean?

16   Q.   Did he get into a car with you?

17   A.   (No response.)

18   Q.   When he left Bismarck?

19   A.   I can't recall it.  I think I took him back home.

20   I'm not for sure.  I'm sorry.

21   Q.   Okay.  Who brought Rocco?

22   A.   Vito did.

23   Q.   Vito did?

24   A.   Yes.

25   Q.   You sure Herb didn't?

1    A.   Yeah, I'm sure Herb didn't.

2              MR. GOFF:  That's all I have, Your Honor.

3              THE COURT:  Mr. Mottinger?

4                    **CROSS EXAMINATION**

5    **BY MR. MOTTINGER:**

6    Q.   Good afternoon.

7    A.   Good afternoon.

8    Q.   Do you know Jennifer Jordan?

9    A.   Jennifer Jordan?

10   Q.   Yup.

11   A.   I don't know.

12   Q.   You don't know who Jennifer Jordan is?

13   A.   I can't recall that.  I don't know last names.

14   Q.   Well, do you know a Jennifer?

15   A.   Yes.

16   Q.   Used to be a customer of yours?

17   A.   Yes.

18   Q.   Do you know whether or not she testified in this

19   trial?

20   A.   No, sir.

21   Q.   A little earlier last week there was a Jennifer

22   Jordan who testified --

23   A.   Mm-hmm.

24   Q.   -- and said that up until very recently, within

25   the last three months, you'd been trying to sell her

1    drugs.

2        A.   That's not true.

3        Q.   Not true at all?

4        A.   No.

5        Q.   Do you know James Randall?

6        A.   Yes.

7        Q.   How do you know James Randall?

8        A.   He was a customer.

9        Q.   Good customer of yours?

10       A.   He was okay.

11       Q.   How much money do you suppose he spent with you?

12       A.   I can't recall that.  A lot of money though.

13       Q.   A lot of money?

14       A.   Yes.

15       Q.   Several thousand dollars?

16       A.   Yes.

17       Q.   Do you know where he's at now?

18       A.   No, sir.

19       Q.   I'm a little curious about the copies you made on

20   your cell phone.

21       A.   Mm-hmm.

22       Q.   Why was it you made those copies?

23       A.   So because everybody was talking about I was a

24   snitch and I was telling on Vito and them and

25   everything.

1    Q.   Well, you were, right?

2    A.   Yes.

3    Q.   You'd already debriefed at that point?

4    A.   Yes.

5    Q.   You didn't make copies of that portion of the

6    discovery to show everybody, did you?

7    A.   Well, I didn't do what they thought I was doing

8    either though.  They thought I actually wore a wire on

9    Vito and them and everything.  I didn't do none of that.

10   Q.   And how many people did you show those to?

11   A.   One person.

12   Q.   Do you know Kenny Askew?

13   A.   Yes.

14   Q.   How do you know him?

15   A.   From the neighborhood.

16   Q.   From the neighborhood?  Did you tell Detective

17   Stuvland that you'd purchased about four and a half

18   ounces of cocaine by -- from Kenny Askew in Chicago?

19   A.   I can't recall that.

20   Q.   He wouldn't have any reason to misquote you,

21   would he?

22   A.   No.

23   Q.   Are you trying to protect Kenny Askew?

24   A.   No, sir.  Actually the times was different.  You

25   all throwing everything in on the same time, you know.

1    During this case and my involvement up here and

2    everything, I haven't messed with Kenny Askew.

3        Q.   So you didn't tell Detective Stuvland that there

4    were a few times when you and Ferris Lee went to Chicago

5    to get drugs, and that one of the times they were

6    supplied -- you were supplied by Kenny Askew, who sold

7    you about four and a half ounces of cocaine?

8        A.   Yes, but this was before the case.

9        Q.   That was before the case?

10       A.   Yes.

11       Q.   Well, when was it?

12       A.   A long time ago.

13       Q.   How long ago?

14       A.   It was -- I don't know.  It was pretty much some

15   years ago.

16       Q.   So were you mixing in a lot of things that you

17   told Detective Stuvland that were old and not related to

18   this particular situation, or was that the only thing?

19       A.   No.  Pretty much when he mentioned that to me I

20   was being truthful with him and everything.  That was

21   just on what he was asking me and I was telling him the

22   truth that, yeah, I had bought drugs from him before.

23       Q.   Your testimony earlier was that there was a time

24   you purchased controlled substance from Marcus Royston

25   in Minneapolis.  Do you remember that?

1    A.   Yes.

2    Q.   When was that?

3    A.   I can't recall the date, sir.

4    Q.   What time of year was it?

5    A.   I'm not sure, sir.

6    Q.   Was it hot?  Was it cold?

7    A.   It was warm out.

8    Q.   So it could have been spring?

9    A.   It could have been spring.

10   Q.   Could have been summer?

11   A.   I doubt it was summer.  It wasn't that hot

12   outside.

13   Q.   Or it could have been fall?

14   A.   I'm sorry, sir, I wasn't paying attention to the

15   weather and the dates when I was selling drugs.  I'm

16   sorry, I wasn't.

17   Q.   You seem to be paying attention to some things

18   but not everything, right?

19           MR. MYERS:  I'm going to object, Your Honor.

20   That's argumentative.

21           THE COURT:  Overruled.  Go ahead and answer

22   the question.

23           THE WITNESS:  Could you rephrase that?

24           THE COURT:  Changed my mind.  Sustained.

25           MR. MOTTINGER:  I don't have anything else,

1    Judge.

2             THE COURT:   Sometimes I change my mind.

3    Mr. Loos?

4             MR. LOOS:   Thank you, Your Honor.

5                        **CROSS EXAMINATION**

6    **BY MR. LOOS:**

7        Q.   Good afternoon, Mr. Northern.

8        A.   Good afternoon.

9        Q.   I represent Maurice Forest.  You remember that?

10       A.   Mm-hmm.

11       Q.   Do you recall a photograph that was -- that you

12   identified when you first testified that showed Maurice

13   with a couple other people?

14       A.   Yes.

15       Q.   Was that photo taken at the party for your wife?

16       A.   Yes.

17       Q.   And this didn't have anything to do with drugs;

18   is that correct?

19       A.   Yes, it didn't.

20       Q.   And you previously testified that this was before

21   Maurice was ever in North Dakota; is that correct?

22       A.   Yes.

23       Q.   Just to be clear, you testified earlier that you

24   never sold Maurice any drugs; is that correct?

25       A.   I never sold Maurice any, no.

1    Q.   You also testified that you brought Maurice from

2  Chicago to Bismarck; is that correct?

3    A.   Yes.

4    Q.   So if Tara Bauer testified that you weren't

5  present bringing him up from Chicago, that would be

6  incorrect?

7    A.   What you mean by that?

8    Q.   If she was to testify that you were not in the

9  car when Maurice came from Chicago to North Dakota,

10  would that be correct or not?

11    A.   How would she know that?

12          MR. LOOS:   That answers my question.  I have

13  no further questions, Your Honor.

14          THE COURT:   Ms. Goetz?

15          MS. GOETZ:   Could I have just a moment, Your

16  Honor?

17          THE COURT:   You may.

18          MS. GOETZ:   Your Honor, I will pass on this

19  witness.   Thank you.

20          THE COURT:   Thank you.   Mr. Myers?

21          MR. MYERS:   Could I just have one second,

22  Judge?

23          THE COURT:   You may.

24          MR. MYERS:   I don't have any questions,

25  Judge.

```
 1                THE COURT:  You may step down, Mr. Northern.
 2                MR. NORTHERN:  Leave out?
 3                THE COURT:  You're done.
 4                MR. GOFF:  Your Honor, may we approach?
 5                THE COURT:  You may.
 6                (The following sidebar discussion was had
 7      outside the hearing of the jury:)
 8                MR. GOFF:  Your Honor, I have a little bit
 9      of an unusual circumstance.  I'm at the point where I
10      intend to rest.  I don't have any further planned
11      witnesses, but I do think that I need to make a record
12      at some point of the fact that my client has now raised
13      the possibility of alibi as to May 28th and/or
14      July 24th.
15                Now I can state for the Court that from the
16      information I've been given right now there is no alibi,
17      but the first time he mentioned any of this to me was
18      last night in the jail.  So I've not given any notice.
19      I've not investigated this and so on and so forth.  He's
20      got his parents now doing some background investigation,
21      but I just want to make a record because I think I need
22      to do that.  But I don't have any further witnesses.
23                THE COURT:  Mr. Myers, do you wish to be
24      heard on that?
25                MR. MYERS:  Well, only to the extent, Judge,
```

1    that the -- these buys have been central to the case

2    from the initiation of the investigation.  And obviously

3    if Mr. Lee had an alibi with any merit I'm guessing we

4    would have heard about it a long time ago.  And so I

5    think Mr. Goff is doing what he needs to do as an

6    advocate, and if there's any evidence to be presented I

7    would ask the Court give a short window to present that

8    so we're not waiting for days or even multiple hours

9    to --

10               THE COURT:  Well, here's what my thought is,

11   and just to be perfectly blunt, I believe Mr. Loos has

12   one more witness to call and I think that then that will

13   close the evidence for all the defendants.  At this

14   point what I'm inclined to do is to hold Mr. Goff's case

15   open till tomorrow morning, and if he comes up with

16   something that looks like a real live alibi witness and

17   he thinks he's got to present it and he thinks he has

18   some explanation as to why it couldn't have been

19   presented and the proper notice couldn't have been given

20   or some constitutional reason why he should be allowed

21   to present it in any event, I'm all good with all that.

22   But I think we'll just give him till tomorrow morning to

23   figure it out, and we'll close the evidence tomorrow

24   morning.

25               We'll have the instructions conference and

1    things to do at that point anyhow, and so I'll just ask

2    him if he has any further witnesses to call at this

3    point.  Then I'll go through the rest of them.  Then

4    we'll break till morning.  Then when we get back in here

5    tomorrow morning we'll figure out where we're at.

6                  MR. GOFF:  Very well.  Thank you.

7                  (Sidebar concluded.)

8                  THE COURT:  Mr. Goff, do you have any

9    witnesses to call at this point?

10                  MR. GOFF:  No, Your Honor.

11                  THE COURT:  Mr. Mottinger, does Mr. Royston

12   have any witnesses to call at this point?

13                  MR. MOTTINGER:  No, Your Honor.  Defense for

14   Mr. Royston rests.

15                  THE COURT:  Thank you.  Mr. Loos?

16                  MR. LOOS:  We'd call Agent Leingang to the

17   stand, Your Honor.

18                  THE COURT:  Agent Leingang, I would just

19   remind you that you remain under oath.  You may retake

20   the stand.

21                  MR. LOOS:  I only have a few questions, Your

22   Honor.  Is it all right if I stay here?

23                  THE COURT:  You may.

24                           **BEN LEINGANG,**

25      HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE
         WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO

1        SAID CAUSE, TESTIFIED AS FOLLOWS:

2                    **DIRECT EXAMINATION**

3    **BY MR. LOOS:**

4        Q.   Agent Leingang, you testified earlier that you're

5    pretty familiar with the Budget Inn; is that correct?

6        A.   Yes.

7        Q.   This is the one in Bismarck.  Are you aware if

8    the Budget Inn has any video cameras?

9        A.   Yes.

10       Q.   And do they have video cameras?

11       A.   I'm pretty sure they do.

12       Q.   Did you check any of these surveillance cameras

13   when you were at the Budget Inn in regards to this case?

14       A.   No.

15       Q.   Do you recall Tara Bauer's testimony where she

16   said she was getting drunk in the Comfort Inn with Casey

17   Peterson on her birthday?

18       A.   Yes.

19       Q.   Do you recall that her birthday is January 19th?

20       A.   I don't recall that.

21       Q.   Is there a reason you didn't look at the video

22   surveillance tapes from the Budget Inn?

23       A.   No, I just didn't.

24       Q.   So when you're doing a criminal investigation, if

25   you think there's a crime that had been committed and it

1    was potentially caught on video, would you normally

2    check videotape?

3        A.   I would assume they probably wouldn't be dealing

4    drugs right outside by the video cameras.  I assume

5    they'd probably do it inside a hotel room where they're

6    not under surveillance.

7        Q.   But wouldn't the video show people coming in and

8    out of a hotel like you alleged?

9        A.   It could.

10             MR. LOOS:  I have no further questions, Your

11   Honor.

12             THE COURT:  Ms. Goetz, any questions of this

13   witness?

14             MS. GOETZ:  No, Your Honor.

15             THE COURT:  Mr. Goff?

16             MR. GOFF:  No, Your Honor.

17             THE COURT:  Mr. Mottinger?

18             MR. MOTTINGER:  No.

19             THE COURT:  Mr. Myers?

20             MR. MYERS:  No questions, Judge.

21             THE COURT:  All right.  You may step down,

22   sir.

23             Mr. Loos, any further witnesses to call?

24             MR. LOOS:  No, Your Honor.  Mr. Forest

25   rests.

```
 1              THE COURT:  Ms. Dietz?
 2              MS. GOETZ:  Your Honor, we have no witnesses
 3   to call, and we rest.
 4              THE COURT:  All right.  And so, ladies and
 5   gentlemen of the jury, that likely concludes all the
 6   evidence that will be presented in this case.  There are
 7   a number of questions of law that the Court needs to
 8   take up and a number of matters that need to be
 9   finalized.  Why don't you report back here tomorrow
10   morning at 10 o'clock.  Even though you have heard all
11   the evidence, you haven't heard my final instructions on
12   the law and you haven't heard the closing arguments of
13   counsel.  I want you to put this case out of your mind,
14   not think about it, not talk about it, because you still
15   haven't heard everything you're supposed to hear before
16   you make a decision.
17              I'm going to remind you not to discuss the
18   case or form any opinions or draw any conclusions until
19   we ultimately submit the case to you for your
20   deliberations.  We'll stand in recess until 10 o'clock
21   tomorrow morning.
22              (Jury excused.)
23              (In open court, all counsel and the
24   Defendants present, outside the presence and hearing of
25   the jury:)
```

1        THE COURT:  In light of the other issues

2   that we discussed at sidebar that may come up in the

3   morning, I think we should be here at 8:45 tomorrow,

4   which I think will give us time to do the jury

5   instructions and also take up any further evidentiary

6   questions.

7        Is there anything else that we need to put

8   on the record before we break?

9        MR. MYERS:  No, Your Honor.

10        THE COURT:  We'll stand in recess then until

11   8:45 tomorrow morning.

12        (Adjourned at 2:55 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25