1      **UNITED STATES DISTRICT COURT**
            **DISTRICT OF NORTH DAKOTA**
2             **SOUTHEASTERN DIVISION**

3   - - - - - - - - - - - - - - - - - -
                                      )
4   United States of America,         )
                                      )
5            Plaintiff,               )
                                      )
6        vs.                          ) **FILE NO. 3:09-cr-155-01**
                                      )          **3:09-cr-155-02**
7   Ferris Lavelle Lee, a/k/a Vito,)             **3:09-cr-155-04**
    Marcus Jermaine Royston,          )          **3:09-cr-155-08**
8   a/k/a BD, Maurice M. Forest,      )
    Jessica M. Dietz,                 )
9                                     )
             Defendants.              )
10  - - - - - - - - - - - - - - - - - -

11

12

13

14                    **T R A N S C R I P T**

15                           **O F**

16                  **P R O C E E D I N G S**

16          **JURY TRIAL - VOLUME X - MAY 25, 2010**

17                    **Pages 1829-1908**

18

19

20

21

22  TAKEN AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
              655 FIRST AVENUE NORTH
23            FARGO, NORTH DAKOTA  58102

24  BEFORE:  THE HONORABLE RALPH R. ERICKSON

25  COURT REPORTER:  KELLY A. KROKE

```
 1                    A P P E A R A N C E S

 2   MR. CHRISTOPHER C. MYERS            COUNSEL FOR PLAINTIFF;
     MS. JULIE LAWYER
 3   Office of US Attorney
     655 1st Avenue North, Ste. 250
 4   Fargo, ND 58102

 5   MR. JOHN T. GOFF              COUNSEL FOR DEFENDANT LEE;
     Attorney at Law
 6   4650 38th Avenue South, Ste. 110
     Fargo, ND  58106
 7
     MR. STEVEN D. MOTTINGER   COUNSEL FOR DEFENDANT ROYSTON;
 8   Attorney at Law
     15 9th Street South
 9   Fargo, ND  58102

10   MR. JASON T. LOOS            COUNSEL FOR DEFENDANT FOREST;
     Attorney at Law
11   505 North Broadway, Ste. 208
     Fargo, ND  58102
12
     MS. CAREY A. GOETZ           COUNSEL FOR DEFENDANT DIETZ;
13   Attorney at Law
     316 North 5th Street
14   Bismarck, ND  58503

15

16

17

18

19

20

21

22

23

24

25
```

1    **P R O C E E D I N G S**

2            (May 25, 2010:  The following proceedings

3    commenced at 8:45 a.m.: In open court, all counsel and

4    the Defendants present, outside the presence and hearing

5    of the jury:)

6            THE COURT:  We'll go on the record in a case

7    entitled United States of America versus Ferris Lavelle

8    Lee, also known as Vito; Marcus Jermaine Royston, also

9    known as BD; Maurice Forest; and Jessica Marie Dietz.

10   It's File No. 3:09-CR-155.  The record should reflect

11   that Mr. Lee appears personally along with his counsel,

12   Mr. Goff.  Mr. Royston appears with his counsel,

13   Mr. Mottinger.  Mr. Forest appears with his counsel,

14   Mr. Loos.  Ms. Dietz appears with her counsel,

15   Ms. Goetz.  Mr. Myers appears on behalf -- and

16   Ms. Lawyer appear on behalf of the United States.

17            When we last broke I had taken under

18   advisement Mr. Forest's motion for a directed verdict of

19   acquittal under Rule 29 as to Count Ten.  I've had a

20   chance to review the -- a preliminary transcript, and

21   essentially Galen Smith, as relates to Count Ten,

22   testified that I think it was a guy they called D, but I

23   wasn't really sure.  And then he followed that up by

24   stating that he didn't really get a good look, and that

25   is really the only reference as far as Count Ten goes.

1           Count Eleven, the identification is much

2   more positive and -- but, in looking at his testimony,

3   it does appear that while he was able to identify who D

4   is and how he came to know him, he is not able to

5   identify on Count Ten to a degree sufficient to

6   establish proof beyond a reasonable doubt that D, who he

7   identified as Maurice Forest, was actually present on

8   that occasion.  And so the motion for a directed verdict

9   on Count Ten -- or judgment of acquittal under Rule 29

10  on Count Ten, as relates to Mr. Forest, is granted.

11          All right.  Mr. Royston, there's something

12  you want to tell me?

13          DEFENDANT ROYSTON:  Yes, it is, Your Honor.

14  There's a few other issues that I think the Court should

15  be aware of that was not brought up, but I'll take the

16  time right now to bring it up.

17          I'm also glad that you did mention Galen

18  Smith because he's a part of what I have to argue.  It

19  has come to my attention that Mr. Myers and his staff,

20  along with some of those officers that had took the

21  stand, they willingly and knowingly committed perjury on

22  the stand, and I will explain why.  In the buys that was

23  alleged on May 28th, 2009, Officer Stuvland, in his

24  recording, he states not once but twice -- somewhere

25  back he states that the date was the 24th of May.  In

1    the CashWise buy he states that the date was the 20th of

2    May, which leaves us not knowing what the actual date

3    was, and all the officers testified to it being the

4    28th.

5            Furthermore, Galen Smith, who is also known

6    as Smitty, he testified that those buys didn't even

7    occur on the same day.  He testified that the buys

8    happened at least a week apart, which gives further

9    evidence to the fact that the government is alleging

10   these buys took place on the same day and they didn't.

11           Also this mysterious officer who supposedly

12   and allegedly pulled Maurice Forest over after the buy,

13   they say that there was no proof about this unlawful

14   traffic stop that allegedly occurred.  And there was no

15   proof of a citation.  There was no proof of any type of

16   written report.  And they didn't even bring the man to

17   court to testify that he pulled Maurice Forest over.

18   And this statement that the officer made was not in our

19   discovery, which brings me to the fact that there was --

20   there was proof and there could have been proof

21   presented had this been brought up into our discovery

22   and the lawyer would have had time to probably do a

23   little research on this alleged pullover because what I

24   understand when the officer's pulled you over and he

25   activates those lights on the car, the camera in that

1  front dashboard in the police car, it automatically

2  activates, which would have shown that that day it was

3  proof that Maurice Forest either got pulled over or he

4  didn't.  And had that been mentioned in our discovery

5  about this mysterious officer who alleged this traffic

6  stop, that evidence could have been brought forth that

7  he actually did get pulled over and that's actually how

8  he got identified as being the individual who actually

9  did those transactions that day.

10           So based upon -- and this is -- this is the

11  evidence that the government has presented which is in

12  that little box right there.  It's evidence in these

13  recordings and with this testimony that shows that these

14  different dates that Officer Stuvland recorded hisself

15  saying.  The evidence is there.  And I ask that the

16  Court review this evidence and take into consideration

17  of the fact that, you know, that these allegations are

18  false.

19           And there was -- the government hasn't

20  proven anything, the 500 grams, the 50 grams.  If you

21  look at the 50 grams of crack, it hasn't been proven.

22  They weighed this crack up with other substances so that

23  doesn't even give us an accurate weight.  So that's a

24  fatal variance right there into the Indictment.  Not

25  only that, but they don't even have a seed, a marijuana

1   seed.  So I'm not even understanding where this

2   marijuana's coming from.

3            Every -- each and every witness that was

4   placed on the stand that the government put up here,

5   each witness sit up here and told two different stories

6   that wasn't even accurate to what they say to the

7   police -- in the police's initial investigation and the

8   statements that they initially made to the police.  They

9   changed their stories.  Every witness did.  And every

10  witness was on the stand and said that they didn't say

11  what they said in the initial report.  And what was said

12  and what was stated in those initial reports was what

13  ultimately led to us being indicted in the first place.

14  So if it wasn't accurate there was no reason for us to

15  even be indicted on such a case that the government

16  alleged was this big massive organization that had so

17  many amounts of -- X amount of dollars, X amount of

18  dollars.  I mean, it doesn't -- none of it makes any

19  sense, Your Honor.  And I don't think that there's even

20  enough evidence to even -- I mean, with all due respect,

21  there's not even enough evidence to even turn this over

22  to the jury's hands.  There's too many unexplained

23  questions, and all we can do is sit here and wonder to

24  ourselves, like, what happened?

25            The buy at Sunmart where Herb Brown alleges

1  one thing happens but gets on the stand and then

2  testifies to another, he's the only one who was actually

3  able to put anybody on the scene.  And he tells two

4  different stories so we're left not knowing what to

5  believe.  So we don't know if the transaction -- we

6  don't know when the transaction happened.

7          Stuvland clearly put that out there.  We

8  don't even know when the transaction happened.  We don't

9  know what happened, and we don't even know who was

10  there.  There's insufficient evidence to establish all

11  this, all the government's claims, there's insufficient

12  evidence, and I can't see why -- I mean, I just don't

13  see it.  I mean, maybe I'm missing something, but I

14  don't see where the government has even provided any

15  type of doubt.  Their witnesses got up there and said

16  that what he is claiming is not what they said, and if

17  I'm missing anything, you know, I mean (no further

18  response).

19          DEFENDANT FOREST:  Yes, I got something to

20  say, too, Your Honor.  I wrote you a letter that I was

21  supposed to send to your office, but it didn't get

22  there.  I didn't send it off.  But it's a letter that I

23  wrote to you for the fact is that this Adrienne American

24  Horse, when she allegedly got on the stand, when she was

25  told to identify me she pointed and said a different

1  color shirt than I had on.  If you wouldn't have

2  corrected her she would have been pointing to

3  Mr. Royston as me.  She pointed out the shirt that he

4  had on.  She didn't say the color that I had on.  But

5  you stopped her, before she could finish, to correct

6  her.  And I believe that's something that need to be

7  addressed, too.  I told my lawyer to do it, but

8  evidently he didn't so -- and then like he was saying

9  about this -- these allegedly drug buys, now this

10 Zachary Jones, he's supposed to be a co-conspirator but

11 he's not charged in this case.  He didn't accept no type

12 of agreement for jail time or nothing.  He made a

13 statement saying that he didn't have nothing to do with

14 this.  The drugs he got caught with was his own.  So why

15 has we been charged with something that he was involved

16 with?

17            And then like you said, Mr. Smitty, how

18 everybody else know me as Big Man supposedly, and this

19 guy all of a sudden say I'm somebody named D.  Who is D?

20 You know, and then he stated that he never -- he don't

21 know if that was me in the car, which you granted me

22 that.  I appreciate that.

23            And then, you know, like you said, this

24 Stuvland officer, he said different dates, which I

25 believe that these officers was trying to trigger a

1  mandatory minimum of these drug buys that happened

2  different days.  And they tried to point it to you when

3  they gave it to the prosecutor to point out and make

4  these drug buys the same days so they wouldn't see that

5  they did trigger a mandatory minimum for entrapment,

6  which is -- there's various case laws under that that

7  should happen, you know.  And I believe that this case

8  shouldn't even been brought to your attention or to no

9  other federal judge, but the prosecutor did this to make

10  these drug buys on the same day, which they didn't occur

11  on the same day as you can see the witnesses stated

12  this.

13          Smitty say that this drug buy's supposed to

14  be February 6th.  Didn't happen on the same date.  And

15  then Stuvland briefly in his opening -- when he doing

16  the drug buys for Herbert Brown stated different days

17  each -- each buy that that happened on.  So I believe

18  that this -- it's a lot of stuff that, like he say,

19  shouldn't be brought to the jury attention.  This case

20  shouldn't even be going to the jury.  I feel that it is

21  something that you should decide, and you should look at

22  all these variances and decide this on this case.

23          THE COURT:  Thank you.

24          DEFENDANT LEE:  I just want to add, too, you

25  know, yesterday Brad Stuvland got up there and he said

1  he got some reliable information about Lionel Fraction

2  from Jake Northern.  Jake Northern, from the first time

3  he testified and to now, yesterday got up there and told

4  you that he never told Brad Stuvland that Lionel had

5  nothing to do with this.  Now he committed perjury up

6  there and said that Jake Northern told him that Lionel

7  had something to do with this.  Well, if Lionel is the

8  source, and I work for Lionel supposedly, why Lionel is

9  not charged?  So evidently he didn't believe what

10  whoever, Jake Northern or Tara Bauer, whichever one of

11  them said this about Lionel.  He didn't believe it

12  enough to charge it.  And that's crazy because he

13  believed what Jake Northern said about Jessica though.

14  You see what I'm saying?

15          They believe in what they want to believe,

16  Your Honor, and it don't make no sense.  This whole

17  thing, where's the drugs?  Where's the money?  Where's

18  this big-time crime large drug scale organization?  I

19  ain't heard a controlled buy over -- I can't even say

20  2.5 because all that ain't even drugs.  You just heard

21  the lab report got up there and specifically told these

22  people, without this cut this drug could be weighed way

23  lesser.

24          And all these controlled buys that they

25  trying to charge me with, Your Honor, I don't have

1  nothing to do with that.  I'm not nowhere around from

2  Two, Three, Four, Six, Seven.  I'm just being charged

3  because of what?  Because somebody said that I supplied

4  some drugs?  Where's the evidence for that?  I don't see

5  no evidence for none of that.  I don't even see why we

6  even charged.  He charging us with 50 grams.  If you

7  total up the drugs that you let get into evidence is

8  nowhere near 50 grams, nowhere near 50 grams.

9       Then you got -- he played a battle with

10  Zachary Jones because Cavelle Smallwood got up there and

11  told these people that Zachary Jones told him he got

12  some drugs from me.  This man said I was out on 2006.

13  I'm incarcerated in 2006, Your Honor.  I know you

14  probably seen it and looked at it.  I'm in jail, in

15  prison, so how am I -- how is this guy that met me in

16  2006, how do we know this guy's even telling the truth?

17  Like he said, Zachary Jones said he didn't have nothing

18  to do with this.  Rashad Jackson said he don't know what

19  Zachary Jones was doing.  He said he -- what Rashad said

20  was that he messed around for a month and a half or so.

21  When they finally got popped, that was March.  So how

22  does that put me with -- have to do with anything -- of

23  anything of his drugs?  That 11.73 grams should not be

24  admitted into evidence.  That's hearsay from who?

25  Somebody we don't even know.

1    All these people getting up here saying one

2    thing in the initial debrief, which I want to point out

3    that numerous -- the government witness has got up there

4    and said that Stuvland wrote down what he wanted to.  I

5    didn't say this or, you know, so how do we know that

6    this Brad Stuvland is just not putting what he wanted on

7    paper?  Herb Brown said it, Jake Northern, Jennifer

8    Jordan.  All these people saying they did not say this.

9    So this man just basically wrote what he wanted to.

10    And then it goes back to the controlled

11    buys.  He's stating on the tape 5/20.  Then he state

12    5/24.  I just got a flight attendant to show that I was

13    nowhere around here on May 24th, nowhere around here.

14    Yeah, the 28th I was nowhere around here, Your Honor.

15    How could I be in Atlanta, which is I don't know how

16    many miles away from here, but I supposed to be on a

17    controlled buy.

18    I mean, Your Honor, to tell you the truth, I

19    don't even see why this case went this far because, you

20    know, I'm not the smartest man in the world but I done

21    seen cases and, like I said, this case, I mean, if I'm

22    supposed to be such a big drug dealer, where is all

23    these exes that I was supposed to have?  Where is all --

24    why did they never -- they said that supposedly all

25    these drugs was kept at Shaina house, and why not once

1    did they ever come raid the residence?  Ain't none of

2    this making no sense.  They don't got a dollar, Your

3    Honor, a dollar, a dollar, Your Honor.

4              DEFENDANT ROYSTON:  Basically what it all

5    boils down to is this whole case is hearsay.  And if the

6    government is allowed to present a case just based off

7    accusations that they obtained from various individuals

8    and say:  Ah, well, such and such told us this, that's

9    just like me saying that my lawyer committed a murder

10   but they have no body and no missing person report.

11   Then I get to court and he's in court fighting a murder

12   charge, and then I get to court and I testify and say:

13   Oh, I'm sorry, they got it wrong in the statement.  It

14   was three bodies instead of just the one.  You see what

15   I'm saying?  It's all hearsay.

16              And if the government is allowed to sit up

17   here and present a case just based off what an

18   individual who was facing a mandatory life sentence and

19   trying to get out of his whole whatever he was faced

20   with and just bring up accusations against other

21   individuals, if they're allowed to do that then I don't

22   see why our argument shouldn't be taken into

23   consideration when I got more proof to prove that the

24   government was allowing these officers to go up on this

25   stand and commit perjury because it's on the recordings.

1   It's there.  The dates is there.  He said it.

2              I mean, like he tried to argue away:  Oh, it

3   wasn't the 20th that I said.  It was the 28th.  I just

4   said it fast.  Okay.  I give you that.  But then so what

5   about the 24th then?  You also said that.  You didn't

6   make that mistake once.  You made it twice.  And that

7   because it wasn't a mistake.  They trying to couple all

8   these buys that they saying happened on one day, and

9   it's not adding up, Your Honor.

10             Like Smitty said, Galen Smith, this is their

11  reliable confidential informant.  He said it hisself.

12  These buys didn't happen the same day.  These was at

13  least a week apart.  So if the government is allowed to

14  just bring accusations forth, then our argument should

15  be able to be taken into consideration as well because I

16  can show more proof that they lying than they got to

17  show that I was ever involved in anything.

18             They don't have any witnesses -- they don't

19  have any witnesses placing me anywhere, anywhere.

20  Everybody's saying:  Oh, well, he was rarely around.

21  Then they got the nerve to ask people if I had a job,

22  Your Honor.  I don't even live in Fargo.  I stay in

23  Minneapolis.  These people say they rarely saw me.  How

24  do you know if I got a job or not?  I don't even

25  understand why that question was even asked.

1           The accusations -- I mean, the whole case is

2   hearsay, Your Honor.  The whole case is hearsay.  We

3   don't know what happened on the 28th or even anything

4   ever happened on the 28th.  We don't know what took

5   place in that automobile because, for one, Herb has

6   already been proven to lie under oath, and then for two,

7   he gave two different accounts of what happened on that

8   day.  He gave two different stories.  So what are we to

9   believe?  How can we even believe that any of these

10  things even took place?

11          DEFENDANT LEE:  And another thing that I

12  want to add is, okay, they say Tara Bauer provided them

13  with information about this case.  But Tara Bauer, when

14  she got up there and testified, Your Honor, she said

15  everything she basically know is hearsay.  Now check the

16  court transcripts if I'm right or wrong, but I believe I

17  heard that she said everything she basically know is

18  hearsay.  So if everything she basically know was

19  hearsay, how can we build a case?

20          DEFENDANT FOREST:  I got something to add,

21  too, Your Honor, about these witnesses lying.  These

22  American Horse sisters, Clarissa and Adrienne, they

23  stated in their statements that I sold them drugs in

24  April and May.  I have a ticket getting pulled over by

25  the Wisconsin State Patrol on Highway 94 when I was

1 going to Chicago on March the 20th, which is the day of
2 my mother's birthday.  I told my lawyer about this
3 ticket.  He have a copy of that.  It should have been in
4 evidence.  But this clearly state that these witnesses
5 are lying saying that I was in North Dakota in April or
6 May in this truck.  I got pulled over in her truck that
7 I supposedly stole, and these people ran my name and let
8 me go.  If I was in a stolen truck how am I -- why was I
9 not charged for a stolen truck?  But I got pulled over
10 by the Wisconsin patrol on my way to Chicago in March,
11 but these people stated that I was selling them drugs in
12 April and May.  I wasn't nowhere in North Dakota in
13 April or May.
14          THE COURT:  All right.  Mr. Myers, is there
15 anything you want to say in response to any of that?
16          MR. MYERS:  Judge, I don't.
17          THE COURT:  Mr. Goff, is there anything that
18 you want to bring before the Court at this time?
19          MR. GOFF:  Yes, Your Honor.  Thank you.  As
20 I indicated for the Court yesterday at sidebar, and I
21 raised it at that point because I had concluded the
22 testimony of Jake North -- or Northern, which I guess
23 was my case in chief in recalling him, and I didn't want
24 to rest without bringing to the Court's attention that
25 my client, Mr. Lee, has advised me really as of Sunday

1   in the -- when I visited him two days ago, that he felt

2   that he had alibi evidence possibly for the July 24,

3   2009 alleged controlled buy, and potentially the May 28,

4   2009 two controlled buys.  We had not discussed the

5   possibility of an alibi defense before this, before

6   during trial.

7           In fairness though in speaking with his

8   mother some weeks ago, we didn't talk about an alibi

9   defense.  But she did tell me at one point that he was

10  in Atlanta here and there and Chicago here and there,

11  and he traveled primarily to Atlanta from time to time.

12  In any event, as I told the Court yesterday, his family

13  was doing some investigation as we spoke yesterday, and

14  the Court granted us until this morning to come up with

15  something.

16          What I have been provided this morning, Your

17  Honor, purports to be a travel history on United

18  Airlines.  The problem that I see from my client's

19  standpoint is that nowhere on this two-page document

20  does it include his name, but it's a pass.  It's a

21  travel pass history for an individual and it says logged

22  in as Carlton E. Sallis, S-a-l-l-i-s, who I am

23  informed -- without doing any independent investigation,

24  I'm informed is an employee of United Airlines and an

25  acquaintance of my client such that Mr. Sallis from time

1  to time would purchase airline tickets in his own name I

2  guess or at least as his log-in ID, and provide travel

3  passes or tickets to my client.  The individual

4  transactions, and there are quite a number of them, are

5  identified as either employee or companion, and then

6  there's some that say eligible.

7          In any event there is an entry on May 24th,

8  2009, which indicates that the origination location is

9  Chicago, CHI, and the destination is Atlanta, ATL, and

10  the relation category, which is what I've identified as

11  employee, companion or eligible, and that particular

12  flight says companion, which I am informed, again

13  without independent investigation, is what my client

14  would be identified as when Mr. Sallis would obtain a

15  ticket for him.  And of course the obvious purpose of

16  this is the reduced fees that employees of airlines get,

17  and there's a fee on that particular travel of $49.90.

18  There was -- that takes care of this document that I was

19  provided this morning, Your Honor.

20          There was an indication that my client had a

21  reservation at an Extended Stay hotel in the Atlanta

22  area in May of 2009.  That information was brought to my

23  attention yesterday.  I did make a personal phone call

24  to the motel, Extended Stay hotel, motel, in the Atlanta

25  area.  There's a name of the city, and I have it but it

1    escapes me right at the moment, but it's in the Atlanta

2    area.   And I identified myself and the reason I was

3    calling, and the person I spoke to said they would have

4    to check with somebody and get back to me, and I've

5    never received a return phone call.   That was right at

6    the close of court yesterday.   That information was

7    initially given to me by my client's parents.   His

8    mother actually gave me that particular information.

9    That's what I know about May 28th at this point, Your

10   Honor.

11            My client indicates to me that he's also

12   attempting to obtain travel information in February, and

13   I believe there's a couple of buys alleged on

14   February 6th.   He's identifying Frontier Airlines as the

15   possible commercial carrier that he's checking or trying

16   to check with, although I don't think they're -- I think

17   their business status is questionable at this point.

18            As I said yesterday, Your Honor, I didn't

19   bring it to the Court's attention because I didn't know

20   there was any issue.   I'm not sure at this point I can

21   even -- I would even represent to the Court that I have

22   alibi evidence, as I've identified the specifics of the

23   May potential travel issue at this point.

24            What further complicates it, Your Honor, is

25   even if the Court were to allow me to present anything

1    like that without notice to the government, without them

2    having an opportunity to investigate all the issues that

3    go along with that, without myself having a thorough

4    opportunity to investigate this, my client has already

5    exercised his right to remain silent and not testify.

6    I don't have Mr. Sallis.  I've never spoken with

7    Mr. Sallis.  I have no idea who that person is other

8    than his name is on this document and I've been told

9    that he buys tickets for my client.  I don't have that

10   person available.  I don't even know the details of what

11   he would say.

12            But that's the information I've been

13   presented with, Your Honor, and the time frame I've been

14   presented this information in.  Again from what I see

15   there may be some questions that could be raised, but I

16   don't see that I have absolute alibi evidence at this

17   point; although, my client indicates to me that he did

18   travel on May 24, 2009 from Chicago to Atlanta and

19   stayed there beyond the date in question.

20            He apparently wants to address the Court,

21   Your Honor.

22            THE COURT:  He may.

23            DEFENDANT LEE:  About these plane tickets,

24   Your Honor, well, you know, on YouTube you could clearly

25   see that my reason for flying to Atlanta was because I

1    was doing music stuff with my cousin.  So that's why I

2    had to fly back and forth because I had to perform and

3    then when I wasn't performing I'd fly back home.  But at

4    the same time I flew out of here February -- I think

5    February -- February 5th, the night of February 5th,

6    from Frontier Airlines.  And I've been trying to obtain

7    that -- that information, but Frontier Airline has went

8    out of business because it was only a small like

9    commercial airline in Fargo.

10            And another thing I want to let you know

11   that when I supply my lawyer information about the

12   individuals that would have came and testified about

13   Jake Northern showing the discovery to everybody and the

14   female that he questioned him about, she was willing to

15   come.  I don't know why my lawyer didn't subpoena her to

16   come, but it's numerous people out here that seen this

17   discovery, and he didn't show them.  And my sister and

18   my father, they have knowledge to this, too, you know.

19   And we just want to let you be known to put out there

20   that where was these lawyers when this man was sitting

21   up here with his phone recording these discovery?  Is

22   this something that they just let happen?

23            So how do we know?  Like Jennifer Jordan

24   said, when she came out the interview room Jake Northern

25   was questioning her.  What is he questioning her about?

1    I mean, it's just a whole bunch of speculation.  It's

2    inconsistent, Your Honor.  And I don't see how this case

3    even is going forward the way it is, Your Honor, because

4    it's a whole bunch of inconsistencies.  It's a whole

5    bunch of lies.  Everybody's story is not corroborating.

6    The main person that put this story together got up on

7    the stand and admitted that everything they know is

8    hearsay.  And they say I work for Lionel Fraction and he

9    is my source.  So why isn't he charged in this case?

10   That's my whole point.

11            MR. GOFF:  Your Honor, if I might?

12            THE COURT:  You might.

13            MR. GOFF:  I might just add a couple things

14   my client just said about my representation of him.  He

15   gave me the name of Kelly Poss, who I confront -- and a

16   telephone number that I confronted Mr. Northern with

17   yesterday.  He gave me that a couple of days ago.  It

18   might have been in the jail on Sunday or it could have

19   been yesterday.  I'm not sure.  No, it was definitely

20   before yesterday because I did call her on Sunday night.

21   I called her on Sunday night.  I spoke with her.  And

22   she's the one that gave me the information about 51

23   video entries on Mr. Northern's cell phone.  I didn't

24   make that up.  That's where I got that information was

25   from Kelly Poss.

1        When I confronted Mr. Northern with the fact

2   that he had recorded this and shown it to her, he

3   admitted it.  I mean, I don't know what else I could

4   have done with Kelly Poss.  He acknowledged and admitted

5   that he had recorded these things.  Didn't acknowledge

6   the number, but that's really insignificant I think

7   anyway.  So I just wanted to clarify that, acknowledge

8   that that happened.  I did speak with Kelly Poss, and

9   that's where I got some of that information that I asked

10  and confronted him about.

11       Now one additional item that hasn't come up

12  today.  His cousin, Patrick Lee, who lives in Sioux

13  Falls, South Dakota, I think I confronted Mr. Northern

14  with that yesterday.  Well, that name anyway.  My client

15  has talked about calling Mr. Lee, and he was one of the

16  two people I think in the very status conference we had

17  a week or so before this trial that I indicated there

18  were two people that I was talking to.  One of them was

19  Lionel Fraction and the other one was Patrick Lee.  I

20  did speak with both of those people.

21       The issue with Mr. Lee is that he would

22  purportedly say that he -- to his knowledge there was no

23  meeting in the summer of 2008 at Shaina Sjostrand's

24  apartment, which there has been some testimony that

25  there was a meeting there when my client and

1    Mr. Northern said they were going to start delivering

2    drugs.  When I talked with Mr. Lee about that, he could

3    not be specific as to when this happened.  He couldn't

4    possibly have been at Miss Sjostrand's apartment the

5    entire summer.  The only time frame we have is the

6    summer of 2008.

7              When my client brought that up during the

8    trial -- because there had been some testimony about

9    that.  I think it might have been Jake Northern or Herb

10   Brown apparently.  Either way, whoever it was, I

11   informed him that in my opinion that was so

12   insignificant in the whole scheme of things that calling

13   one person to say that there was no meeting over the

14   period of a number of months when he couldn't possibly

15   reasonably know that would just draw more attention to

16   that than had already been given.  But in any event

17   that's the reason.  That was the discussion.  I don't

18   have Mr. Lee here because he can't tell us when.

19              THE COURT:  All right.

20              DEFENDANT ROYSTON:  I just got one more

21   thing, Your Honor.

22              THE COURT:  Yes.

23              DEFENDANT ROYSTON:  I know it's getting

24   tiresome.  There's also like a number of different

25   things, too, because on the 28th I was -- I mean, I

1    could have had proof because I did ask my lawyer, and I

2    ain't trying to beat my lawyer up or badger him or

3    nothing.  I think I done enough of that.  But there

4    was -- I did give him information that he should have

5    got in contact with my probation officer in Minneapolis

6    for information that was stating that I was traveling.

7    She gave me a travel pass to go down to Chicago, me and

8    my baby momma, Jessica, for my brother's wedding.  And

9    all this was around the time of the 28th when these buys

10   allegedly occurred.  I'm not sure why this

11   information -- why my lawyer hadn't obtained this

12   information to present to the Court.

13              And also Jake Northern in his statement --

14   and this is something I did really want pointed out

15   because in his statement he stated to the police that he

16   met me in Bismarck at Jessica's house when him and

17   Ferris first went down there around the summer of 2008,

18   which that was impossible because I was in custody of

19   the La Crosse County, Wisconsin.  I was on house arrest.

20   I was in their custody from March till October, and then

21   from October to December I was incarcerated.  So I'm not

22   seeing how it was even possible for me to even be

23   anywhere in North Dakota.  And this is an issue that I

24   wanted raised while Jake Northern was on the stand.  But

25   it's in his statement and he stated this to the police.

1           And once again this whole Indictment was

2   brought down because of the statements that was made by

3   the individuals who they questioned.  And that was

4   impossible for me to ever been anywhere in the vicinity

5   if I'm on house arrest.  And even then he also stated in

6   his statement that I was on the north side of

7   Minneapolis somewhere during the summer and I was

8   selling drugs in and out of the house.  I stay in

9   Brooklyn Center, Minnesota in an apartment building on

10  house arrest.  How I'm on the north side of Minneapolis

11  selling drugs out of a house?

12          See, these are issues that should have got

13  brought forth when Jake Northern was on the stand.

14  These are issues that I really did want to bring forth.

15  But once again it wasn't, you know, and -- but it's all

16  right here, man.  I mean, the statements, the audio

17  recordings that Mr. Stuvland did, all the statements

18  made by all the witnesses on the stand, I mean, it's all

19  right there, Your Honor.  And if the government is

20  allowed to just bring up a whole case and have me facing

21  a mandatory life sentence based off accusations that

22  they just heard from other people and that be taken into

23  consideration, which have us right here now in trial,

24  which have us sitting here since -- I was locked up

25  January 15th, indicted December 10th.  So if that

1   information was enough to even get us in this courtroom

2   today, I don't see how the information we're providing

3   right now is not enough to oppose what it is that the

4   government is alleging when I got witnesses that can sit

5   up there and tell you that -- in this courtroom right

6   now today that can sit up here and say that I was in

7   Chicago for my brother's wedding on the 28th.  So

8   they're allowed to bring up accusations based off no

9   factual proof.  I mean, my arguments right now today in

10  this courtroom should hold the same weight.

11              MR. GOFF:  Your Honor, I don't mean to

12  belabor this.  There was one more thing in light of the

13  potential for some of these things coming up later.

14  Just with regard to Mr. Lionel Fraction, as I indicated

15  I did speak with him at some length on the telephone.

16  And I went and visited my client at the jail and we

17  talked about that.  And because of some information that

18  Mr. Fraction would present -- and it had nothing to do

19  with crack or marijuana or anything.  It had to do with

20  a relationship of my client and Jake Northern.  Because

21  of that information and what he would testify to, he

22  said, about the relationship, my client decided it was

23  not a good idea and did not want to have Mr. Fraction

24  come.

25              DEFENDANT FOREST:  Your Honor, can I say

1    something?  My last time, too.  I just want to address,

2    you know, we not taking nothing from our lawyers.  We

3    feel that they've done a good job, you know.  We

4    all human.  They might forget things, make mistakes, you

5    know.  They're not fighting for their lives.  That's why

6    we're here, to correct things that they miss or to let

7    them know things that they missed that should have

8    brought forth.  We feel that they done a good job, you

9    know.  But, like I say, it's not them that's fighting

10   for their lives right now.  It's us.  So we feel that

11   these accusations should be heard that we have brought

12   forth.  So we not trying to get no mistrial or blaming

13   our lawyers for nothing.  We just feel that these

14   accusations need to be heard that was not presented.

15   That's all.

16            THE COURT:  All right.  Let's kind of all

17   step back and let's take a look at what we've heard.

18   Now the great bulk of what you folks have told me are

19   proper argument and can be raised in the closing

20   arguments and should be addressed.  I mean, the

21   confusion on the dates, the ever-changing testimony of

22   certain witnesses, you know, that's all fair game.  The

23   evidence is out there.  It needs to be argued.  The

24   problem is that really what we're talking about on those

25   issues is weight and credibility of the witnesses, which

1    is not ordinarily the judge's job to decide.

2            The second thing is this whole question

3    about, well, the case is built on hearsay.  The problem

4    that you're running into in this case is that this case

5    is what's called a historical conspiracy, and it looks

6    back in time and it's usually recreated through the

7    testimony of witnesses.  In this circuit historical

8    conspiracies are fairly commonly prosecuted.  They're

9    fairly commonly prosecuted all over the country.  The

10   issues about who said what, when, where, those issues

11   are always very important in a historical conspiracy

12   case, and there's a lot of argument.  And the problem in

13   this case is not very uncommon, and that is you get to

14   the point where one of the arguments is -- you say I

15   had, you know, X amount of drugs, and all you've got is

16   X minus 80 percent sitting in a box, and that's what you

17   really have.

18           And ultimately you've got witnesses whose

19   stories don't match up entirely.  The quantities that

20   they testify to vary from witness to witness.  That kind

21   of evidence is really frankly very common in these types

22   of conspiracy prosecutions because nobody gets out their

23   scale and weighs every single quantity of narcotics that

24   they see.  It just doesn't happen that way.

25           Now defense lawyers routinely argue that,

1   you know, there's a lot of incentives for these

2   witnesses to take the stand and triple and quadruple and

3   double the amount of drugs they see, and those arguments

4   are made.  And why are they made?  Well, you say:  Look,

5   these people are looking at long prison sentences.

6   They're willing to say anything.  But once again that's

7   about the weight and the credibility, and that's

8   ultimately a jury question, okay?  And so that's --

9   that's something that the Court doesn't usually get to

10  decide the case on.

11           Now there are a number of things that folks

12  said here today that you want me to take it into

13  consideration.  Well, I can't.  It's not the evidence.

14  It hasn't been presented here in court, and it needs to

15  be presented, okay, if it's going to be considered.

16           Now if you look at what you've been saying

17  now, there's a bunch of it that's just saying:  Look,

18  they've been inconsistent, they've said this, they've

19  said that, they keep changing their stories, it's all

20  hearsay.  All that's already in the record, okay?  But

21  there are some specific details that you're talking

22  about that just frankly aren't in the record.  I mean,

23  you know, there is no evidence at this point that says

24  that Mr. Royston was on house arrest during this period

25  in time and could not have been in North Dakota, and

nobody's presented any records that say here's the electronic monitor records which show that Mr. Royston was sitting in Brooklyn Center this whole time, all right?

And part of the issue there is -- and there's always -- there's always an issue of how do you get that evidence in?  What issue is it particularly relevant to?

And let's be perfectly frank.  The dates in this case are all messed up, and so nobody's really able to identify exactly when anything happened with the exception of some of the alleged controlled buys and -- you know, and so you've got to make tactical decisions. And some of the things that you folks are talking about, the only way they're going to get in front of the jury is if you take the stand and testify.  And, of course, if you take the stand and testify you open yourself up to cross-examination on a whole bunch of issues, which I'm sure you've talked to your lawyers about, and you've got to make a tactical decision.

Now I'm not the lawyer.  I don't get to make the choice as to whether you should be taking the stand or not taking the stand or any of those sorts of things. Ultimately those are issues you've got to decide based on the evidence that you know of.  And understand this:

1  I don't know anything about the evidence that hasn't

2  been presented in this courtroom, okay?  Because

3  whatever is not here I don't know anything about.  I

4  haven't reviewed any of the discovery because it's not

5  my job to do that and, in fact, it would be

6  inappropriate for me to do it.  I haven't read any

7  statements.  I haven't listened to any recorded

8  statements or any recordings that were taken other than

9  what's been played in open court, okay?  So ultimately

10 those are the decisions you're going to have to make.

11         Now I want to talk specifically about this

12 whole alibi thing because at this point what I'm being

13 told is we have a document.  We have a document that

14 relates to a Mr. Sallis that we can't really state with

15 certainty that it has any connection with Mr. Lee, and

16 we can't even state with any certainty that it has any

17 connection to what allegedly happened on the 28th of

18 May, all right?  And Mr. Goff is basically telling me he

19 doesn't have a witness that he can call and he can put

20 on the stand and lay in the foundation to get the

21 exhibit in.  And he's telling me he tried to check with

22 the hotel and he hasn't even gotten an answer yet as to

23 who was registered there, under what circumstances, and

24 what evidence do they have.

25         Now there are some serious questions about

```
 1    the notice of this particular defense, you know, and at
 2    some point we'll have to address those things, but I
 3    need to know.  You know, here's the deal.  I mean, I
 4    might be talked into continuing this thing for a day and
 5    allowing you to try and run down some witness and see if
 6    you can't pull this thing together over the next 24
 7    hours, and it will inconvenience the jury and it'll
 8    inconvenience the Court.  But I think that, you know, at
 9    a minimum knowing what we've got and seeing if we can
10    find the witnesses, I'm willing to give you that
11    opportunity.  The real question is:  Do you think at the
12    end of the day you're even going to have anything that
13    you could put in?
14                DEFENDANT LEE:  Your Honor, I got documents
15    that can --
16                MR. GOFF:  Your Honor, the Court is
17    completely aware of everything that I know at this
18    point.  My client tells me that we could find and get in
19    touch with Mr. Carlton E. Sallis.  And again if that
20    were to happen and if I could confirm with Mr. Sallis
21    and if I could get him here and put him on the witness
22    stand, I believe, based on what is represented to me
23    that he could tell the Court and would tell the Court
24    that he purchased this ticket for travel for my client
25    on May 24th, 2009 from Chicago to Atlanta.
```

1    Now that doesn't prove the 28th.  My client

2    indicates to me that, as he told the Court earlier, he

3    travels to Atlanta regularly to visit his cousin who's a

4    musician and apparently works with him, helps him out,

5    whatever.  The only evidence that I know that I could

6    present -- or I don't know, but I suspect or what I'm

7    being told I could present would be either my client,

8    and that's not gonna happen.  At least right now as far

9    as I know it's not going to happen, or his cousin would

10   be the one who would have to put him in Atlanta on

11   May 28th, unless somebody else was there, and I don't

12   know that yet.  He's indicated to me maybe his mother,

13   but I don't know if she was there or not.  That's what I

14   know, Your Honor.  Again I understand the issues.  I

15   didn't have this information timely.  Whether that

16   was -- whose fault it was, I guess it doesn't matter at

17   this point.

18            THE COURT:  Mr. Myers?

19            MR. MYERS:  Judge, first on the issue of

20   this evidence, the first thing that we would object to

21   continuing this case at all for is even if they

22   establish what is purported to be a trip on May 24th, we

23   would object to relevance.  The evidence has established

24   several different ways that the buys at Sunmart and at

25   CashWise were on May 28th.  So even if they establish

1  this May 24th, it's not relevant, okay?

2       THE COURT:  Well, we don't really -- the

3  real issue is:  Was he there on the 28th?  And we don't

4  have any evidence at this point and I don't think

5  Mr. Goff knows.  I mean, what we know -- hey, look, I

6  could get on a plane on May 24th and fly somewhere and I

7  could be back on the 24th or the 25th, or I could get on

8  a plane and fly somewhere on the 24th and be gone for 30

9  days.  And, I mean, at this point we don't even know

10  what the heck we're talking about.

11       MR. MYERS:  And that's what I mean.  Even

12  assuming the entire proffer of this evidence is true,

13  it's not relevant, period, unless they can establish

14  somehow he's gone on the 28th.

15       That being said, we've been provided no

16  notice, Judge, at all.  We get this a mere matter of

17  minutes before closing arguments and it -- that's the

18  reason we have witness lists, exhibit lists.  And I know

19  the Court would give more leeway to defendants in a

20  situation where we're right before trial and they

21  present this information or right at the beginning of

22  trial.  This isn't a new case.  This has been pending

23  for quite some time.  We've been in trial, what, two and

24  a half weeks, and all of a sudden this is sprung upon

25  us.

1    And so for those two reasons we'd ask the

2    Court to exclude this evidence and proceed to closing

3    arguments.

4    THE COURT:  Mr. Goff, you really haven't

5    told me yet whether you want the day.

6    MR. GOFF:  Your Honor, in complete candor

7    with the Court, as I have always done and always will, I

8    don't know what evidence exists about my client's

9    whereabouts outside of North Dakota on May 28th.  What I

10   would -- but it's apparently -- if it exists it's going

11   to be a family member.  And what I would ask the Court

12   would be, I guess, to give me sufficient time this

13   morning to try and make further investigation into even

14   the existence of an alibi defense.  I guess it would be

15   important for the Court to know before the Court even

16   makes a ruling.  So I would ask the Court to give me --

17   I know the Court has the jury coming at 10:00.  Could I

18   have one second, Your Honor?

19   Your Honor, we have a name and we have a

20   phone number.  If I could have an hour to just try and

21   make that contact at this point, and then I can

22   represent to the Court whether I think I have something

23   or not.

24   THE COURT:  Mr. Mottinger, you had something

25   you wanted to --

1                MR. MOTTINGER:  Your Honor, a couple things

2    in response to some of Mr. Royston's comments?

3                THE COURT:  Yes.

4                MR. MOTTINGER:  Mr. Royston finds himself in

5    the same box everybody else does.  In order to put a lot

6    of information on, he would have to testify.  He has

7    chose not to testify after considering advice I gave

8    him.  And obviously the Court has had an opportunity to

9    determine, after observing Mr. Royston, is that he is --

10   one thing, he's not a stupid man.  He was in fact in

11   custody for a period of time in La Crosse, Wisconsin,

12   was on house arrest, was violated off his house arrest

13   and later turned himself into the --

14                DEFENDANT ROYSTON:  No, that's not accurate.

15                MR. MOTTINGER:  He turned himself in to the

16   La Crosse County Jail.  We've got records from La Crosse

17   County Jail and Sanctions that were monitoring the house

18   arrest and records from the La Crosse County Jail

19   indicating when he was back in.  Unfortunately there's a

20   window in there that potentially fits into testimony of

21   one of the witnesses.  I did share that information with

22   Mr. Myers.  Mr. Myers was kind enough to offer to enter

23   into a stipulation that we did not have to drag a deputy

24   sheriff or somebody from Sanctions up here from La

25   Crosse to testify to that.  But, as he pointed out, if

1    that information goes in I'm certainly free to inquire

2    as to why he was in custody.  Based on that and the

3    inconsistencies with that, Mr. Royston and I made a

4    decision not to use it.

5              Mr. Royston also references the fact that he

6    wishes I would have called his parole/probation officer

7    to establish that he had a travel permit someplace.  As

8    the Court is well aware from the detention hearing we

9    had, there is a petition for rev- -- violation of his

10   probation pending.  The last time I checked, Judge, the

11   lawyer has the responsibility to decide which defenses

12   to use and which witnesses to call.  Mr. Royston and I,

13   although he has expressed some dissatisfaction in court,

14   for the most part have gotten along fairly well, and I

15   think we continue to get along fairly well.  He may

16   disagree with some of my decisions but, as the Court

17   indicated, we made some strategy decisions based on my

18   view of the evidence, potential gains by offering that

19   evidence and the potential downsides to that evidence.

20             That's all I have to say on those subjects.

21   Mr. Royston and I may disagree, but as far as I know

22   it's my call.

23             DEFENDANT ROYSTON:  Okay.  Let me clarify a

24   few things.  For one, I didn't have a violation from

25   Justice Sanctions about my house arrest.  I got

1  sentenced -- when I was released -- I got arrested in La

2  Crosse County on March 12th of 2008.  I sat in custody

3  for 28 days.  Upon my release a stipulation of my

4  release was that I be placed on house arrest in

5  Minneapolis at my home in Brooklyn Center, and I was to

6  remain on house arrest until my sentencing.  And then

7  after my sentencing I was supposed to remain on house

8  arrest until I turned myself in.  At my sentencing I was

9  sentenced to 60 days.  This was back in September of

10  2008.  I got sentenced to 60 days.  Now I had to turn

11  myself in October 8th of 2008 to serve my 60-day

12  sentence.

13          Now what Mr. Mottinger informed me was that

14  Justice Sanctions had stopped monitoring me somewhere

15  between maybe September to October or the end of August

16  to October.  They never notified me that they stopped

17  monitoring me.  It was not a violation.  It's just the

18  fact that I stayed on house arrest for almost seven

19  months, and I guess they felt like they didn't have the

20  need to monitor me anymore --

21          THE REPORTER:  Excuse me, please slow down.

22          THE COURT:  You need to slow down a bit.

23          DEFENDANT ROYSTON:  Okay.  What did you

24  miss?

25          THE COURT:  She actually has got it all

1    down.   It's just that you were pushing her.

2              DEFENDANT ROYSTON:  Okay.  Yeah, like I was

3    saying though there was a stint of time that

4    Mr. Mottinger made we aware of that Justice Sanctions

5    did say that they had stopped monitoring me for maybe a

6    month and a half, but they never contacted me and made

7    me aware of this so I'm still under the impression that

8    I'm on house arrest.  I mean, I'm pretty upset about it

9    because I could have been outside during that month and

10   a half, but at the same time I'm on house arrest.

11             And, I mean, a lot of other things that I

12   wanted to raise was -- part of my whole argument today

13   was the fact that -- and this is something I just want

14   to read to you.  It says even the Indictment that is

15   sufficient on face value may be challenged.

16   Specifically an Indictment may fail when there is a

17   fatal variance between its allegations and the evidence

18   introduced.  It says fatal defects in Indictments are

19   jurisdictional and may be raised at any time.

20             THE COURT:  Exactly.  That's the law.  No

21   question about that.

22             DEFENDANT ROYSTON:  Exactly.  So this is why

23   I'm raising a lot of these issues because there are

24   fatal defects in this Indictment.  There's fatal defects

25   in the weights, the dates and the overall allegations of

1    the Indictment.

2            THE COURT:  All right.

3            DEFENDANT ROYSTON:  And this is something

4    that the Court should take into consideration, Your

5    Honor.

6            THE COURT:  Okay.  Ultimately I think that

7    the question that needed to be resolved as far as this

8    electronic monitoring, the house arrest thing, is

9    something you needed to resolve with your lawyer.  And

10   the real problem is -- tactically there are two

11   problems, is that when they quit monitoring you -- and I

12   can tell you exactly what happened is they were

13   authorized to monitor your for six months.  They

14   monitored you for six months.  Time expired.  They

15   turned off the switch.  They didn't tell you.  It's a

16   failure to communicate.  That's not the first time

17   that's ever happened in that type of a situation.

18            And so I don't dispute anything you're

19   saying about that, but it does in fact leave some period

20   of time where nobody was watching.  And, you know, you'd

21   have to take the stand and say:  One, I was on

22   supervision.  The reason I was on supervision is this.

23   And you'd have to say:  I sat there for six weeks

24   because nobody told me that that -- that I'd come off

25   that supervision.  And all that's fine and dandy, you

1    know, but tactically what ends up happening is once you

2    open that door.  Then the government gets to ask:  Okay.

3    What crime did you commit?  Why were you on supervision?

4    What happened with that sentence?  If there's a pending

5    revocation that's relevant, too.  Plus if you take the

6    stand it opens up a whole series of questions of other

7    prior convictions that may be admissible that were not

8    otherwise admissible.

9             And so that's why the lawyer and you have

10   got to talk.  I mean, sometimes you have a defendant who

11   has very little criminal history and nothing's gone

12   wrong and you can say:  I can put him on the stand to

13   explain what happened.  Sometimes what you're being held

14   on is such a minor deal and unrelated to what you're

15   charged with nobody cares and you can put them on the

16   stand.  Sometimes what you're being held on is

17   sufficiently related to what you're charged with in this

18   case that, you know, it sends off big bells and

19   whistles.  And the juries have a hard time sorting out

20   the reason why that evidence is in, and they can use it

21   to convict you.  I mean, it's just -- it's a

22   double-edged sword, and tactically you've got to make a

23   choice at some point as to how you're going to do that.

24             And Mr. Mottinger is right, that ultimately

25   the lawyer has an ethical duty to present the claims and

1  defenses that he believes are supportable by the

2  evidence, sustainable by the law and likely to result in

3  a positive result for his client, all right?  And so

4  that's all part of the deal.

5          Now as far as the claim that the evidence

6  varies from the Indictment and rendering the Indictment

7  fatally defective, I don't see it.  Now part of the

8  problem is that you have to look at the alleged dates

9  for each of -- these charges are on or about, and that

10 means the government need only prove that the incidents

11 occurred reasonably near the date indicted, okay?  And

12 so all the problems with the dates are going to kind of

13 fall -- I mean, because really if you're looking at --

14 we're a month here.  We're four days there.  We're two

15 days here.  And those are things that, under the law of

16 the Eighth Circuit, are not going to be viewed as fatal

17 variances on the date charged.  The jury will be

18 instructed that they need to find that the conduct

19 occurred on or about, which means reasonably near the

20 date alleged, and you can argue that the jury should say

21 that these are not on or about that date and are not

22 reasonably near that date.  That's all part of it.

23         Now a lot of what you're saying here can be

24 argued based on the evidence, and I think that

25 ultimately that's where we're at.  But I don't see that

1  there's a fatal variance here.  I mean, I've tried a lot

2  of cases and I look at the evidence, and what you have

3  here are the kind of things that happen in trials where

4  people are fuzzy on dates, people are oftentimes fuzzy

5  on who's where, when and why.  I mean, as a practical

6  matter people are not computers.  And you're asking them

7  things that happened two years ago and, you know,

8  frankly if somebody asked me right now today where was I

9  on May 28, 2009, I know because that's my daughter's

10  birthday.  I know exactly where I was.  But if somebody

11  asked me where was I on May 30, 2009, I frankly have no

12  clue.  I mean, and that's kind of -- kind of the way

13  memory works.

14         Here's what I think.  I'm going to go ahead

15  and recess from now until 11 o'clock.  I'll give you

16  time to try and run down what you're going to do and

17  we'll see where we're at then.  Mr. Myers?

18         MR. MYERS:  Judge, I was just going to make

19  a suggestion.  Perhaps we could address -- and we just

20  have minor suggestions on the jury instructions.

21  Perhaps we could do that now and then we take our break

22  and by the time we come back we'll get everything

23  squared away.

24         THE COURT:  Yeah, that's fine.  Go ahead.

25         MR. MYERS:  After the conspiracy charge and

1   aiding and abetting the conspiracy charge, I would

2   request the Court put together the special verdict form

3   or findings for the drug quantities of greater than 50

4   grams of a mixture containing cocaine base and greater

5   than 500 grams of a mixture containing cocaine.

6                THE COURT:  On the verdict form?

7                MR. MYERS:  Yes.

8                THE COURT:  All right.  Any objection to

9   that, Mr. Goff?

10               MR. GOFF:  Your Honor, you're talking about

11  putting that on the verdict form?

12               THE COURT:  On the verdict form.  And

13  there's special interrogatories that in fact under the

14  statute I'm going to have to ask at some point.  And so

15  the question is:  If I don't ask them now we'll get a

16  verdict, and if the verdict is guilty on aiding and

17  abetting then we'll have to send the jury back to

18  re-deliberate on those two questions.  And so the

19  question is:  Are we better off saying if yes then

20  answer, or if guilty answer the following two questions?

21  And so, I mean, I'm going to have to -- if there's a

22  guilty verdict they'll have to be asked of the jury

23  eventually, and the question is:  Do we want to have the

24  jury deliberate once or do we want to send them back a

25  second time?

1           And I guess if the answer is we want to send

2  them back a second time, then I think we should yank all

3  the quantity questions at this point and just let the

4  guilt or innocence be decided and then send the quantity

5  questions if there's a conviction.  You know, that makes

6  juries very unhappy because they think they're done and

7  then we send them back to deliberate some more.

8           MR. GOFF:  Your Honor, I'm in agreement with

9  the Court's statements and Mr. Myers' suggestion.  I'd

10  like to have the quantities included on the verdict

11  forms because I intend to argue that issue and I want

12  the jury to deliberate that issue.  Now I'm not sure my

13  client agrees with me on that right now.  That's what I

14  think.

15           THE COURT:  All right.

16           MR. MOTTINGER:  I'd like to be able to argue

17  it, Judge.  If the numbers aren't in there we can't

18  argue it and we've got a problem.

19           THE COURT:  Mr. Loos?

20           MR. LOOS:  I agree, Your Honor.

21           MS. GOETZ:  I'm in agreement.

22           THE COURT:  And I think we ought to do that.

23  Let's get it to the jury at one point.  I think the

24  problem is if you get a conviction -- and I'm saying

25  this for the defendants' benefit.  The real problem is

1  if you get a conviction and the jury thinks their work's

2  done and then you send them back out to mess with the

3  quantities, the lawyers never really get to argue it

4  because it doesn't make much sense.  And historically if

5  there's no new evidence presented there's no re-argument

6  allowed.

7          And so I guess I think it's really in the

8  defendants' benefit to have those questions asked

9  because frankly I think that one of the strongest

10  arguments that can be made in this case is that the

11  quantities don't add up.  And that's -- you know, along

12  with some other credibility things, and I think that at

13  the end of the day that that's where -- that's where the

14  argument lies.  And so I think that taking that away

15  from the defendants and saying let's wait on that is a

16  bad idea.

17          Mr. Myers?

18          MR. MYERS:  The other area I saw in the --

19  Count Fourteen, the CCE charge, the series of three or

20  more related felony controlled substance laws, I'd ask

21  the Court to review the jury instruction that the Court

22  used in the Chavez case which lists the substantive

23  counts that we allege in the Indictment.  And the way

24  it's written here it seems to suggest that you have to

25  have each of these three.  And, as the Court is well

1  aware, we just have to prove a series of three or more

2  of any controlled substance violation.  And so listing

3  the substantive counts, and then perhaps a statement

4  that articulates that we only need to prove a series of

5  three or more related felonies.  So they can be a

6  combination of all three of these.  They could find one

7  marijuana, one cocaine powder and one marijuana.  And so

8  the way it's written is just -- I don't think the way

9  it's written is an accurate statement of the element we

10  have to prove.

11              THE COURT:  Mr. Goff?

12              MR. GOFF:  Well, Your Honor, I -- I liked

13  that portion of the instruction as written.  I think

14  it's a fair statement of the law.  It I think represents

15  the violations alleged in the Indictment, and I think

16  it's a fair question to ask the jury to find the way

17  it's written.

18              THE COURT:  Mr. Mottinger?

19              MR. MOTTINGER:  I don't think that we've got

20  a dog in that fight, Judge.

21              THE COURT:  All right.  And that's true with

22  you, Mr. Loos, as well?

23              MR. LOOS:  Yeah.  I have no position, Your

24  Honor.

25              THE COURT:  Ms. Dietz -- or Miss Goetz?  I'm

1    sorry.

2              MS. GOETZ:   I have no position.

3              THE COURT:   Here's my problem is that I

4    think that the government's right as a matter of law

5    that they can prove any kind of combination of

6    underlying drug felony offenses in order to meet the

7    continuing criminal enterprise statute.  And I don't

8    think the language as proposed in the instruction is

9    technically wrong, but I think that if I'm going to

10   leave the verdict form as it is I'm going to have to

11   instruct on the question of what constitutes a series of

12   three or more related felonies.  And I think that if I

13   do that it's going to get stickier, and I'm more

14   inclined to say let's go ahead and revisit the

15   substantive counts because I think that's really the

16   only evidence that's out there.

17             There has been no evidence really presented

18   that goes much beyond the actually charged items, and we

19   don't want to get in a situation where the jury starts

20   trying to put together three and they start thinking

21   about something that happened somewhere else in

22   Minnesota that resulted in this conviction and sentence

23   years ago, which is clearly not relevant and is only in

24   for a limited purpose.  And we told the jury what the

25   limited purpose is, but the problem is, is that once

```
 1   they get out there and start talking you never really
 2   know what they're talking about.
 3                And so I'm inclined to take a look at this,
 4   and I probably will change it, but I won't make a final
 5   ruling at this point.  What I'll do is I'll go back,
 6   read it, take a look at it, and when I get done I'll get
 7   it to you as soon as I've got it figured out.
 8                Mr. Myers, anything else?
 9                MR. MYERS:  I just have a couple more,
10   Judge.  In the people that are listed as supervisees or
11   people that the defendant managed or organized --
12                THE COURT:  Yes.
13                MR. MYERS:  -- I would ask the Court to take
14   out the following because I don't think there's
15   sufficient evidence of the defendants' supervision over
16   these people or management.
17                THE COURT:  All right.
18                MR. MYERS:  Gov, who the Court will recall
19   was a source of supply.
20                THE COURT:  Yes.
21                MR. MYERS:  Keith Murry, Eugene Lindsay,
22   Adrienne "Promise" American Horse, Clarissa Takes Horse,
23   Lemont Rogers, Galen Smith, Cavelle Smallwood, Lionel
24   Fraction, Kenny DeBerry and Darrin Raysor.  I would ask
25   the Court take those out.  I don't think a jury could
```

1  find those people were organized, supervised or managed

2  by this defendant.  They were either sources of supply,

3  competitors or customers.

4           And then we'd ask the Court to add Rocco.

5  We heard an abundance of testimony about Rocco that came

6  in and distributed.  That's the kid that was robbed at

7  Tambi Bishop's.

8           THE COURT:  Yeah, and he needs to be added

9  to my Bell order, too, so I just forgot him.

10          Mr. Goff?

11          MR. GOFF:  Your Honor, I think this list,

12  with the exception of Rocco, is consistent with the list

13  that the Court included in its Bell finding.  And I

14  would submit, Your Honor, that that's because if you

15  look at the evidence as presented by the government and

16  you believe everything that the government witnesses

17  testified to and all the other evidence that they

18  presented, I think it's possible one could find that

19  those people were a part of this organization.  I just

20  don't -- I don't think it's appropriate to take them out

21  of there.  I think it's a fair depiction of the names

22  and possible -- you know, possible people involved in

23  this -- in these transactions.  And I don't think the

24  jury should be instructed to consider some and not

25  others because they know all these people's names.  They

 1   know all the discussion that was -- all the testimony

 2   that was presented about these people.  And I disagree

 3   with the request of the government, Your Honor.  I'd ask

 4   that the names be included as they are because that's

 5   what the evidence is.

 6            THE COURT:  Really the only way that you can

 7   get there is if somebody were to decide that Mr. Lee was

 8   in fact sort of the organizer, supervisor, the kingpin,

 9   whatever you want to describe him, of this entire

10   conspiracy, and that therefore he had indirect control

11   over everyone.  And the question really I think becomes

12   this and that is:  Is there sufficient evidence to let

13   that go to the jury?  And basically the government's

14   telling me there's not enough evidence as regards these

15   defendants -- or these alleged co-conspirators.  And my

16   question really is:  Is your client willing to waive the

17   possibility that the jury would reach a perverse verdict

18   on that particular question?

19            I mean, because here's what I don't want to

20   see happen is I don't want to see you jumping up and

21   down and saying:  We gotta let it go to the jury.  Then

22   the jury comes back and says:  Okay.  We think that Gov

23   is somebody controlled by Ferris Lee.  And then you're

24   going to say:  Oh, by the way, that's against the great

25   weight of the evidence.  It's a perverse verdict, and

```
 1   there's insufficient evidence as a matter of law to
 2   sustain the finding of guilty on the continuing criminal
 3   enterprise, because we know there's no evidence about
 4   Gov and how do we know -- I mean, it's just apparent
 5   they just ignored the evidence, and then all of a sudden
 6   there's a collateral attack made on all their findings
 7   whatsoever.
 8             And so my question is:  Is your client going
 9   to waive that on his 2255 and on his appeal.
10             MR. GOFF:  No, I'm sure he's not, Your
11   Honor.
12             THE COURT:  I'm sure he's not either, and
13   therefore, I'm going to strike Gov; Keith Murry, also
14   known as Moe; Eugene Lindsay; Adrienne "Promise"
15   American Horse; Clarissa Takes Horse; Lemont Rogers,
16   also known as Wow-Wow; Galen Smith, known as Smitty;
17   Cavelle Smallwood; Lionel Fraction; Kenny DeBerry; and
18   Darrin Bernard Raysor.
19             MR. MYERS:  The only other thing, Judge, is
20   at the end the --
21             THE COURT:  And I'm going to add Rocco,
22   sorry.
23             MR. MYERS:  Thank you.  The principal
24   leader, organizer, this is a penalty enhancement under
25   Section 848(b).  That's the same penalty enhancement we
```

1    used in the Chavez case, and I'm guessing that's maybe

2    where this came from.  That penalty Section 848(b) is

3    for the mandatory life on the continuing criminal

4    enterprise.  As the Court recalls, that's 300 times the

5    underlying drug quantity in 841(a)(1).  We have not

6    charged that, and so I don't think a jury needs to

7    answer that question.

8                    THE COURT:  That's true.  The evidence

9    doesn't sustain it even if it were charged.

10                   MR. GOFF:  Which one is that?

11                   THE COURT:  The very last question, question

12   three, principal, organizer and leader.  That requires a

13   showing -- it's the kingpin provision.  It's the

14   provision that gets you there for life.  They have to

15   show that you have sold -- or the organization moved 300

16   times the quantity, and there's just -- I mean, there's

17   a question whether they got to the quantity let alone

18   the 300 times the quantity.  So there's not -- I mean,

19   it wasn't charged.  That would be a fatal variance right

20   there because it's not indicted and there is no

21   evidence.

22                   MR. GOFF:  Your Honor, may I -- are you

23   through?

24                   MR. MYERS:  Yeah, I'm done.

25                   MR. GOFF:  One other issue with Count

1   Fourteen and the verdict form in comparison with the

2   Instruction No. 11, continuing criminal enterprise.  The

3   instruction includes five essential elements.  Number --

4   well, No. 4, which is the organizer or supervisor, which

5   I think is what the Court just struck from the verdict

6   form, and No. 5 is the substantial amount of money,

7   which the Court has already instructed on previously I

8   think in the preliminary instructions.  And there is

9   nothing in the verdict form about that.

10              THE COURT:  Mr. Myers, do you wish to be

11   heard on that?

12              MR. MYERS:  Judge, there's a multitude of

13   Eighth Circuit cases that talk about substantial income,

14   and there's no definition aside from the definition that

15   the Court has provided in the standard jury

16   instructions.  There's no requirement that we prove any

17   specific amount at any time, and so I think there is no

18   need for an instruction specifically on the verdict

19   form.

20              MR. GOFF:  Well, I understand the

21   government's position, Your Honor, but it seems to me as

22   an essential element it should be alleged.  They can be

23   instructed there's no definition of what that is, but

24   they can reach a reasonable definition themselves, as I

25   think they would have to do.

1            THE COURT:  All right.  First of all,

2    Mr. Goff, the defendant still has to be an organizer,

3    supervisor or manager of five or more people.  That is

4    in the continuing criminal enterprise statute.  What I

5    struck was the provision that you can prove which shows

6    that you were the principal administrator, you know, and

7    so that provision is still in there.  There is no

8    definition of "substantial amount of money," and the

9    case law is pretty clear that they don't have to prove

10   anything, that those are words that the jury knows and

11   that they're able to apply their common sense and

12   understanding as to what constitutes a substantial

13   amount of money.  The case law also says they can

14   consider everything when they look at it.  It doesn't

15   talk about profit, and so that's part of it.

16            I'm not really inclined to instruct further

17   on the -- and give a definition of "substantial amount

18   of money" because the Circuit's always declined to do

19   that.  If I give an instruction on "substantial amount

20   of money or other property," all I'm going to say is

21   that the words should be given their usual and customary

22   meaning in the English language, and if you want me to

23   say that I'd be happy to say it.

24            MR. GOFF:  I would, Your Honor.

25            THE COURT:  All right.  And we'll just add

```
 1    at -- before the -- after the fifth element and before
 2    we get to the last conclusory paragraph, just that as
 3    used herein the words substantial amount of money or
 4    other property -- or probably what I'll say is:
 5    Substantial amount of money or property -- or other
 6    property means what the words would ordinarily mean in
 7    the English language, period.
 8              MR. GOFF:  Thank you, Your Honor.
 9    Additionally my client is concerned about the -- back to
10    the verdict form, on Count Fourteen again, same one, the
11    second question about the list of names.  And Mr. Myers
12    went through them fairly quickly, as did the Court.
13    Is the Court's intention to include Zach Jones?
14              THE COURT:  Yes.
15              MR. GOFF:  I don't think there's any more
16    evidence in this case, Your Honor, that my client was a
17    supervisor or manager of Zach Jones than Gov or Cavelle
18    Smallwood himself or any of the rest of the group that
19    are being -- that have been excluded, Your Honor.  The
20    only evidence that I know of is that Zach Fat -- Zach
21    Jones, Fats, allegedly sold some drugs to Cavelle
22    Smallwood and said they came from Ferris -- or Smallwood
23    says that Fats says they came from my client, sand
24    that's all that I recall about that, Your Honor.  I
25    don't think that's necessarily a person that he
```

1  supervised or even reasonably.

2         MR. MYERS:  Judge, Jake Northern testified

3  that Ferris Lee brought him from St. Cloud and placed

4  him in Bismarck and that, as I recall, he was working

5  with Rob.  I think that's more than sufficient evidence

6  in light of the record to have him listed there.

7         THE COURT:  I believe there is a sufficient

8  question there.

9         MR. GOFF:  Well, then this is also not going

10  to fly, Your Honor, but my client wants to ask that

11  Marcus Royston be struck from that because of the --

12  because of the allegations, I guess, of some of the

13  evidence that he possibly was a source of controlled

14  substance rather than somebody who would have been

15  supervised by my client for the record, Your Honor.

16         MR. MYERS:  Judge, as the Court knows,

17  people can change roles during the course of an

18  enterprise.  He was the source at one time, and then

19  during the transaction May 28th he was under the

20  supervision and control of Mr. Lee when he delivered the

21  crack to Herb Brown.

22         THE COURT:  The problem is, of course, if

23  you look at the testimony of Herb Brown the story is

24  that Mr. Lee hands the drugs to Mr. Royston and then

25  Mr. Royston delivers the drugs.  If the jury chooses to

1   believe that based on the record that's before it, that

2   in fact could be a moment of supervision sufficient to

3   create a jury question.

4           MR. GOFF:  That's all I have, Your Honor.

5           THE COURT:  You also have the statement --

6           MR. GOFF:  My client disagrees with that,

7   but that's all I have.

8           THE COURT:  I'm sure he does, but you also

9   have the text that says hit up BD, all of which, you

10  know, tends to indicate some sort of a relationship.

11  And ultimately, like I said, it's not what I believe to

12  be true.  It's what the jury is going to decide based on

13  the arguments and the facts.

14          Mr. Lee?

15          DEFENDANT LEE:  I want to say something.

16  Okay.  He just said that whoever he said testified that

17  Rashad -- or whatever he just said, well, Rashad said

18  hisself up there that he don't know where Fats got his

19  drugs from.  And Rashad Jackson said -- when he got up

20  there and testified, his statement was that he was doing

21  whatever he was doing for a month and a half, then he

22  stopped.  So if he's saying he did whatever he did for a

23  month and a half and he came down there in December,

24  they got popped off in March, so how do I have anything

25  to do with that?

1           THE COURT:  It's Jake Northern.  And once

2   again the question is who believes whatever with

3   Mr. Northern is ultimately the issue.

4           Mr. Mottinger?

5           MR. MOTTINGER:  As the instructions apply to

6   Mr. Royston, we don't have any objections.

7           THE COURT:  Mr. Loos?

8           MR. LOOS:  Your Honor, I'd just ask what you

9   plan on doing with Count Ten as far as the instructions

10  go?

11          THE COURT:  It's going to come out.  I've

12  dismissed it.

13          MR. LOOS:  Okay.  Then I have no other

14  problems with it.

15          MS. GOETZ:  I have no objection to the jury

16  instructions, Your Honor.

17          THE COURT:  Thank you, Ms. Goetz.  That

18  takes -- you have something else?

19          MR. MYERS:  Just a point of clarification as

20  to Count Ten.  I assume the Court intends to leave --

21  just take out Maurice Forest because Mr. Lee is charged

22  in both.

23          THE COURT:  Yes.

24          MR. MYERS:  Okay.  Thank you.  That's all.

25          THE COURT:  All right.  Thank you.

```
 1                    (Recess taken; 10:10 a.m. to 1:30 p.m.)
 2                    (In open court, all counsel and the
 3       Defendants present, outside the presence and hearing of
 4       the jury:)
 5                    THE COURT:  We'll go on the record in a case
 6       entitled United States of America versus Ferris Lee,
 7       Marcus Royston, Maurice Forest and Jessica Dietz.  The
 8       record should reflect that each of the defendants are
 9       present along with their counsel of record, and the --
10       Mr. Myers and Ms. Lawyer appear on behalf of the United
11       States.
12                    Mr. Goff, is there something you want to
13       bring before the Court?
14                    MR. GOFF:  Yes, Your Honor.  I have been
15       informed -- just hung up the telephone, as I walked into
16       the courtroom, with Dennis Byron, who is -- represented
17       to me that he is in Atlanta, and he's the editor of a
18       publication called Hip Hop Enquirer.  He does some other
19       stuff, too.  But in any event he is a publicist in the
20       media business, works with my client's cousin, Jason
21       Frazier, who is in the music business, music videos,
22       that sort of thing.  I've talked with both of them,
23       Jason Frazier, my client's cousin, and now Dennis Byron
24       just moments ago, and I also spoke with Mr. Sallis,
25       Carlton Sallis.  Mr. Sallis confirmed for me that he
```

1    made the reservation on -- for May 24, 2009, for Ferris

2    Lee to travel from Chicago to Atlanta, Georgia, and to

3    the best of his knowledge Ferris used that airline

4    reservation.  And then I was told within the last half

5    an hour by both Jason Frazier, my client's cousin, and

6    also Dennis Byron that my client was in Atlanta on

7    May 28th, 2009.

8              With the comments that I made earlier to the

9    Court as far as the circumstances of becoming aware of

10   all this, that still stands.  That's still the way this

11   thing has arisen.  I spoke with both of them about the

12   availability.  Mr. Byron has other commitments tomorrow,

13   but he said if need be he would comply with the request

14   to come here.

15             THE COURT:  Is that a request for --

16             MR. GOFF:  Under the circumstances, Your

17   Honor, I think I'm duty-bound to make the request to the

18   Court to have an opportunity to present this evidence.

19             THE COURT:  Mr. Mottinger, do you wish to be

20   heard on this issue?

21             MR. MOTTINGER:  It would seem to me that if

22   Mr. Goff's in a position to put on evidence that

23   indicates Mr. Lee was not present during the May 28th

24   buys that it could be advantageous to my client as well.

25   I certainly wouldn't object to Mr. Goff having an

1    opportunity to do that.

2              THE COURT:  Mr. Loos?

3              MR. LOOS:  Your Honor, I guess I don't

4    object.  I don't really take a position with it.

5              THE COURT:  Ms. Goetz?

6              MS. GOETZ:  Your Honor, I don't necessarily

7    have a dog in this fight, but I don't object, and I

8    agree that Mr. Goff should be able to present this

9    evidence.

10             THE COURT:  Mr. Myers?

11             MR. MYERS:  Judge, we oppose allowing the

12   defendant to present this evidence.  We have rules of

13   disclosure of witnesses and exhibits prior to trial for

14   a reason.  The defendants were all put on notice at the

15   time they were indicted as to the dates of these

16   offenses.  Now moments before closing arguments again we

17   have now two additional witnesses that could have been

18   disclosed to us months ago.  And, Your Honor, if it was

19   the government that made this request there is

20   absolutely no way we would be allowed to present this

21   evidence.

22             Based on the late timing of this

23   information, these defendants should not be allowed to

24   present this evidence and it should be excluded.  In our

25   view, Judge, this is not in any way reversible error

1    when the defendants could have known this information

2    months and months ago, and we're more than happy to

3    argue that issue on appeal.  They should be held to at

4    least a similar standard as the United States on these

5    issues.

6              THE COURT:  Mr. Goff?

7              MR. GOFF:  Your Honor, I completely

8    appreciate Mr. Myers' comments and his position and

9    would probably represent the same thing if I were in his

10   shoes.  But I'm not in his shoes, and I'm not in

11   Mr. Ferris Lee's shoes.  And in light of what the not

12   only potential but obvious and clear result of this

13   criminal case is going to be if the jury convicts my

14   client of the offenses charged, it will be the rest of

15   his life.  And I'm not saying that he should be given

16   carte blanche or free reign to do anything that he wants

17   as a result of that, but I do think that it raises the

18   issue of making sure that all credible available

19   evidence is presented to this jury.  And I realize and I

20   recognize and acknowledge that we have not complied with

21   any rules of notice regarding any alibi defense but,

22   having said that, I don't know -- I can't answer for the

23   Court why this evidence has not been brought forth

24   previously.  I brought it forth to the Court's attention

25   within a matter of hours probably or certainly a day

1    after it was brought to my attention and have done

2    everything I can to follow up with investigation in the

3    last 24 hours and including, as I said, within the last

4    half an hour obtaining much of the information from

5    Mr. Byron and Mr. Frazier.

6              And in light of all of the circumstances and

7    all of the facts that the government has been able to

8    present in this case and the potential or likely or

9    obvious result if my client is convicted, I think in the

10   face of -- considering the length of this trial, the

11   minimal impact it will have upon the government, I'd ask

12   the Court allow the evidence.

13             Having said that, Your Honor, I have no

14   arrangements for these people to be here.  I've just

15   been -- told the Court everything I know about what they

16   would say, and at least Mr. Byron said he would be

17   available if I can get him here.  Mr. Frazier did not

18   say he wouldn't be available, but it's obviously

19   difficult for them, too.  But I fully honestly represent

20   to the Court that I've been told they would be here if

21   necessary, if allowed.

22             THE COURT:  We'll recess until 10 o'clock

23   tomorrow morning.  You have whatever witnesses here you

24   intend to call.  If the government needs a continuance

25   after they've heard from those witnesses, I'll give the

1    government an opportunity for a continuance.  That's I

2    think where we're at on this thing.

3            And I appreciate, you know, what -- what the

4    United States is -- what they're protesting, and really

5    my concern really is a couple of things.  And I know

6    they feel very comfortable arguing the issue on appeal.

7    If I thought that it was going to end on appeal I

8    would -- I would have no problem endorsing the

9    government's position.  My problem is I don't think it

10   ends on appeal.  I think we end up with a 2255 motion

11   where there are claims of ineffective assistance of

12   counsel and there's need for evidentiary hearings, and

13   it just becomes a huge mess.  And I think that the

14   matter of a delay at this point, you know, of half a day

15   strikes me as better than having to deal with this thing

16   in a post-conviction proceeding if we get to that point.

17           And I just look at it -- the amount of work

18   that it takes for the Court in those situations.  I know

19   the government always says we're happy to defend those

20   2255 proceedings, but they're way more work for the

21   Court than it is to take this four-hour break and hear

22   whatever evidence there will be presented tomorrow.  As

23   far as the judicial economy is concerned, I'd prefer to

24   just let it go that way.

25           Let's go ahead and bring in the jury and

1  we'll send them home.

2           MR. MYERS:  Judge, before we do that, could

3  we make a request from the Court to get the full name

4  and spelling of these witnesses and any contact

5  information that the defense has?

6           THE COURT:  Yes.

7           MR. MYERS:  Obviously we -- this is the

8  first we heard of Sallis this morning, and five minutes

9  ago we heard of Byron and Frazier and --

10          THE COURT:  I want the names and addresses

11 and their contact information, including phone numbers

12 of where these people can be reached, delivered to the

13 United States within five minutes of the time that we

14 adjourn here.

15          MR. GOFF:  I will, Your Honor.  I don't have

16 addresses yet, but I will try and acquire that.

17          (In open court, all counsel and the

18 Defendants present, in the presence and hearing of the

19 jury.)

20          THE COURT:  We'll go on the record in a case

21 entitled United States of America versus Lee, et al.

22 It's file No. 3:09-cr-155.  Each of the named defendants

23 is present along with their counsel.  Mr. Myers and

24 Ms. Lawyer are present on behalf of the United States.

25 The jury's in the box.

1           Ladies and gentlemen of the jury, I want to

2    apologize for the delays.  We still have some work to do

3    here.  I think that it's unrealistic to think we're

4    going to get anything meaningful accomplished yet today

5    so I'm going to send you home and ask you to come back

6    tomorrow morning at 10 o'clock.

7           I want to remind you that you're not to

8    discuss the case, form any opinions or draw any

9    conclusions until the case is ultimately submitted to

10   you for your deliberations.  Thank you.  You're not to

11   speculate as to why we've run into the problems that we

12   have today, please.

13           (Jury excused.)

14           (In open court, all counsel and the

15   Defendants present, outside the presence and hearing of

16   the jury:)

17           THE COURT:  I want you guys here at 9:00

18   tomorrow morning.  Should we take up the jury

19   instructions now?  Do you want to --

20           MR. MYERS:  That would be our preference,

21   Judge.

22           THE COURT:  All right.  Please be seated.

23   We're outside the presence of the jury.  The defendants

24   are present along with their counsel, and the AUSAs are

25   present as well.

1          Mr. Myers?

2          MR. MYERS:  Judge, I just wanted to address

3    some of the issues in the jury instructions I've been

4    handed, I think the sticky note version of the changes

5    on these final instructions.  The first change there's

6    a -- it's highlighted under Count Ten on -- I don't know

7    what page, but that's the first one.  No objection to

8    that.

9          Instruction No. 8, it refers to Defendant

10   Maurice Forest is charged as an aider and abetter in

11   Count Eleven.  No objection to that.

12         The CCE Instruction No. 11 where the Court

13   has inserted "substantial amount of money or property,"

14   no objection to that.

15         THE COURT:  There's a period in the middle

16   of that that's got to come out, but other than that,

17   yeah, that's fine.

18         MR. MYERS:  Okay.  Instruction No. 14, I

19   don't have an objection at all, Judge, to the substance

20   of the instruction, but I do to the title of it because

21   you -- in the body of the instruction it says you're not

22   to speculate what happened and then at the top it says

23   dismissal.  So we'd ask the Court to change that to some

24   language that's neutral.

25         THE COURT:  I'm inclined to change it to say

1    "resolution of some charges against single defendant."

2    Does that work for you?

3              MR. MYERS:  That's fine with us, Judge.

4              THE COURT:  Any objection to that from any

5    of the defendants?

6              MR. MOTTINGER:  No.

7              MR. GOFF:  No, Your Honor.

8              MS. GOETZ:  No, Your Honor.

9              THE COURT:  All right.

10             MR. MYERS:  On the verdict form, Judge, as

11   it relates to the cocaine base and cocaine powder, we'd

12   ask that the Court put in "a mixture and substance

13   containing."  Both those in the statute articulate that,

14   and we'd ask that that change be made.

15             As it relates to the marijuana, I don't

16   think there's any need for a special verdict form on the

17   marijuana.  That's merely a sentencing issue for the

18   Court at sentencing.  There is no requirement that the

19   jury make any special finding that it is -- contains any

20   marijuana so I think that's just -- it's not necessary.

21             MR. GOFF:  Which verdict form is this, Your

22   Honor?

23             THE COURT:  If you start at Count One, the

24   government has essentially asked that where we refer to

25   quantities, that first that it include a mixture

1    containing cocaine or cocaine base, and that is the

2    statutory language, and I think that -- and I haven't

3    looked at the Indictment today.  I don't know what the

4    exact language is in the Indictment.

5              MR. MYERS:  It says crack cocaine and a

6    mixture and substance containing powder.  And, Judge, by

7    definition crack cocaine is a mixture and substance, and

8    that's what the statute says.

9              THE COURT:  Anything else, Mr. Myers?

10              MR. MYERS:  We have no objection to the

11    remaining.

12              THE COURT:  All right.  Mr. Goff, any

13    objection to the proposed change to the verdict form?

14              MR. GOFF:  Your Honor, I would like to be

15    heard on the verdict form for Count One, and it's not

16    about the quantity because the statutory language and

17    the Indictment both talk in terms of 500 grams of a

18    mixture and substance containing cocaine.  But I think

19    what Mr. Myers said, if I understood correctly, was on

20    the last paragraph of that verdict form regarding

21    marijuana, he suggested that that be deleted.  Was I

22    correct on that?

23              THE COURT:  Right.

24              MR. MYERS:  Right.

25              MR. GOFF:  I would resist that, Your Honor,

1    strenuously actually because it seems to me that the way

2    the Indictment is phrased and the way the Instruction

3    No. 5 regarding conspiracy is phrased, it talks in terms

4    of --

5              THE COURT:  It's fine, Mr. Goff.  If you

6    object to taking marijuana out and -- it's one question

7    in a 20-page jury verdict form.  It's clearly

8    contemplated by the statute.  It's clearly contemplated

9    in the Indictment.  Whether it becomes a factor I

10   consider at sentencing or you let the jury decide

11   whether marijuana was part of this conspiracy, it

12   doesn't matter.  At the end of the day what's going to

13   happen is if the jury finds the existence of a

14   conspiracy to deliver marijuana, they're going to do it

15   to proof beyond a reasonable doubt and that's fine.

16             If it's presented to me as a sentencing

17   factor, the burden of proof is to a lesser standard

18   anyhow.  And so if the jury finds that marijuana is part

19   of this, it solves the problem forever.  If the jury

20   finds that marijuana was not part of it, then we're

21   going to end up in that whole situation, is what do you

22   do with acquitted conduct in the course of sentencing?

23   And frankly, given the mandatory minimums that exist for

24   some of the other charges, that if they get to the point

25   that that's the real big hang-up in the sentencing your

1    clients will have prevailed on many other issues.

2         MR. GOFF:  Your Honor, there is one point

3    that I wanted to raise, and I want it to be clear,

4    because in No. 1 under the essential elements of

5    conspiracy it talks in terms of distributing in excess

6    of 50 grams of cocaine base, in excess of 500 grams of a

7    mixture containing a detectable amount of cocaine, a

8    Schedule II controlled substance, and marijuana.  It's

9    an inclusive language, and that's the way the Indictment

10   reads, too.  And it would seem to me, Your Honor, that

11   the way the government has indicted this case is it's

12   inclusive proof of all of those elements.

13        THE COURT:  Yeah.  That would be an argument

14   that's been advanced to the Eighth Circuit a number of

15   times and repeatedly rejected.  You know, it's not

16   really consistent with the way that your grammar teacher

17   would have taught you, but the case law out of the

18   Eighth Circuit says that "and" means "or."  I kid you

19   not.  That's the way it is.  And so that particular

20   issue's been in front of the Court of Appeals in St.

21   Louis dozens of times, and they've come back with the

22   same ruling all the time.

23        MR. GOFF:  My objection stands as is, Your

24   Honor.

25        THE COURT:  And it's preserved for the

1  record, and you can bring it up there for the next time,

2  if it gets there, and we'll see what the Court of

3  Appeals says on it.  I think it's not necessary that

4  the government -- that even though they've indicted that

5  the conspiracy has as its objects three alternative

6  illegal things and they do it inclusively such that the

7  word "and" appears, that they don't have to prove all

8  three.  I think that's pretty clear.

9          MR. GOFF:  I have no objection to the other

10  matters, Your Honor.

11          THE COURT:  Mr. Myers, do you wish to be

12  heard on that particular item?  I guess I've already

13  said what I think the law is.

14          MR. MYERS:  Yeah.  I don't have any -- I

15  agree with the Court.  It's kind of superfluous language

16  in the big scheme of things so -- and of course if

17  they're arguing that we have to prove all three versus

18  the agreement to distribute one or all of them, then of

19  course that's an objection this Court's going to sustain

20  because that's -- as the Court articulated, that's not

21  the law.

22          THE COURT:  All right.  Mr. Mottinger?

23          MR. MOTTINGER:  Your Honor, we would take

24  the same position as Mr. Goff does in regard to these

25  specific instructions on Mr. Royston.  I understand the

```
 1    Court's ruling.
 2              THE COURT:  All right.  Mr. Loos?
 3              MR. LOOS:  I'll take the same position as
 4    well, Your Honor.
 5              THE COURT:  And Ms. Goetz?
 6              MS. GOETZ:  My position is the same as
 7    theirs, Your Honor.
 8              THE COURT:  If overnight any of you want to
 9    look at some case law and you can find a case that
10    actually stands for the proposition advanced that comes
11    out of our circuit, I'd certainly be willing to revisit
12    the issue.  But I've done a lot of research on that
13    issue at different times, and it always seems to be --
14    doesn't take me very long to find the cases.  But if you
15    find something I'll be more than willing to listen.
16              Anything else that we need to take up?
17              (No response.)
18              THE COURT:  We'll stand in recess until
19    tomorrow morning.
20              MR. MOTTINGER:  Your Honor, may I inquire?
21              THE COURT:  You may.
22              MR. MOTTINGER:  Do the preliminary
23    instructions go in the jury room as well?
24              THE COURT:  Yeah.  What the jury will get is
25    they'll get all of the exhibits that have been received
```

1   that are not contraband.  We'll spread the contraband

2   out on a table and give them a chance to look at it, and

3   then we'll take possession of it.  If at any time they

4   want to see it again, we'll bring them back in the

5   courtroom to view that evidence.

6           They'll get three copies of the Indictment

7   and they'll get -- with the dismissed defendants' names

8   eliminated where they appear in the Indictment.  And for

9   Mr. Forest, the dismissed count, his name will be

10  blacked out of that count as well.  And then they'll get

11  the preliminary instructions and my final instructions,

12  and the only instruction that they will not get, because

13  I never reduced it to writing, is the instruction that

14  basically says that the evidence is what you hear or

15  what you see, not what you read.  And I think I've said

16  that to them eight times.  I don't think I need to

17  repeat it again.

18          MR. MYERS:  Is the Court -- just for

19  housekeeping, is the Court going to read the entire

20  final instructions?  I know that most of these were

21  already read with the exception of the couple

22  highlighted changes.

23          THE COURT:  Yeah, I am.  I'm going to read

24  the instructions, all 16 of them.  I'll read the first

25  14, and then I'll read 15 and 16 after the arguments.

1          How long does -- well, we don't even know
2    what evidence is in.  I won't ask that question.
3          MR. MYERS:  It's about an hour if that's
4    what --
5          THE COURT:  That's --
6          MR. MYERS:  My closing is going to be about
7    an hour.
8          THE COURT:  Mr. Lee?
9          DEFENDANT LEE:  Something I want to add.
10   Okay.  On Count Eleven was supposed to be the CI, Galen
11   Smith, he came in here and he testified.  He said he
12   made a phone call and he said he believed that it wasn't
13   me that he talked to on Count Eleven.  And I'm trying to
14   figure out, okay, if the CI said that he placed a call
15   and he believed it wasn't me, then why am I charged on
16   Count Eleven?
17         MR. MYERS:  Judge, the evidence on that
18   count is the defendant set up that transaction and Big
19   Man, Maurice Forest, made the delivery.
20         DEFENDANT LEE:  But the CI said that he
21   believed it wasn't me that he talked to.
22         MR. GOFF:  Your Honor, I advised my client
23   that if that's the recollection of the testimony that
24   would be argument and go to credibility and weight and
25   so forth, but he wanted to bring that up to the Court.

1          THE COURT:  Right.

2          DEFENDANT FOREST:  Your Honor, I want to say

3     something, too.  He didn't say Big Man.  He said D.  So

4     it ain't Big Man that he said.  He said D.  And he did

5     state that Ferris -- he didn't -- he didn't hear

6     Ferris's voice on the phone call or Ferris wasn't on the

7     delivery.  So why is he charged with it?

8          THE COURT:  I don't have an exact

9     recollection of the testimony of Mr. Smith as regards

10    that, and I'm going to have to look at it.

11         MR. MYERS:  Judge, regardless it's all

12    aiding and abetting theory, the whole thing is.  So

13    regardless that count's going to stand on Mr. Lee.

14         THE COURT:  Yeah.  I mean, I can appreciate

15    that.  I mean, the problem is always in a conspiracy,

16    particularly when the allegations are that people were

17    operating under the direction and control of somebody,

18    is that the aiding and abetting part is exceptionally

19    difficult to get rid of if there's evidence that would

20    sustain that that relationship existed, and that's part

21    of the deal.  But anyhow the specific -- I mean, I do

22    remember that the testimony was that D did it, not Big

23    Man.  And I assume that that's something that people can

24    argue as well.  And, you know, whatever we've got is

25    what we've got.

```
 1            I'll take a look at the rest of it though,
 2   Mr. Lee, and I'll make some kind of a ruling on it.  I
 3   suspect that when I get done reading that I'm going to
 4   arrive at the conclusion that there is sufficient
 5   evidence for that issue to be presented to the jury and
 6   that ultimately the question is really one of weight,
 7   and it's a matter of argument rather than a matter of
 8   law.
 9            Is there anything else?
10            MR. MYERS:  No, Your Honor.
11            THE COURT:  We'll stand in recess.
12            (Adjourned at 2:00 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```