1              **UNITED STATES DISTRICT COURT**
               **DISTRICT OF NORTH DAKOTA**
2                **SOUTHEASTERN DIVISION**

3    - - - - - - - - - - - - - - - - -
                                      )
4    United States of America,        )
                                      )
5              Plaintiff,             )
                                      )
6          vs.                        ) **FILE NO. 3:09-cr-155-01**
                                      )
7    Ferris Lavelle Lee, a/k/a Vito,  )
                                      )
8              Defendant.             )
     - - - - - - - - - - - - - - - - -

9

10

11

12

13              **T R A N S C R I P T**

14                    **O F**

15           **P R O C E E D I N G S**

16        **SENTENCING - AUGUST 30, 2010**

17              **Pages 1-46**

18

19

20

21

22   TAKEN AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
              655 FIRST AVENUE NORTH
23            FARGO, NORTH DAKOTA  58102

24   BEFORE:  THE HONORABLE RALPH R. ERICKSON

25   COURT REPORTER:  KELLY A. KROKE

```
1   MR. CHRISTOPHER C. MYERS              FOR THE PLAINTIFF;
    Office of United States Attorney
2   655 1st Avenue North, Ste. 250
    Fargo, ND 58102
3

4   MR. JOHN T. GOFF              COUNSEL FOR DEFENDANT LEE;
    Attorney at Law
5   4650 38th Avenue South, Ste. 110
    Fargo, ND  58106
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1              P R O C E E D I N G S
 2              (August 30, 2010:  The following proceedings
 3   commenced at 11:00 a.m.:)
 4              THE COURT:  We'll go on the record in a case
 5   entitled United States of America versus Ferris Lavelle
 6   Lee.  It's file No. 3:09-cr-155.  The record should
 7   reflect that the defendant appears personally along with
 8   his counsel, Mr. Goff.  Mr. Myers appears on behalf of
 9   the United States.
10              This case was tried to a jury trial and on
11   May 28, 2010 the defendant was found guilty of Count
12   One, conspiracy to possess with intent to distribute and
13   distribute a controlled substance, in violation of 21,
14   United States Code, 841(b)(1)(A), and 18, United States
15   Code, Section 2.  That carries a maximum term of
16   imprisonment of life.  It carries a mandatory minimum
17   sentence of life.  There is a maximum allowable $8
18   million fine, supervised release of at least 10 years
19   and a $100 special assessment.
20              Counts Two through Twelve charge the
21   defendant with distribution of a controlled substance,
22   in violation of 21, United States Code, Section
23   841(b)(1)(C) and 18, United States Code, Section 2.
24   They carry a maximum term of imprisonment of 30 years.
25   There is no mandatory minimum, a maximum allowable fine
</pre>

1    of $2 million, six years of supervised release and a

2    special assessment of $100.

3           Then on Count Fourteen the defendant was

4    convicted of a charge of continuing criminal enterprise,

5    in violation of 21, United States Code, 848(a)(1)(H) and

6    (C).  This is a Class A felony.  It carries a maximum

7    term of imprisonment of life.  There is a minimum

8    mandatory 30-year sentence that is required in this

9    case.  There's a maximum allowable fine of $4 million,

10   supervised release of five years and a $100 special

11   assessment.  Basically if you look at the sentence then

12   the defendant faces a maximum total of two life

13   sentences plus ten 30-year sentences.  So two life

14   sentences plus 300 years, special assessments of up to

15   $1,200 and a period of supervision up to life.

16          Now there is one complicating factor.  The

17   defendant's been convicted on both Count One and Count

18   Fourteen, and one of those counts must be vacated at the

19   time of sentencing and that's because in Rutledge v.

20   United States the United States Supreme Court held that

21   a continuing criminal enterprise conviction under 848

22   necessarily includes a conspiracy charge under 846 and,

23   therefore, only one punishment may be imposed.

24          In Ball v. United States the Court -- which

25   is a U. S. Supreme Court case from 1985 as well.  The

1    remedy for that is vacation of one of the sentences.

2    That, of course, leaves it open to the judge or to the

3    discretion of the Court.  Eighth Circuit law is somewhat

4    ambivalent.  On a couple of occasions the Court has sent

5    back, with instruction, a direction that one of the

6    convictions be vacated.  I point to United States v.

7    Johnson, which is at 495 F.3d 951 at page 981, and

8    United States v. Possick, which is at 849 F.2d 332.

9    United States v. Jefferson was sent back with direction

10   that the conspiracy count be dismissed because it's a

11   lesser included and it must be vacated on double

12   jeopardy grounds.  That's at 215 F.3d, page 823.

13           Other circuits, when they've looked at it,

14   have basically said that the rule of lenity is

15   inapplicable and that, therefore, the Constitution

16   requires the vacation of the underlying conspiracy

17   charge.  I would point to United States v. Brito, which

18   is at 136 F.3d 397 at page 408, and United States --

19   that's a Fifth Circuit case, and United States v.

20   Decarlo, which is at 434 F.3d 447, which is a 2006 Sixth

21   Circuit case.  And then the Eleventh Circuit also

22   requires the vacation of the lesser included offense.

23   That's United States v. Boyd at 131 F.3d 951.

24           Other Courts, in applying Rutledge, have

25   said it's up to the Court to make their own

1    determination.   There's a Second Circuit opinion that's

2    found at 8 Federal Appendix 109 and a Seventh Circuit

3    case at 220 F.3d 833.   And, like I said, the Eighth

4    Circuit law is somewhat ambivalent in that we have two

5    cases that said that they should be remanded for the

6    Court to determine and one that directed the Court to

7    dismiss the lesser included offense.   And so I think all

8    of that leads to this particular discussion.

9            The sentence range on Count Fourteen is 360

10   months to life, with the lesser included offense

11   carrying a mandatory minimum life sentence.   And the

12   co-defendant, who's been convicted of only the

13   conspiracy charge, faces a mandatory minimum life

14   sentence.   And so we are in sort of a rather unusual

15   circumstance that if the Court follows what would

16   ordinarily be what appears to be the majority position,

17   which is you dismiss the lesser included offense, you'll

18   dismiss the mandatory life sentence and then be left

19   with a sentence guideline range on Fourteen of 360 to

20   life.

21           And basically I lay all this out because I

22   think that ultimately I think that's an issue that the

23   parties should address in their arguments when we get to

24   the question of sentencing.

25           Do you understand what I've laid out and

1  why, Mr. Myers?

2            MR. MYERS:  Yes, Your Honor.

3            THE COURT:  Mr. Goff?

4            MR. GOFF:  Yes, Your Honor.

5            THE COURT:  All right.  Okay.  Now a

6  Presentence Investigation Report has been prepared.

7  It's been lodged with the Court.  I've had an

8  opportunity to review it.

9            Does the United States have any objections

10  or corrections to it?

11            MR. MYERS:  We don't, Your Honor.  And as it

12  relates to the written objections of Mr. Lee through the

13  letter of Mr. Goff, I think that's adequately covered

14  each of those paragraphs, either through Mr. Roerich's

15  response and most of which is referenced to the record

16  at trial.

17            THE COURT:  All right.  Mr. Goff, as the

18  objections were raised, there were a number of changes

19  that were made then to the Presentence Investigative

20  Report and there were a number where basically what

21  happened was the investigating officer noted the

22  objection's been raised, set forth the position why he

23  thinks what he put there was correct and then

24  recommended no change.

25            And at the end of the day I don't know that

1  any of them really have any bearing at all on how the

2  Court will look at the sentencing factors and their

3  applicability in this case, but if you -- do you wish to

4  make any further objection that you have not raised?

5          MR. GOFF:  Your Honor, I believe that in my

6  correspondence to the probation officer who prepared the

7  Presentence Investigation, I raised the objections that

8  my client and I discussed personally when we went over

9  the Presentence Investigation.  I do know that in

10  visiting with my client today that he indicates that I

11  did not represent all of the objections that he had at

12  that time and that he has additional objections that he

13  intends to raise today.

14          I don't know the details of those at this

15  time, but I do believe that I raised the objections that

16  we discussed when we met and went over the Presentence

17  Investigation and I acknowledge the responses of the

18  presentence investigator.

19          THE COURT:  All right.  Mr. Lee, what

20  objections do you wish to raise that have not been

21  raised?

22          THE DEFENDANT:  When he came and seen me

23  when I was reading the whole government's story, I told

24  him that I object to the whole thing so just all of it.

25  I mean, if you want me to go one by one give me the

1   paper.  I object to them.  If you want me to read them

2   off, the whole government's --

3               THE REPORTER:  Can you move the mic closer,

4   please, Mr. Lee?

5               THE DEFENDANT:  I said the whole

6   government's --

7               MR. ROERICH:  Your Honor, I hate to

8   interrupt but I can't hear a word he's saying.

9               THE COURT:  Yeah, we'll move the microphone

10  closer.  All right.  Now you object to the whole thing.

11  You mean, the entire presentence report?

12              THE DEFENDANT:  About, yeah, the

13  government's story, whatever it is.  Yeah, the offense

14  conduct, whatever it is.

15              THE COURT:  All right.  And you object to

16  the offense conduct.  What page and what paragraphs in

17  specific?  You know, you're starting on page seven with

18  paragraph 26.

19              MR. GOFF:  He's on that page now, Your

20  Honor.

21              THE COURT:  All right.  And so basically

22  you're saying that paragraphs 26 through 54, which is

23  the offense conduct, you object to all of it?

24              THE DEFENDANT:  Yup.

25              THE COURT:  Okay.  Anything else you want to

1   tell me about what you object in that and why?

2        THE DEFENDANT:  I had -- when I went over it

3   with my lawyer it's like -- let me see.

4        MR. GOFF:  If I might just interject, Your

5   Honor, while he's looking we did go over the entire

6   Presentence Investigation page by page, paragraph by

7   paragraph, line by line.  And my intent was to represent

8   in the correspondence that I sent to the presentence

9   investigator the objections that he and I discussed and

10  that he had to the facts.  If there are additional ones

11  I'm not aware of those, but I did try to represent those

12  as we went through this line by line at that time.

13        THE DEFENDANT:  His whole thing that he told

14  me was he told me that this is just the government's

15  story and, you know, what happened in trial.  So he

16  didn't write down every objection that I had to each one

17  of these paragraphs because as we went along I kept on

18  objecting, objecting, objecting.  And he's like:  Well,

19  it's just the government's story and the judge knows

20  what evidence was proven in trial.

21        But I'm saying it says that I'm a part of a

22  Mickey Cobras street gang.  Lionel Fraction is

23  supposedly who I worked for.  There's a lot of stuff,

24  man.  Let me see.

25        THE COURT:  All right.  Let's just do this.

1    I've had a chance to review the responses of the

2    probation officer, the changes that have been made.  I

3    find that those changes that were made were appropriate.

4             Now as far as the offense conduct is

5    concerned, I'm giving no weight to any claim that the

6    defendant as a member of a criminal street gang.  I am

7    giving no weight to what Lionel Fraction's role was, if

8    any, because it doesn't really matter to how I see the

9    case.  The fact is that the evidence that I have

10   considered and will consider in the course of trying the

11   case is the evidence that was presented at trial that

12   was subject to the cross-examination of the parties.  It

13   strikes me that that's the evidence that's important to

14   this case.  And that in addition to that I will consider

15   the defendant's criminal history.

16            But as far as the offense conduct, who said

17   what, when they said it, just -- it's not that important

18   to me.  I mean, I think the bottom line here is the

19   evidence that was presented in trial which led to the

20   conviction and that's -- I mean, that's really the

21   evidence that's before the Court.

22            So your objection's been noted for the

23   record, okay?  Anything else?

24            THE DEFENDANT:  I want to know -- you

25   said -- what did you say about the fatal variance?

1          MR. GOFF:  He's referring now to your order

2    denying the motions, Your Honor.  He's been moved

3    recently to Crookston so we met about that personally

4    today and I showed him a copy through the glass.  I just

5    handed him a copy here at the beginning of the hearing

6    today.  I think that's what he's referring to now rather

7    than the PSI.

8          THE COURT:  I denied the motions.  I believe

9    that there is sufficient evidence in the record to

10   sustain the convictions.

11         THE DEFENDANT:  Right.  So, I mean, when we

12   was going through trial you said:  I will tell you that

13   it is a fatal variance in the drug amount.  Now you

14   ruled against it or what?

15         THE COURT:  I don't understand what you're

16   saying.

17         THE DEFENDANT:  You said there was a fatal

18   variance in the amount of drugs, the weight of the drugs

19   in the Indictment, right, when we was going through

20   trial?

21         THE COURT:  No, I never said there was a

22   fatal variance, did I?  That's not my recollection.

23         THE DEFENDANT:  Yeah, when Marcus Royston

24   brought it up.  You don't remember?

25         THE COURT:  Okay.  If you read what Marcus

1  Royston's argument was, was that there was a fatal
2  variance in the drug quantities.  And there is not a
3  fatal variance in the drug quantities as the whole of
4  the conspiracy is concerned.  I don't understand what
5  you're getting at.  Do you want to tell me exactly --
6  where do you see the fatal variance?  Where's the proof
7  problem specifically?
8              THE DEFENDANT:  I don't have my exact papers
9  here right now, but I don't have them papers with me
10  right now.
11             THE COURT:  I think the evidence is
12  sufficient to sustain the verdicts and I think the
13  evidence is sufficient under the Indictment.  That's
14  what my order said, and I believe that's what the proof
15  will sustain.
16             THE DEFENDANT:  Right, okay.  Well, can you
17  explain this to me, okay?  I was found guilty of 500
18  grams, right?
19             THE COURT:  Right.
20             THE DEFENDANT:  Okay.  Due to the minor's
21  story, Marcus Royston was my supplier, right?
22             THE COURT:  There were in the evidence
23  different routes of supply.
24             THE DEFENDANT:  It was only one supplier
25  that was talked about during trial.  Jake Northern said

1    he didn't get no drugs from Chicago.  He said Marcus

2    Royston put a bowl up on the screen and Marcus Royston

3    was my supplier.  How am I found guilty of 500 grams but

4    not my supplier?

5              THE COURT:  There were other avenues into

6    that conspiracy in the evidence.  I mean, that's the

7    problem.

8              THE DEFENDANT:  I'm saying --

9              THE COURT:  The trips to Chicago.

10             THE DEFENDANT:  Right.  That Jake Northern

11   got on the stand hisself and say he never got any drugs

12   from Chicago.

13             THE COURT:  Mr. Myers, do you wish to

14   address that?

15             MR. MYERS:  Judge, I think the Court's

16   analysis is correct.  There were various trips to

17   Chicago and Minneapolis.  For a time Marcus Royston was

18   a source of supply for the powder cocaine by way of

19   Minneapolis for this organization.  So I think the Court

20   correctly sizes up this conspiracy.

21             THE COURT:  The other thing that's important

22   to note when you look at -- one never creates a variance

23   by looking at the convictions of another defendant, and

24   there's case law that says that a person may be found

25   not guilty or a factual finding not made because the

1   jury may be motivated by -- may be motivated by mercy.

2   And at the end of the day one examines the evidence of

3   each individual defendant on each individual charge to

4   see if it's sufficient, all right?  Because we don't

5   know whose ox is gored, okay?  And that's the -- that's

6   just the legal analysis.

7              THE DEFENDANT:  Right, okay.  But the trip

8   that Herb said supposedly went to Chicago and got drugs,

9   Jake Northern said it never happened.  That was the only

10  trip to Chicago that was mentioned to get drugs.  The

11  only other drugs that was mentioned that Jake Northern

12  testified came from Marcus Royston.  So I don't

13  understand.  Like, how does that go?

14             THE COURT:  Here's really the deal.  I went

15  through the evidence.  I reviewed it.  I looked at the

16  transcript.  I reviewed what I had.  I am convinced that

17  the evidence is sufficient to sustain the convictions.

18  Now you got a problem with that?  You take that up with

19  the Court of Appeals, okay?  You raised it.  I ruled.

20             THE DEFENDANT:  Mm-hmm.

21             THE COURT:  Okay?  Anything else you want to

22  talk about?

23             (Defendant shakes head.)

24             MR. GOFF:  Your Honor, I know that my client

25  wishes to address the Court as to sentencing.  I don't

1   know if there are any other issues that will be

2   appropriate before sentencing.  I'm not sure.  He's

3   asking me, Your Honor, about post-conviction proceedings

4   and I've explained to him that would be later.

5            THE COURT:  The base level of the offense --

6   first of all, I'll receive the Presentence Investigation

7   Report.  I believe I've ruled on all of the objections

8   to it.  The base level of the offense under sentencing

9   guideline 2D1.1 is 34.  That's based on at least 500

10  grams but less than 1.5 kilograms.  There's a four-level

11  upward adjustment under 3B1.1(a) because the defendant

12  was an organizer or leader of a criminal activity that

13  involved five or more participants or was otherwise

14  extensive.  There's a two-level upward adjustment under

15  3B1.4 because the defendant used a person under the age

16  of 18 to assist in the offense or to avoid apprehension

17  for the offense.  That would yield an adjusted offense

18  level of 40.

19            On Count Two the base level of the offense

20  under 2D1.1 is 12.  There's a plus four for an

21  aggravating role adjustment under 3B1.1 for a total

22  adjusted offense level of 16.

23            On Count Three the base level of the offense

24  under 2D1.1 is 16.  There's a plus four under 3B1.1(a)

25  for the leadership role in the offense.  That would

1   yield an adjusted offense level on Count Three of 20.

2           On Count Four the base level of the offense

3   under 2D1.1(c)(14) is 12, plus four under 3B1.1 for role

4   in the offense for an adjusted offense level of 16.

5           Count Five, the base level of the offense

6   under 2D1.1(c)(12) is 16.  There is a plus four under

7   3B1.1(a) for role in the offense for an adjusted offense

8   level of 20.

9           Count Six, distribution of a controlled

10  substance, the base level of the offense is -- under

11  2D1.1 is 16.  There's plus four under 3B1.1(a) for the

12  role in the offenses for an adjusted offense level of

13  20.

14          Count Seven, under 2D1.1 the base level of

15  the offense is 12.  There is a plus four under 3B1.1(a)

16  for role in the offense for an adjusted offense level of

17  16.

18          Count Eight, the base level of the offense

19  under 2D1.1(c)(13) is 14, plus four for the role in the

20  offense under 3B1.1(a) for a total of 18.

21          Count Nine, distribution of a controlled

22  substance, under 2D1.1 the base level of the offense is

23  a 12.  Then there's a plus four upward adjustment for

24  role in the offense under 3B1.1 for an adjusted offense

25  level of 16.

1    Count Ten, distribution of a controlled
2  substance, the base level under 2D1.1 is 18.  There is a
3  plus four under 3B1.1 for role in the offense for an
4  adjusted offense level of 22.
5    Count Eleven, the base level of the offense
6  is 16 under 2D1.1(c)(12).  There is a plus four under
7  3B1.1(a) for role in the offense for an adjusted offense
8  level of 20.
9    Count Twelve, the base level of the offense
10  is a 14 under 2D1.1(c)(13).  There's plus four under
11  3B1.1(a) for role in the offense.  This should yield an
12  adjusted offense level of 18.
13    Count Fourteen, which is the continuing
14  criminal enterprise conviction, under 2D1.5(a)(2) the
15  base level is 38.  There are no adjustments to that and
16  so it would yield an adjusted offense level of 38.
17    The combined offense level, you look at
18  Counts One through Twelve and Fourteen, they're all
19  closely related counts under 3D1.2(d) and under 3D1.3(b)
20  they should be grouped.  Group one has the highest
21  offense total in Count One which has an adjusted offense
22  level of 40.  The defendant is a career offender under
23  4B1.1 as well.  His criminal history score is a total of
24  seven.  Pursuant to 4A1.1(d), two points are added if
25  the defendant committed any part of the offense while

1    under a criminal justice sentence, including probation.

2              In this case the defendant was still under a

3    criminal justice sentence in the following cases during

4    the time frame that he was committing the instant

5    offense:  One, Clay County District Court file No.

6    14-K5-04-001798; Burleigh County District Court file

7    No. 08-K-2699 and Minnehaha County Circuit Court

8    No. 49C03003613.  In addition, there would be two

9    additional points added to the instant offense following

10   release from confinement less than two years under

11   4A1.1(b).  However, if two points are added under

12   4A1.1(d) then only one point may be added under

13   4A1.1(e).  According to Table 5, part A10, the criminal

14   history points would establish a Criminal History

15   Category of V.

16             The recency point -- however, even if the

17   provisions under 4B1.1 career offender subsection (b)

18   have been met, the Criminal History Category in every

19   case shall be Criminal History Category VI and the

20   defendant does meet the criteria.  So he's in Criminal

21   History Category VI.

22             Now if you're in Criminal History

23   Category -- level 40, Criminal History Category VI, it

24   would be 360 to life.  If the Court vacates Count One as

25   a lesser included offense, then the defendant would be

1    sentenced at a level 38 in Criminal History Category VI,

2    which would also yield a sentencing guideline range of

3    360 months to life.  The mandatory minimum sentence on

4    Count One is life and so the sentencing guideline range

5    would be life if the Court does not vacate Count One.

6    The sentencing guideline range, if the Court were to

7    vacate Count One, would be 360 months to life, which is

8    all as clear as mud.  But, as we sit here right now at

9    this moment, the sentencing guideline range is life

10   because right now the defendant's been convicted on both

11   Count One and Count Fourteen.

12           Any objection to the guideline calculation,

13   Mr. Myers?

14           MR. MYERS:  No, in essence I don't, Judge.

15   A couple things.  One on the minimum mandatory, I note

16   that pretrial services found that the racketeering

17   conviction in Clay County would be a prior offense under

18   848, that section.  I don't necessarily agree and I

19   can't stand here and let this proceed without noting

20   this for the Court.  I don't think, under that section,

21   that's a prior conviction.  Racketeering is a similar

22   offense but the way 848 reads it indicates that it needs

23   to be a prior conviction under this section, and the

24   only way you can read that is a prior conviction under

25   the CCE statute.  Otherwise, we could certify any prior

1    felony conviction under 848, which we can't do.

2              And so I think, Judge, on Count Fourteen the

3    minimum mandatory is 20 with a guideline range of 360 to

4    life as the Court noted.

5              THE COURT:  On Count Fourteen it's 20 with

6    360 to life.

7              MR. MYERS:  Correct.

8              THE COURT:  All right.

9              MR. MYERS:  And the only other thing is I

10   believe that if the Court vacates the conspiracy count I

11   still believe that the use of the juvenile can be

12   attributed to the CCE count because it's a distinct

13   enhancement for two levels.  So I think it's 40.  Again

14   it doesn't change the guideline analysis but if the

15   Court vacates that it's going to be a 40 instead of a

16   38.  Again it doesn't change.  That's all I had to note

17   for the record on those issues.

18             THE COURT:  Use of minor under 40 would in

19   fact be a two-level adjustment upward.

20             MR. MYERS:  And typically --

21             THE COURT:  Typically we don't worry about

22   it because it's not part of the deal, and we've got a

23   mandatory life sentence in both counts.  Usually we get

24   to the quantity on the CCE charge.

25             MR. MYERS:  Right.  And usually you don't --

1          THE COURT:  You've got --

2          MR. MYERS:  You know, you'll have the two to

3  four levels enhancement.  Under CCE you don't count

4  those because they're already incorporated.  This is

5  different I believe.  The juvenile should be counted if

6  the Court vacates it.  Again it's a theoretical

7  difference.

8          THE COURT:  Mr. Goff?

9          MR. GOFF:  Your Honor, as I understand that

10 last discussion, it's a theoretical difference because

11 the guideline range on the CCE count is still 360 to

12 life.

13         THE COURT:  It's going to be 360 to life no

14 matter what.  And the question really is:  Is it a base

15 offense level 40 or is it a base offense level 38?  And

16 the range doesn't matter.  The minimum mandatory is

17 less.  It's 20 years and I think the government's

18 analysis is right on that.  And so I think the minimum

19 mandatory on Count Fourteen is 20 years, not 30 years,

20 and that the 30 years to life is the guideline range.

21         MR. GOFF:  With that conclusion, Your Honor,

22 I agree with that analysis.

23         THE COURT:  All right.  So I think what

24 we've got here is that the sentencing guideline range is

25 life on Count One and 360 to life on Count Fourteen and

1    that without any of the sentences being vacated under

2    the grouping we'd then be looking at the guideline range

3    being life.  And the issue will become -- we're going to

4    have to vacate either Count One or Count Fourteen and

5    the question becomes which one?

6              All right.  Mr. Myers, I think whatever

7    objections there are to the guideline calculations have

8    been addressed.  At this point does the United States

9    have a sentence recommendation?

10             MR. MYERS:  We do, Your Honor.  First to

11   start out, Judge, I want to address the Court's

12   questions on which count to sentence the defendant on,

13   either Count One or Count Fourteen.  We, as the Court

14   noted, had difficulty finding really good case law on

15   this particular issue and we would fall back on the

16   principle of the Court should sentence this defendant on

17   the most serious offense that was charged, that being

18   the CCE count even though the conspiracy count carries a

19   greater penalty.  So that would -- we would ask the

20   Court to sentence the defendant on the CCE count.

21             That being said, the case law Rutledge I

22   think itself indicates that should the defendant be

23   successful on appeal on the CCE count the Court of

24   Appeals could vacate that count and reinstitute the

25   CCE -- or the conspiracy count and the sentence that

1    accompanies that particular offense.

2              In looking at our sentencing recommendation

3    here today, Judge, I want to highlight some of the

4    3553(a) factors that the Court has available to it in

5    fashioning a sentence for this particular defendant.

6              First, the serious nature of the offense.

7    Who we have here today is a leader of a continuing

8    criminal enterprise.  This again is the most serious

9    drug offense that can be charged under federal law.  The

10   conduct of this defendant in leading this particular

11   enterprise was arguably the largest and most

12   sophisticated crack cocaine distribution system that

13   we've seen, at least in my tenure here in this office.

14             As part of the enterprise, hundreds if not

15   thousands of offenses were committed in the distribution

16   of these rocks of crack cocaine.  As the Court saw at

17   the trial, this drug was devastating to the users, each

18   rock affecting and changing the life of many people as

19   it affected the user.  It was a fairly sophisticated

20   enterprise over multiple states.  Ferris Lee would drop

21   in a distributor in Sioux Falls or drop in one in Fargo

22   or drop one in particularly in Bismarck where they

23   dropped in a distributor that had issues, pulled him

24   out.  Dropped in another one, pulled him out.  Dropped

25   in another one, all of which was designed simply to

1    insulate Ferris Lee and the upper echelon of this

2    organization from law enforcement detectives.

3              Coupled with that sophistication, you have

4    the use of a juvenile in distributing controlled

5    substances.  And undoubtedly Mr. Goff will talk about

6    the count he was acquitted on but the jury found beyond

7    a reasonable doubt that Lloyd Johnson was used as part

8    of this particular enterprise.  The evidence bore that

9    out.  Mr. Johnson was a significant marijuana and crack

10   cocaine distributor for the organization.

11             Ferris Lee's method of operation could be

12   best described as simply using people to make money for

13   himself.  He used people at every turn.  Tambi Bishop,

14   used her place, used her in exchange for crack cocaine.

15   His girlfriend, Shaina Sjostrand, again used her.  James

16   Randall, took what virtually could be described as a

17   life savings from him as part of the distribution and

18   used all these people as he put them into places to

19   distribute.

20             When you look at the scope of the

21   supervision, I counted this morning about 11 people that

22   the jury found beyond a reasonable doubt that Ferris Lee

23   supervised during the course of this enterprise.  That's

24   twice as many that we have to prove in the elements.  As

25   the Court knows, we have to prove five.  There were 11,

1    again including a juvenile.  Significant and

2    sophisticated was this particular organization.

3              You look at the history and characteristics

4    of this defendant, he's a career offender, two prior

5    felony drug convictions, one a racketeering in Clay

6    County.  And I think the Court noted this when analyzing

7    the 404(b) evidence at the trial.  You know, one can

8    look at the crime of racketeering and then ascribe it a

9    very significant offense.  And when you look at the

10   underlying charging documents I agree with the Court's

11   analysis that it was technically racketeering under

12   Minnesota law, but they were engaged in a similar

13   activity in the distribution of cocaine and crack

14   cocaine in the Clay County case.

15             What's significant about that offense,

16   Judge, is the defendant was convicted of racketeering,

17   served a relatively short sentence and does he change

18   direction in his life?  No.  Does he stop dealing

19   controlled substances?  No.  Does he stop dealing crack

20   cocaine?  No.  What does he do?  He rises to the level

21   of the leader of an organization doing the same thing.

22             That's the significance of that conviction

23   when you analyze the history and characteristics of this

24   defendant particularly when the Court is fashioning a

25   sentence that is designed to promote respect for the

law.  When somebody is convicted of a racketeering offense, gets out after a relatively short sentence, the next sentence should be designed to promote respect for the law.

We look at deterrence, specific and general, of course.  This defendant has been previously convicted on felony-level drug trafficking crimes on two occasions.  It's hard to see what the future might hold; although, I note from the Presentence there was a fight in the jail with Mr. Royston leading up to sentencing in this case.  So there is a need for specific deterrence. And obviously with the leader of these organizations general deterrence is of paramount importance in these cases.

Finally, Judge, in analyzing a sentence that is fair and just, we look at the issue of just punishment.  And here's where this sentence, and I think the Court noted this at the outset, makes this sentencing more difficult for all the parties, including the Court, in fashioning a just sentence.

First I want to look outside the conspiracy at other CCE defendants, and the only one that I could find that was even similarly situated was Michael Sanmiguel.  Not a monstrous organization but significant distributors, significant drugs amounts.  This is a guy

who had a guideline range of 292 to 365 and then lost

acceptance because of the new crime and the Court

sentenced him to 360 months.  Similar criminal history

absent a racketeering conviction.

Then you have within this particular

conspiracy Marcus Royston, who will -- later today based

on the minimum mandatory will likely receive a life

sentence based on the statute.  Marcus Royston's role in

this particular offense was as a supervisor much less.

His culpability in our view, much less; albeit, he was a

source of supply for powder cocaine for a time frame.

At the end at least when narcotics agents are buying

drugs Marcus Royston's then working for Ferris Lee, and

so there's a switch in the structure which often happens

in these conspiracies.  But the thing that remained

constant during the course of this whole conspiracy is

that Ferris Lee was the leader, period.

So we have the issue of unwarranted

sentencing disparity within this conspiracy case.  So

how does the Court fashion a sentence to meet the goals

of this particular statute and fashion a sentence that

is just?  Judge, the guideline range that the Court has

articulated and that Congress has indicated is 360 to

life.  That meaning a sentence anywhere between 360 to

life is an appropriate sentence for this particular

1    offense.

2            Your Honor, it is our recommendation here

3    today that you sentence Mr. Lee to life in prison for

4    his role in this particular case and the factors under

5    3553(a) that we have articulated.  We believe it's a

6    fair and just punishment for this particular conduct.

7    Thank you.

8            THE COURT:  Mr. Goff?

9            MR. GOFF:  Thank you, Your Honor.  At the

10   outset let me state where I think Mr. Myers and I agree,

11   and that is that I recommend also the Court sentence my

12   client on the continuing criminal enterprise, Count

13   Fourteen, and vacate Count One, the conspiracy.  From

14   there I don't think we'll agree on much.

15           This is described by counsel as the largest

16   and most sophisticated crack cocaine conspiracy or

17   enterprise that he has seen here.  One thing I'd like to

18   draw the Court's attention to is the actual quantity of

19   substance that was ever seized in this investigation and

20   acknowledged at the trial in this case.  I didn't bring

21   my notes with the exact amount but it was not a large --

22   we're talking around 20 grams or something of actual

23   substance that they seized.

24           Now I recognize the testimonial evidence and

25   the witnesses and the trips to Chicago back and forth,

1    various people.  I recognize all that in term of the

2    evidence supporting the verdicts, Your Honor, but I

3    really would be reluctant and reticent to acknowledge or

4    agree that this was one of the most significant or

5    sophisticated organizations that this district has seen.

6              To say that my client used people, you know,

7    the people that were involved in this organization, the

8    people that were involved in this activity, had to make

9    choices on their own.  My client, as the evidence

10   presented, was a person who was involved in various

11   locations: the Fargo, Bismarck, Sioux Falls, South

12   Dakota locations.  No question that acknowledging the

13   facts in support of the convictions, but the people that

14   were involved in this thing, Your Honor, they made

15   choices of their own.  They got involved in these

16   matters on their own.  Those that used crack cocaine

17   made that choice on their own.  That has to stand for

18   something.  My client didn't hold a handle over

19   anybody's head.  There's no indication, no allegation,

20   no claim of violence on his part in anything having to

21   do with the evidence in this case at all.

22             He has a history of criminal activity.

23   That's obvious.  And it's been in a relatively short

24   period of time, as he's only about 26 years old, Your

25   Honor, much of it dealing with crack cocaine, cocaine

1  base.  And he needs to be deterred from that.  I will

2  acknowledge that and agree with Mr. Myers about that.

3  But what is enough?

4         I appreciate the recognition that the CCE

5  charge is the appropriate one to ask the Court to

6  sentence him on which, as we've discussed at length, the

7  Court has already today, that that leaves the guideline

8  range of 360 months to life.  What's the right amount?

9  I would submit to the Court that there should be some

10 light at the end of that tunnel for a man that's 26

11 years old who needs to be -- needs to revisit the

12 decisions that he's made in his life.  But there's no

13 reason to believe that he can't at some point recognize

14 that, accept that, take responsibility for that and

15 change any future behavior and conduct.  He has a good

16 support system.  Why that hasn't been enough in the past

17 I don't know.  None of us can know.  But they're here

18 again today trying to do what they can to support him.

19        Specific deterrence?  Yeah, I guess that's

20 what I've addressed.  General deterrence?  It's very,

21 very important.  But when is 30 years not enough general

22 deterrence?  Not very often in my opinion that it's not

23 enough general deterrence.  Is it 30 years?  Is it 40

24 years?  I would ask the Court to consider that 360-month

25 sentence for him on Count Fourteen and the other Counts

1    Two through Twelve would follow suit.  I'd ask the Court
2    to impose those concurrently.  It gives my client an
3    opportunity to enter whatever facility he finds himself
4    in with the recognition that if I behave, if I learn, if
5    I change, I can see something down the road where I can
6    have a life, something near my age I suppose when he
7    gets out if the Court were to accept that type of a
8    sentence.  I just think that's enough, Your Honor.  I
9    recognize all of the evidence in this case.  I recognize
10   all of the people that have been affected here.  But
11   that's a long time and not just a long time, I think
12   it's enough.
13            The disparity between he and Mr. Royston,
14   you know, the government probably had a choice in
15   indicting for both conspiracy and CCE, but we're left
16   with that situation.  Mr. Royston, I think, has to take
17   responsibility and the consequences for his actions, for
18   his involvement.  Whether it changed to become a
19   supervisor and then working underneath somebody else, I
20   can't change that.  I can't fix that.  We're only
21   dealing here with Mr. Ferris Lee, his life, the facts of
22   this case and the offenses and sentencing alternatives
23   that this Court has.  I'd ask the Court to sentence him
24   to 360 months.
25            THE COURT:  Mr. Myers?

1          MR. MYERS:  Just briefly, Judge.  I want to
2  highlight the comments on the drug quantity.  I think as
3  articulated in the Presentence Report there was around
4  718 grams of crack cocaine.  That's an enormous amount
5  of crack cocaine.  When you even look at the new
6  calculations under the Fair Sentencing Act, that's two
7  and a half times the 10-year minimum threshold level.
8  That's an enormous amount of crack cocaine when you
9  consider the dosage units, the small quantities that
10  crack cocaine is sold in.  That's the business, selling
11  as small a rock as you can for the greatest amount of
12  profit.  And so that's a large amount of crack cocaine.
13          Secondly, Mr. Goff is right.  The people
14  that entered into this conspiracy all made choices.  But
15  when you talk about a leader and qualities of a good
16  leader, whether it be for bad purposes or good purposes,
17  that leader is successful when they persuade people to
18  make decisions in furtherance of the goal of that
19  organization or team or what have you.  And that's what
20  Ferris Lee did.  That's what he did.  And that's what
21  he's getting punished for relating to the CCE.
22          And it is an irony in this case that had he
23  been just convicted of the conspiracy he would have
24  gotten a mandatory life.  And, true, we did have a
25  choice to charge this case out and we did charge it the

1  appropriate way, charging Mr. Lee with the most serious

2  offense based upon his conduct.

3            That being said, guidelines and the law

4  allow this Court to sentence him up to life in prison

5  and that's what we're asking.  Thank you.

6            THE COURT:  Mr. Goff, anything further from

7  you?

8            MR. GOFF:  I don't, Your Honor, but I know

9  my client wants to address the Court.

10            THE COURT:  Mr. Lee, you have the right to

11  address the Court.  Anything you say I will consider in

12  sentencing.

13            THE DEFENDANT:  Okay.  Well, he was talking

14  about a large-scale drug organization.  For them to be

15  saying they investigated -- had me under investigation

16  for two years and really to my recollection in the

17  Indictment there was, what, 13 grams of controlled

18  substance sales.  When the laboratory people came in

19  here they said that it would have been much lesser

20  because it was a mixture or some of the drugs were fake.

21  I don't know if -- like, what large-scale drug

22  organization sells fake drugs or things like that?  And

23  the people that, like, testified to these drugs, these

24  were people that was trying to get theirselves out of

25  situations and lying.

1          Now from trial statements Jake Northern

2    specifically told the Court that he was the president

3    and Tara Bauer was the vice-president.  So if a man

4    admits hisself that he was the president, where does

5    that put me at?  I think the only reason why I was

6    charged with continuing criminal enterprise was because

7    Jake Northern decided to cooperate with law enforcement.

8          Now this whole point about he's saying that

9    I used people and I used force or whatever, first of

10   all, it ain't nothing proven that these people said that

11   they worked for me.  Who actually got on the stand and

12   said that they worked for me?  I was in trial.  I didn't

13   hear none of that.

14          The second part is he said that on the CCE

15   he said I received -- I guess received most of the

16   profits.  There wasn't a dollar in the evidence box

17   through this whole trial.  I don't have no house.  I

18   don't have no car.  I don't have nothing.  So where am I

19   getting all -- where was all this money at that I

20   supposedly got from this so-called organization?

21          Another thing, he's saying Lloyd Johnson was

22   a minor.  I got acquitted on that so how can we use that

23   to -- as an aggravating factor?  What else was I going

24   to say?  That's really all.  I'm just -- it's just -- I

25   don't see like where there was no evidence to prove that

I was a CCE leader of the organization and he's saying
that I used people and all these people worked for me.
I don't see how it was proven that these people worked
for me.  And he said it was 718 grams at trial.  Like my
lawyer said, it was only 13.  Then they added another 11
grams from somebody that they say that the CI said that
the person that he got the drugs from said that he got
them from me.  Now if that person would have said that
he got the drugs from me, I'm quite sure that they would
have had him testify in trial to that.

Now the person -- Cavelle Smallwood, he said
he knew me but he said he met me and I was incarcerated.
When he said he met me I was incarcerated so I don't see
how that could hold any weight.  The rest of the grams
that he calculated was all hearsay.  It wasn't like
no -- like I could see, okay, they caught somebody with
four ounces or even two ounces.  Okay, that's probable
cause to say, okay, maybe then they can get 718 grams.
You caught somebody altogether in the conspiracy, well
you didn't catch nobody.  You conduct controlled buys
for 18 grand.  For a big-scale organization that's all
you could do is 13 grams and you been watching them for
two years?  That's a waste of the taxpayers' money.  You
scheduling buys for -- you paying $1,800 for a buy and
you get one gram, 1.3 grams and you trying to say these

1   people was big organized drug crimes?  I mean, I see on

2   the news every day big organized drug crimes that get

3   caught with 20,000, 20 bricks of cocaine, hundred

4   thousands of dollars, cribs everywhere, cars.  I don't

5   have none of that, none of that, Your Honor.  It just --

6   it don't make no sense to me.

7           THE COURT:  The Court has considered the

8   sentencing statute, including the mandatory minimum

9   sentences that apply.  The Court is required by law to

10   impose a sentence not greater than necessary but

11   sufficient to comply with the purposes set forth in the

12   statute, which is found at 18, United States Code,

13   Section 3553.

14           We turn first to the nature and

15   circumstances of the offense.  I would agree with the

16   government's characterization that this is a relatively

17   sophisticated operation that takes place over a period

18   of time and takes place over a rather large geographic

19   sweep.  There's evidence that activity was conducted in

20   Minnesota, North Dakota, South Dakota and ties into

21   Illinois.  The organization existed for a period of some

22   time, and there were repeated crimes committed during

23   the time that the organization was in existence.  It's a

24   significant drug conspiracy in both its scope and its

25   length.

1           We look to the history and characteristics

2     of the defendant.  The defendant has obviously a

3     significant criminal history.  He is a career offender,

4     which obviously is something this Court takes into

5     consideration.  I am particularly troubled with the fact

6     that the defendant had a conviction previously for

7     racketeering and within a relatively short period of

8     time following his release he was engaged in exactly the

9     same activities and conduct.  And that's a factor that

10    the Court takes into consideration.

11          The sentence needs to reflect the

12    seriousness of the offense, promote respect for the law

13    and provide just punishment.  Any of the sentences that

14    we're talking about here would reflect that this is a

15    serious drug crime and they would promote respect for

16    the law and provide just punishment.

17          We want to afford adequate deterrence to

18    criminal conduct.  That's specific deterrence.  You

19    know, this defendant's past would indicate that he's had

20    some difficulty living a law-abiding lifestyle.  It

21    seems to me that he has not learned very quickly from

22    his previous mistakes.  I believe that he does pose a

23    continuing risk to the -- to criminal conduct.

24          When we look at the next, which is general

25    deterrence, providing adequate deterrence to criminal

1    conduct generally, the important thing in the continuing

2    criminal enterprise convictions is that the sentences be

3    imposed to deter others from really engaging in sort of

4    sophisticated criminal behavior involving the management

5    of more people.  And I think that that's a factor the

6    Court needs to take into consideration.

7              Providing the defendant with needed

8    educational, vocational training, medical care or other

9    correctional treatment, doesn't appear to be a lot of

10   basis for that in this particular sentence.

11             When we turn to the kinds of punishments

12   available, we look to the statutes relating to

13   sentencing.  This is a presumptive imprisonment case and

14   Congress of the United States has elected to impose

15   mandatory minimums that are significant in a number of

16   the counts with a mandatory life sentence on Count One.

17             It is, therefore, the order of the Court on

18   Count One that the defendant be committed to the care,

19   custody and control of the United States Department of

20   Justice for a period of life; that following that life

21   sentence he be placed on supervised release for a period

22   of five years on the standard terms and conditions.  And

23   there will be additional terms and conditions that will

24   apply:

25             One, that the defendant totally abstain from

1  the use of alcohol and/or illegal drugs or the

2  possession of a controlled substance as defined in 21,

3  United States Code, Section 802 or any state statute,

4  unless it's prescribed by a licensed medical

5  practitioner as well as prohibition of the use of

6  inhalants.  The defendant shall submit to drug and

7  alcohol screening at the direction of the probation

8  officer to verify compliance.  Failure or refusal to

9  submit to testing can result in a mandatory revocation.

10 Tampering with the collection process or specimen may be

11 considered the same as a positive test result.

12          Three, the defendant will participate in a

13 treatment program for alcohol and drug abuse as provided

14 by his -- as approved by his supervising officer.

15          Four, the defendant shall submit his person,

16 residence, workplace, vehicle, computer and/or

17 possessions to a search conducted by the United States

18 probation officer based upon evidence of a violation of

19 any condition of supervision.  Failure to submit to

20 search may be grounds for revocation, additional

21 criminal charges and arrest.  The defendant shall notify

22 any other residents that the premises may be subject to

23 searches pursuant to this condition.

24          There is no identifiable victim requiring

25 restitution.  The mandatory drug testing provisions of

1  18, United States Code, Section 3563(a)(5) apply and the

2  defendant's placed on notice of the same.

3          The Court will not order a denial of federal

4  benefits in the case.  The special assessment of $100 is

5  due and payable immediately through the clerk of

6  district court.

7          The DNA Analysis Backlog Elimination Act of

8  2000 and the Justice for All Act of 2004 require the

9  defendant to submit to a DNA specimen as directed by his

10  supervising officer.  The Court will order him to

11  cooperate in the collection of that specimen.

12          On Counts Two, Seven and Nine, the Court

13  imposes a sentence of 46 months to run concurrent with

14  each other and to run concurrent with the life sentence,

15  followed by five years of supervised release on the same

16  terms and conditions as were previously stated.

17          On Counts Three, Five, Seven and Eleven, the

18  defendant is ordered to serve in the care, custody and

19  control of the United States Department of Justice 70

20  months to run concurrent with all other counts; five

21  years of supervised release on the same terms and

22  conditions.

23          On Counts Eight and Twelve, the Court orders

24  the defendant to serve 57 months concurrent, five years'

25  supervised release on the same terms and conditions.

1          On Count Ten the Court orders the defendant
2    to serve 84 months concurrent with five years of
3    supervised release on the same conditions.
4          And that leads us to Count Fourteen.  There
5    are a couple of items that I would note for this
6    particular count.  The Court is concerned about
7    sentencing disparity that would arise from a sentence of
8    less than life on Count Fourteen as it appears that this
9    defendant is more culpable than Mr. Royston, and it does
10   appear to be that way from all the evidence.  And
11   ordinarily at that point I really would just impose a
12   life sentence and never look back.
13         But I have some concerns because I don't
14   have a crystal ball and I don't know what's going to
15   happen out in the future.  I do know that we are in a
16   period of time where we have a large number of people
17   incarcerated and the population in prison is growing.
18   And I suspect that at some point either an expansion of
19   the president's commutation powers or exercise of his
20   commutation powers to reduce people to sentences of time
21   served or a reinstatement of some parole system is
22   likely.
23         I also am concerned that in the final
24   analysis if that happens it's unlikely that continuing
25   criminal enterprise convictions would be included in any

1  systematic review of sentences.  And I don't think that

2  the defendant's conduct is so different than

3  Mr. Royston's conduct that that opportunity ought to be

4  foreclosed.  And, like I said, I don't have a crystal

5  ball.  I don't know what the right answer is.

6           At the end it strikes me that we can only do

7  justice in one case one at a time and, frankly, if you

8  look at people who have served life sentences out of

9  this Court generally the drug quantities have been

10  larger and generally the -- there's been greater risk of

11  violence than what appeared to exist in this case.

12           Under those circumstances it's the order of

13  the Court, on Count Fourteen, that the defendant be

14  committed to the care, custody and control of the United

15  States Department of Justice for a period of 540 months,

16  that following that sentence he be placed on supervised

17  release for a period of five years on the same terms and

18  conditions, which means that the defendant will be

19  eligible for release if he stays out of trouble while in

20  custody sometime in his mid '60s.

21           You have the right to appeal the judgment of

22  this Court.  Any appeal -- oh, by the way, the total

23  amount of the special assessment will be $1,200.  The

24  Court will order the vacation of the sentence on

25  Count One and do so on the basis of double jeopardy

1  grounds, that the lesser included offense should be

2  removed.

3          MR. MYERS:  Just a clerical correction,

4  Judge.  I think the Court said, when you talked about

5  Counts Three, Five and Eleven, a 70-month sentence.  I

6  think the Court said Count Seven again.

7          THE COURT:  Oh, did I say seven twice?  I

8  shouldn't have.

9          MR. GOFF:  Yes.

10          THE COURT:  Sorry.  The second time was in

11  error.

12          MR. MYERS:  Is that referring to Counts,

13  Three, Five, Six and Eleven?

14          THE COURT:  Yeah.  Let me take a look just

15  to make sure.  It's Three, Five, Six and Eleven are 70

16  months.  And Two, Four, Seven are 46 months.  And Eight

17  and Twelve are 57 months.  And Ten is 84 months.  And

18  540 months on Count Fourteen, all sentences to run

19  concurrent with each other.

20          MR. GOFF:  Is there a Nine in there?

21          THE COURT:  Did I miss Nine?  Nine is 46

22  months so that should be with Two, Four, Seven and Nine.

23          MR. GOFF:  Okay.  Your Honor, just if I

24  might add, as far as the appeal, my client and I have

25  discussed that and I will be filing a Notice of Appeal

1    on his behalf in the next several days.  He and I have

2    discussed the Fair Sentencing Act recently enacted by

3    Congress and signed by the president, and we discussed

4    the applicability.  It hasn't been raised here today but

5    I think it's not applicable.  It's not retroactive and I

6    just want to make sure that the record is clear.

7              THE COURT:  Right.  I addressed that in my

8    opinion briefly.  I don't know if I did it in just

9    Mr. Forest's case or all of them.  The reality of it is

10   that specifically the act provides that it's not

11   retroactive.  The guidelines may in fact provide for it

12   to be retroactive.  We won't know that until the

13   guideline amendments come out in November, but they

14   can't affect any mandatory minimum sentence and so

15   that's what we know.  At this point I've imposed the

16   sentence based on what law's applicable here today.

17             MR. GOFF:  And one final item before I

18   forget.  If possible, my client would like a

19   recommendation that he be housed somewhere as close as

20   possible to his family in the Chicago, Illinois area.

21             THE COURT:  The Court will make that as its

22   first recommendation.  The second recommendation is that

23   he be allowed to participate in the RDAP program and if

24   there's any benefit to inure through successful

25   completion of the program that he afforded that

1    opportunity.

2              Like I said, you have 10 days to appeal the

3    verdict of this Court -- or the judgment of this Court.

4    Any appeal, if taken, must be perfected as provided by

5    law.  Your lawyer can explain to you what you need to do

6    to do that.

7              Anything further from the United States?

8              MR. MYERS:  No, Your Honor.

9              THE COURT:  From the defense?

10             MR. GOFF:  We probably don't need to mention

11   it, but he'll get credit for time served as well?

12             THE COURT:  Yes.

13             MR. GOFF:  Okay.  Thank you.  That's all I

14   have.

15             (Concluded at 12:20 p.m.)

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

1    
2              I, Kelly A. Kroke, a duly appointed

3    Registered Professional Reporter;

4              DO HEREBY CERTIFY that I reported in

5    shorthand the foregoing proceedings had and made a

6    record at the time and place indicated.

7              I DO HEREBY FURTHER CERTIFY that the

8    foregoing and attached (46) typewritten pages contain an

9    accurate transcript of my shorthand notes then and there

10   taken.

11             Dated this 16th day of January, 2011.

12

13

14

15

16

17                   /s/ Kelly A. Kroke
                     KELLY A. KROKE - RPR, RMR
18                   United States District Court Reporter
                     District of North Dakota
19                   Southeastern Division

20

21

22

23

24

25